# 13-1785-bk

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

IRVING H. PICARD, TRUSTEE FOR THE SUBSTANTIVELY CONSOLIDATED
SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC
AND THE ESTATE OF BERNARD L. MADOFF,

*Plaintiff-Appellant,*

—against—

ERIC T. SCHNEIDERMAN, BART M. SCHWARTZ, RALPH C. DAWSON,
J. EZRA MERKIN, GABRIEL CAPITAL CORPORATION,

*Defendants-Appellees,*

SECURITIES INVESTOR PROTECTION CORPORATION,
STATUTORY INTERVENOR PURSUANT TO SECURITIES INVESTOR
PROTECTION ACT, 15 U.S.C. § 78eee(d),

*Intervenor.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF FOR PLAINTIFF-APPELLANT IRVING H. PICARD,
AS TRUSTEE FOR THE SUBSTANTIVELY CONSOLIDATED SIPA
LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES
AND THE ESTATE OF BERNARD L. MADOFF
[REDACTED]**

---

DAVID B. RIVKIN, JR., ESQ.
LEE A. CASEY, ESQ.
MARK W. DELAQUIL, ESQ.
ANDREW M. GROSSMAN, ESQ.
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 861-1500

DAVID J. SHEEHAN, ESQ.
DEBORAH H. RENNER, ESQ.
TRACY L. COLE, ESQ.
KEITH R. MURPHY, ESQ.
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200

*Attorneys for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, undersigned counsel for the Appellant Irving H. Picard, as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC and the substantively consolidated estate of Bernard L. Madoff ("Trustee"), hereby certifies that the Appellant has no parent corporation and that no publicly held corporation holds 10 percent or more of its stock.

/s/    David J. Sheehan
David J. Sheehan

# TABLE OF CONTENTS

**Page**

GLOSSARY ...................................................................................... xi

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT .................................................. 3

STATEMENT OF ISSUES ............................................................... 4

STATEMENT OF THE CASE ......................................................... 6

      A.    The Securities Investor Protection Act ......................... 7

      B.    The Madoff Fraud and the Recovery Effort ................. 8

      C.    The Trustee's Recovery Action Against the
           Merkin Defendants ...................................................... 10

      D.    The Third Party Actions ............................................. 13

           1.    The NYAG Action ............................................... 13

           2.    The Schwartz Action ......................................... 16

      E.    The Trustee Asserts the BLMIS Estate's Interest
           in Merkin's Assets and Participates in "Global"
           Settlement Negotiations .............................................. 18

      F.    The Settlement Dissipates the Same Assets
           Sought by the Trustee ................................................ 20

      G.    The District Court Denies the Trustee's Request
           To Enjoin the Settlement Pending Resolution of
           His Recovery Action Against Merkin ......................... 23

SUMMARY OF ARGUMENT ....................................................... 26

STANDARD OF REVIEW ............................................................. 30

ARGUMENT .................................................................................. 31

   I.    The District Court Erred in Holding That a Section 105
       Injunction Was Legally Unavailable ................................... 31

      A.    A Section 105 Injunction Is Appropriate To
           Prevent the Settlement from Impeding the
           Liquidation of BLMIS ................................................ 31

# TABLE OF CONTENTS
(continued)

**Page**

B.     The Settlement Will Have Adverse Economic Consequences By Diminishing the Recovery Available to All Victims ................................................. 35

C.     The District Court Erred in Denying an Injunction ..................................................... 38

     1.     The District Court Misconstrued the Standard for a Section 105 Injunction .............. 39

     2.     Dollar-for-Dollar Accounting Is Not Necessary To Recover Fraudulently Transferred Property ......................................... 42

II.     The Settlement Is Inconsistent with SIPA ........................... 45

A.     SIPA Establishes a Comprehensive Remedial Scheme To Protect "Customers" of Failed Brokerages by Returning Their "Customer Property" .................................................... 46

B.     To the Extent They Conflict, SIPA Preempts the NYAG's and Receivers' State Law Claims ................. 50

III.     The Settlement Violates the Automatic Stay ...................... 56

IV.     The Trustee's Injunction Action Is Not Barred by Laches ...................................................................... 61

A.     The District Court's Application of Laches to the Trustee's Section 105 Claim Was *Per Se* Abuse of Discretion .................................................... 63

B.     The District Court's Application of Laches to the Trustee's Section 105 Claim Cannot Be Supported .................................................... 64

C.     Notice and Negotiation Bar Laches ........................... 66

D.     Laches Does Not Apply to Enforcement of the Automatic Stay .......................................... 69

CONCLUSION ....................................................... 71

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.),*
835 F.2d 427 (2d Cir. 1987) .................................................................. 59

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
960 F.2d 1020 (Fed. Cir. 1992) ........................................................... 68

*ACandS, Inc. v. Travelers Cas. & Sur. Co.,*
435 F.3d 252 (3d Cir. 2006) ........................................................... 69, 70

*In re Adelphia Commc'ns Corp.,*
298 B.R. 49 (S.D.N.Y. 2003) ............................................................... 41

*Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I (In re Beacon Assocs. Litig.),*
No. 09-6910 (S.D.N.Y. May 15, 2013) ................................................ 55

*In re Becker,*
407 F.3d 89 (2d Cir. 2005) .................................................................. 61

*In re Bernard L. Madoff Inv. Secs. LLC,*
654 F.3d 229 (2d Cir. 2011) ............................................................... 10

*Brown v. Armstrong,*
949 F.2d 1007 (8th Cir. 1991) ............................................................ 60

*In re Bullion Reserve of N. Am.,*
836 F.2d 1214 (9th Cir. 1988) ............................................................ 37

*California v. ARC Am. Corp.,*
490 U.S. 93 (1989) ......................................................................... 51, 53

*Casse v. Key Bank N.A. (In re Casse),*
198 F.3d 327 (2d Cir. 1999) ............................................................... 41

*In re Commonwealth Oil Ref. Co., Inc.,*
805 F.2d 1175 (5th Cir. 1986) ............................................................ 56

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Connecticut v. Physicians Health Services,*
   287 F.3d 110 (2d Cir. 2002) ............................................................. 56

*Cuomo v. Merkin,*
   Index No. 450879/2009 (N.Y. Sup. Ct. May 28, 2009)............ 14, 36, 43

*E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank, Bennington,*
   236 F.3d 117 (2d Cir. 2001) ............................................................. 48

*E. Refractories Co. Inc. v. Forty Eight Insulations Inc.,*
   157 F.3d 169 (2d Cir. 1998) ............................................................. 70

*EEOC v. Local 638,*
   753 F.2d 1172 (2d Cir. 1985), *aff'd, Local 28 v. EEOC,* 478 U.S.
   421 (1986) ....................................................................................... 67

*FDIC v. Hirsch (In re Colonial Realty Co.),*
   980 F.2d 125 (2d Cir. 1992) .................................................. 57, 58, 61

*Fisher v. Apostolou,*
   155 F.3d 876 (7th Cir. 1998)............................................................. 34

*Fox v. Picard (In re Bernard L. Madoff),*
   848 F. Supp. 2d 469 (S.D.N.Y. 2012)................................................ 61

*Garrity v. Leffler (In re Neuman),*
   71 B.R. 567 (S.D.N.Y. 1987) ............................................................. 41

*Gonzalez Hernandez v. Borgos,*
   343 F.2d 802 (1st Cir. 1965) ............................................................. 34

*Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.,*
   219 F.3d 104 (2d Cir. 2000) ............................................................. 30

*Hsu by and through Hsu v. Roslyn Union Free Sch. Dist. No. 3,*
   85 F.3d 839 (2d Cir. 1996) ............................................................... 41

*Hutton Constr. Co., Inc. v. Cnty. of Rockland,*
   52 F.3d 1191 (2d Cir. 1995) ............................................................. 67

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Serv.s, Inc.)*,
  408 F.3d 689 (11th Cir. 2005) .............................................................. 44

*In re Ira Haupt & Co.*,
  287 F. Supp. 318 (S.D.N.Y. 1968) ....................................................... 50

*In re Ira Haupt & Co.*,
  361 F.2d 164 (2d Cir. 1966) ................................................................ 49

*Ivani Contracting Corp. v. City of New York*,
  103 F.3d 257 (2d Cir. 1997) ................................................................ 30

*Lautenberg Found. v. Picard (In re Bernard L. Madoff Inv. Secs.,
  LLC)*,
  No. 11-5421, 2013 WL 616269 (2d Cir. Feb. 20, 2013) .............. *passim*

*LTV Steel Co., Inc. v. Bd. of Educ. (In re Chateaugay Corp.)*,
  93 B.R. 26 (S.D.N.Y. 1988) ................................................................. 41

*MacArthur Co. v. Johns-Manville Corp.*,
  837 F.2d 89 (2d Cir. 1988) .................................................................. 32

*Madeira v. Affordable Hous. Found., Inc.*,
  469 F.3d 219 (2d Cir. 2006) ................................................................ 55

*Megliola v. Maxwell*,
  293 B.R. 443 (N.D. Ill. 2003) .............................................................. 34

*Mittendorf v. J. R. Williston & Beane Inc.*,
  372 F. Supp. 821 (S.D.N.Y. 1974) ....................................................... 49

*Mogavero v. McLucas*,
  543 F.2d 1081 (4th Cir. 1976) ............................................................. 68

*New York v. 11 Cornwell Co.*,
  695 F.2d 34 (2d. Cir. 1982) ................................................................. 56

*NML Capital v. Republic of Argentina*,
  699 F.3d 246 (2d Cir. 2012) ................................................................ 67

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*O'Donnell v. Royal Bus. Group, Inc. (In re Oxford Homes, Inc.),*
180 B.R. 1 (Bankr. D. Me. 1995) .......................................................... 33

*Ostano Commerzanstalt v. Telewide Sys., Inc.,*
790 F.2d 206 (2d Cir. 1986) .................................................................. 69

*Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc. (In
re Palmdale Hills Prop., LLC),*
654 F.3d 868 (9th Cir. 2011) .................................................................. 30

*Perez v. Danbury Hosp.,*
347 F.3d 419 (2d Cir. 2003) .................................................................. 30

*Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co.,
Inc.),*
676 F.3d 45 (2d Cir. 2012) .................................................................... 32

*Picard v. Charles Ellerin Revocable Trust* (*In re Bernard L.
Madoff Inv. Secs. LLC*),
Case No. 10-4095, 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14,
2012) ........................................................................................... 43, 44

*Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC),*
440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..................................... 13, 42, 43

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic,*
314 F.3d 62 (2d Cir. 2002) .................................................................... 66

*Publicker Indus. Inc. v. United States (In re Cuyahoga Equip.
Corp.),*
980 F.2d 110 (2d Cir. 1992) .................................................................. 34

*Queenie, Ltd. v. Nygard Int'l,*
321 F.3d 282 (2d Cir. 2003) ............................................................ 32, 39

*Reliant Energy Servs., Inc. v. Enron Canada Corp.,*
349 F.3d 816 (5th Cir. 2003) ................................................................. 30

*Republic of Philippines v. Marcos,*
806 F.2d 344 (2d Cir. 1986) ............................................................ 32, 40

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) .......................................................... 40

*Rothensies v. Elec. Storage Battery Co.*,
  329 U.S. 296 (1946) ............................................................................ 61

*In re Saunders*,
  101 B.R. 303 (N.D. Fla. 1989) ...................................................... 57, 58

*Schwartz v. Merkin*,
  Index No. 651516/2010 (N.Y. Sup. Ct. July 19, 2012) ........................ 17

*SEC v. Brennan*,
  230 F.3d 65 (2d Cir. 2000) ...................................................... 55, 60, 61

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
  454 B.R. 285 (Bankr. S.D.N.Y. 2011) ................................................. 37

*Shimer v. Fugazy (In re Fugazy Express, Inc.)*,
  982 F.2d 769 (2d Cir. 1992) ................................................................ 69

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
  379 B.R. 5 (Bankr. E.D.N.Y. 2007) ..................................................... 45

*Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.)*,
  108 F.3d 881 (8th Cir. 1997) ............................................................... 60

*Stone v. Williams*,
  873 F.2d 620 (2d Cir.), *vacated on reh'g on other grounds*, 891
  F.2d 401 (2d Cir. 1989) ...................................................................... 68

*Sykes v. Anderson*,
  625 F.3d 294 (6th Cir. 2010) ............................................................... 64

*In re Tampa Chain Co., Inc.*,
  835 F.2d 54 (2d Cir. 1987) .................................................................. 69

*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*,
  660 F.3d 643 (2d Cir. 2011) ............................................................... 30

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Colasuonno*,
   697 F.3d 164 (2d Cir. 2012) .............................................................. 30

*United States v. Dwyer*,
   539 F.2d 924 (2d Cir. 1976) .............................................................. 64

*United States v. Henshaw*,
   388 F.3d 738 (10th Cir. 2004).......................................................... 44

*United States v. Oddo*,
   314 F.2d 115 (2d Cir. 1963) .............................................................. 66

*Unsecured Creditors' Comm. of DeLorean Motor Co. v. DeLorean
   (In re DeLorean Motor Co.)*,
   755 F.2d 1223 (6th Cir. 1985)...................................................... 33, 34

*Veltri v. Bldg. Serv. 32B-J Pension Fund*,
   393 F.3d 318 (2d Cir. 2004) ........................................................ 63, 67

**STATUTES**

11 U.S.C. § 105........................................................................ *passim*

11 U.S.C. § 105(a) ................................................................... *passim*

11 U.S.C. § 362(a)(1)............................................................ 5, 57, 59

11 U.S.C. § 362(a)(3)............................................................ 5, 58, 59

11 U.S.C. § 362(a)(6)............................................................ 5, 59, 60

15 U.S.C. § 78eee(b)(2)(A) ............................................................ 4

15 U.S.C. § 78eee(b)(4) ................................................................... 4

15 U.S.C. § 78fff............................................................... 31, 50, 53

15 U.S.C. § 78fff-1.............................................................. 48, 51

15 U.S.C. § 78fff-2................................................................. *passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

15 U.S.C. § 78*lll* ................................................................. 8, 49, 51

28 U.S.C. § 157(d) ....................................................................... 4

28 U.S.C. § 158(d) ....................................................................... 4

28 U.S.C. § 1291 ........................................................................... 4

28 U.S.C. § 1334(b) ..................................................................... 4

28 U.S.C. § 1651 ......................................................................... 41

**RULES**

Fed. R. Bankr. P. 7065 ......................................................... 40, 41

Fed. R. Civ. P. 65 .................................................................. 40, 41

**OTHER AUTHORITIES**

116 Cong. Rec. 39,352 (1970) ................................................... 50

Alison Leigh Cowan, "Firm That Trusted a Disgraced Investor,"
  *New York Times*, Dec. 15, 2008, *available at*
  http://www.nytimes.com/2008/12/16/business/16merkin.html?db
  k&_r=0 (last visited June 3, 2013) ....................................... 23

H.R. Rep. No. 91-1613 (1970),
  *reprinted in* 1970 U.S.C.C.A.N. 5254 ......................... 8, 49, 53

H.R. Rep. No. 95-595,
  *reprinted in* 1978 U.S.C.C.A.N. 5787 ................................. 57

H.R. Rep. No. 95-746 (1977) .................................................... 48

Murray Weiss, Bruce Golding & Dan Mangan, "No 'Criminal
  Exposure' For Ruth Madoff: Feds Lack Evidence Against
  Bernie's Wife," *New York Post*, July 1, 2009, *available at*
  http://www.nypost.com/f/print/news/regional/item_NfqzeEZsXD
  IkjGu3KJou4L (last visited June 3, 2013) ........................... 23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Report of Special Study of Securities Markets of the SEC, H.R. Doc. No. 88-95, pt. 1 ................................................................. 47

Restatement (Third) of Agency § 3.03 cmt. e(2) (2006).......................... 42

Restatement (Third) of Restitution and Unjust Enrichment § 59 (2011) ......................................................................................... 44

Securities Investor Protection: Hearings Before the Subcomm. on Commerce & Fin. of the H. Comm. on Interstate & Foreign Comm., 91st Cong. 91-67 (1970)............................................. 49

The Madoff Recovery Initiative, http://www.madofftrustee.com/claims-03.html (last visited June 3, 2013) ....................................................................................... 9

U.S. Const. art. VI, cl. 2 ....................................................................... 50

# GLOSSARY

| | |
|---|---|
| A- | Joint Appendix |
| Ariel | Ariel Fund Limited, one of the three Merkin Funds |
| Ascot | Ascot Partners, L.P., one of the three Merkin Funds, merged in 2003 with Ascot Fund, Ltd. |
| Bankruptcy Code | 11 U.S.C. §§ 101 *et seq.* |
| BLMIS | Bernard L. Madoff Investment Securities LLC |
| Gabriel | Gabriel Capital, L.P., one of the three Merkin Funds |
| Gabriel Corp. | Gabriel Capital Corporation, solely held by Merkin, manager with him of the Merkin Funds |
| Injunction Action | The Trustee's action to enjoin consummation of the settlement between the New York Attorney General, the Receivers, and the Merkin Defendants, *Picard v. Schneiderman*, No. 12-1778 (Bankr. S.D.N.Y. filed Aug. 1, 2012) |
| Madoff | Bernard L. Madoff, principal of BLMIS |
| Merkin | J. Ezra Merkin, principal of Gabriel Corp. and the Merkin Funds and general partner of Ascot |
| Merkin Defendants | Merkin and Gabriel Corp., managers of the Merkin Funds |

| | |
|---|---|
| Merkin Funds | The three investment entities managed by the Merkin Defendants: Gabriel Capital, L.P.; Ariel Fund Limited; and Ascot Partners, L.P. (merged with Ascot Fund, Ltd.) |
| NYAG | The Attorney General of the State of New York, Eric T. Schneiderman, as successor to Andrew M. Cuomo |
| NYAG Action | State-court suit brought by the NYAG against the Merkin Defendants, *Eric T. Schneiderman, as successor to Andrew M. Cuomo, Attorney General of the State of New York v. J. Ezra Merkin, et al.*, Index No. 450879/2009 (N.Y. Sup. Ct.) |
| Receivers | Bart M. Schwartz, court-appointed receiver for the Ariel and Gabriel Funds, and Ralph Dawson, as successor to David Pitofsky, court-appointed receiver for the Ascot Fund |
| Recovery Action | The Trustee's ongoing action to avoid and recover transfers of BLMIS customer property from the Merkin Funds and the Merkin Defendants, *Picard v. Merkin*, No. 09-1182 (Bankr. S.D.N.Y. filed May 7, 2009) |
| Schwartz Action | State-court suit brought by Receiver Schwartz against the Merkin Defendants on behalf of Gabriel and Ariel investors, *Bart M. Schwartz, as Receiver for Ariel Fund Ltd. and for Gabriel Capital, L.P. v. J. Ezra Merkin*, et al., Index No. 651516/2010 (N.Y. Sup. Ct.) |
| SEC | Securities and Exchange Commission |

| | |
|---|---|
| SIPA | Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* |
| SIPC | Securities Investor Protection Corporation |
| SPA- | Special Appendix |
| Third Party Actions | The NYAG Action and the Schwartz Action |
| Trustee | Irving H. Picard, as trustee pursuant to SIPA for the liquidation of the business of BLMIS, substantively consolidated with the estate of Bernard L. Madoff |

## <u>INTRODUCTION</u>

Feeder funds associated with financier J. Ezra Merkin withdrew nearly $560 million from Bernard L. Madoff Investment Securities LLC ("BLMIS") prior to its collapse.  That fact is undisputed.  Also undisputed among the parties asserting competing claims for Merkin's assets is that he knew or was willfully blind to the fact that BLMIS was a fraud— ████████████████████████████████████████

████████████████████████████████████████

████████████████████████  On that basis, Irving Picard, as Trustee for the BLMIS liquidation (the "Trustee"), filed an action to avoid and recover the Merkin Funds' withdrawals as fraudulent transfers so that the money could be returned to BLMIS customers on a *pro rata* basis, as required by the Securities Investor Protection Act ("SIPA").  To the extent that this money has been dissipated from the funds—Merkin's Ascot fund, which received over 90 percent of the transfers from BLMIS, is nearly insolvent today—Merkin himself is liable in equal amount as Ascot's general partner and, at least in part, as a subsequent transferee.

1

The chief obstacle to recovering these fraudulently transferred assets for the benefit of BLMIS customers is not Merkin himself, but a settlement that he entered with receivers for his failed funds ("Receivers") and the New York Attorney General ("NYAG") that diverts over $400 million to investors in those funds. It is undisputed that Merkin lacks sufficient assets to satisfy both the settlement and the amounts sought by the Trustee. Execution of the settlement will therefore preclude the Trustee from collecting in full on his claims. In this way, the settlement will impair the jurisdiction of the bankruptcy court overseeing the BLMIS liquidation and have an immediate adverse economic consequence for the BLMIS estate—the precise circumstances that have led this Court and others to block attempts by third parties to lay claim to property sought by the Trustee for *pro rata* distribution to BLMIS customers according to SIPA's priority scheme.

Nonetheless, the court below held that there was no legal basis to block a settlement agreement that usurps property sought by the Trustee for the benefit of all BLMIS customers and preferentially awards it to investors in funds that are themselves BLMIS customers. It denied the Trustee's application for an injunction pending resolution

of his action to recover from Merkin even though the NYAG's and Receiver Schwartz's complaints against Merkin concede that much of the money they seek—in large part, management and performance "fees" based on the fictitious returns of the Merkin Funds' investments with BLMIS—was fraudulently transferred from BLMIS. Simply because they were first to settle, the Merkin Funds will be able to cut in line ahead of all other BLMIS customers and deny those customers the right to *pro rata* recovery of property that should never have left BLMIS in the first place. That kind of arbitrary and unfair result is precisely what Congress sought to avoid by enacting SIPA.

Accordingly, the Trustee respectfully requests that this Court reverse the decisions of the court below and act to enjoin execution of the settlement until the Trustee's recovery action is resolved.

## JURISDICTIONAL STATEMENT

This case (the "Injunction Action") was brought in the United States Bankruptcy Court for the Southern District of New York by Irving H. Picard, as trustee pursuant to SIPA for the liquidation of the business of BLMIS, substantively consolidated with the estate of Bernard L. Madoff. A-24. The bankruptcy court had subject matter

jurisdiction pursuant to 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4). On December 28, 2012, the United States District Court for the Southern District of New York withdrew the bankruptcy court reference pursuant to 28 U.S.C. § 157(d). A-989. On April 15, 2013, the district court entered an order denying the Trustee's motion for a preliminary injunction and dismissing the action, SPA-1, and the clerk entered final judgment on April 18, SPA-27. On May 2, the Trustee timely filed a Notice of Appeal, invoking this Court's appellate jurisdiction pursuant to 28 U.S.C. §§ 158(d) and 1291. A-2118.

## STATEMENT OF ISSUES

1.    Whether the district court erred in refusing to preliminarily enjoin a settlement under Section 105(a) of the Bankruptcy Code where the settlement would dissipate assets that were fraudulently conveyed from the debtor and are the subject of a pending avoidance and recovery action by the Trustee.

2.    Whether SIPA preempts state law claims that conflict with its statutory priority scheme and are an impediment to its core objective

of recovering and returning "customer property" to the "customers" of a failed brokerage in an orderly and equitable fashion.

3.    Whether third-party claims (a) seeking assets that were fraudulently transferred from the debtor prior to bankruptcy and (b) alleging fraud in connection with such transfers are subject to the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362(a)(1), (3), (6).

4.    Whether laches bars the Trustee's action to enjoin a settlement among parties that dissipates assets fraudulently transferred from the debtor until the Trustee's action to recover those same assets is complete, when (a) all parties were on notice that the Trustee would sue to prevent any attempt to collect those assets, (b) all parties knew that the automatic stay was in force and that they could move the Bankruptcy Court to modify it, (c) the parties engaged in long-running settlement negotiations with the Trustee before reaching their own deal, and (d) the Trustee moved to stop the settlement from proceeding within weeks of learning that the settlement would impede the SIPA liquidation and have an immediate adverse impact on the estate.

## STATEMENT OF THE CASE

This appeal involves competing claims for assets of BLMIS that were improperly transferred before its collapse to investment funds (the "Merkin Funds") managed by J. Ezra Merkin and Gabriel Capital Corporation (collectively, the "Merkin Defendants"). The Trustee claims nearly $560 million in property transferred from BLMIS for return to its customers on an equitable, *pro rata* basis as required by SIPA (the "Recovery Action"). The other claims (the "Third Party Actions"), seeking the same assets as the Trustee, are brought by the New York State Attorney General ("NYAG") and Bart M. Schwartz, the receiver for two Merkin Funds, Ariel and Gabriel.

On June 25, 2012, the NYAG announced a $410 million settlement of the Third Party Actions with the Merkin Defendants. Because it is undisputed that the Merkin Defendants lack sufficient assets to satisfy both sets of claims, the settlement will frustrate the Trustee's ability to collect fully on behalf of Madoff's victims. To prevent that result, the Trustee filed the Injunction Action to enjoin the settlement pending completion of his Recovery Action. The district

court's denial of the Trustee's application for relief is the subject of this appeal.

## A.     The Securities Investor Protection Act

Following the chaotic liquidations of numerous broker-dealers that collapsed due to fraud and mismanagement, Congress in 1970 enacted SIPA to restore confidence in the securities markets.  It did this by establishing a comprehensive remedial scheme to protect investors against the loss of their investments due to brokerage failure.  In the first instance, if the assets remaining in a collapsed brokerage are insufficient to make its customers whole, they may receive advances of up to $500,000 from the Securities Investor Protection Corporation ("SIPC"), which is charged with overseeing the liquidation of failed firms.  But because SIPA does not provide insurance in the manner of the FDIC, any additional recoveries must come through settlements with or litigation against the recipients of investors' assets—typically, in the case of a fraud, individuals and entities that received payments in connection with their participation in the fraud.

To carry out that end, SIPA empowers a SIPC-appointed trustee to recover "customer property" that was wrongfully transferred from the

brokerage, including fraudulent transfers.    15 U.S.C. § 78fff-2(c)(3) (SPA-95).    SIPA defines "customer property" broadly to include any "property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers . . . ." § 78*lll*(4)(E) (SPA-105).    And it mandates the trustee return recovered customer property to customers on an equitable, *pro rata* basis to the extent of their claims, before other creditors may collect at all.  § 78fff-2(c)(1) (SPA-95).

In this way, SIPA channels all recovery actions through a single trustee, thereby achieving "the prompt and orderly liquidation of SIPC members," while avoiding the arbitrary and unfair results of pre-SIPA litigation.  *Lautenberg Found. v. Picard (In re Bernard L. Madoff Inv. Secs., LLC)*, No. 11-5421, 2013 WL 616269, at *2 (2d Cir. Feb. 20, 2013) (summary order) (quoting H.R. Rep. No. 91-1613 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254, 5262).

### B.    The Madoff Fraud and the Recovery Effort

On December 11, 2008, Bernard L. Madoff was arrested and charged with securities fraud.  That same day, the Securities and Exchange Commission ("SEC") filed a complaint against Madoff and

BLMIS, alleging they were operating a massive Ponzi scheme. Madoff ultimately pled guilty to securities fraud and other offenses and was sentenced to 150 years in prison. On December 15, 2008, SIPC filed for liquidation under SIPA. Irving H. Picard was appointed Trustee.

The task of unraveling Madoff's scheme has been unprecedented in scope and complexity. The final customer statements issued by BLMIS, for approximately 4,900 open customer accounts, falsely recorded nearly $64.8 billion of net investments and fictitious gains. When the music stopped, nearly $20 billion in actual investor principal (as opposed to fictitious "gains") was lost. Over 16,500 claims would ultimately be filed on the estate.[1]

The Trustee's court-approved customer claims process governs the filing, evaluation, and resolution of these claims. Customers share *pro rata* in distributions of recovered customer property in accordance with their net equity position. As affirmed by this Court, this position is defined as the amount they deposited into their BLMIS account, less

---

[1]*See* The Madoff Recovery Initiative,
http://www.madofftrustee.com/claims-03.html (last visited June 3, 2013).

any amounts they withdrew.[2]    As of May 2013, the Trustee has recovered or entered into agreements to recover some $9.3 billion—over half of investors' estimated losses—and over $5 billion has already been distributed to customers with allowed claims.[3]

## C.    The Trustee's Recovery Action Against the Merkin Defendants

J. Ezra Merkin was a sophisticated financier with close professional and social ties to Madoff.    He and Gabriel Capital Corporation, a Delaware corporation of which he was the sole shareholder and director, managed the assets of three investment funds (the "Merkin Funds"): Gabriel Capital, L.P. ("Gabriel"); Ariel Fund Limited ("Ariel"); and Ascot Partners, L.P ("Ascot").[4]    The Merkin Funds channeled investors' money to BLMIS, serving as an integral part of Madoff's Ponzi scheme.    Altogether, they were BLMIS's third-largest feeder fund.    Since BLMIS's collapse, all three Merkin Funds, through

---

[2]*In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 235 (2d Cir. 2011).

[3]*See* The Madoff Recovery Initiative, *supra*.

[4]A fourth fund, Ascot Fund, Ltd., was merged into Ascot Partners in early 2003; "Ascot" is used to refer to both entities.

their respective receivers, have filed customer claims in the BLMIS liquidation seeking distributions on behalf of their investors.

Prior to the collapse of Madoff's scheme, the Merkin Funds received nearly $560 million in transfers from BLMIS. Over 90 percent of this amount—some $524 million—was transferred to Ascot, which was almost entirely invested in BLMIS. Gabriel and Ariel, each of which invested roughly a third of their assets in BLMIS, received much smaller transfers—$17.4 and $16.2 million, respectively. The amounts and timing of these transfers are undisputed.

On May 7, 2009, the Trustee sued Merkin, Gabriel Corp., and the Merkin Funds in bankruptcy court for the return of these transfers for *pro rata* distribution to BLIMS customers with allowed claims (the "Recovery Action"). A-87. The gravamen of the Trustee's claims is that the transfers were fraudulent and otherwise avoidable because Merkin, as the funds' principal, knew or should have known Madoff was engaged in fraud. A-125, ¶¶1–2.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████



Ascot is insolvent and has insufficient funds to satisfy any judgment on the Trustee's claims, but the Recovery Action names Merkin as jointly and severally liable with Ascot as its sole general

partner.[5]  A-135; A-154, ¶¶37, 111–13.  The Recovery Action also alleges

that some or all of the transfers to the Merkin Funds were subsequently

transferred to the Merkin Defendants in the form of commissions and

fees and are recoverable on that basis.  A-153, ¶106.

The Recovery Action survived the Merkin Defendants' motion to

dismiss and is pending.[6]   Discovery is ongoing, and the Merkin

Defendants have yet to produce critical documents, including many

regarding Merkin's assets.  The Trustee has made numerous requests to

compel production, and an arbitrator was appointed in June 2012 to

oversee these disputes.[7]

### D.    The Third Party Actions

#### 1.    The NYAG Action

On April 6, 2009, the NYAG sued the Merkin Defendants in New

York County Supreme Court (the "NYAG Action"), bringing securities

fraud claims under New York's General Business Law, breach of

---

[5]Ascot's insolvency is undisputed.  *Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC)*, 440 B.R. 243, 268 (Bankr. S.D.N.Y. 2010) (mem.).

[6]*Id.* at 249, 254–70.

[7]Stipulated Order Appointing a Binding Arbitrator, *Picard v. Merkin*, No. 09-1182 (Bankr. S.D.N.Y. June 20, 2012), ECF No. 127.

fiduciary claims under New York's Non-Profit Corporation Law and common law, and a claim for "persistent fraud or illegality" under New York's Executive Law.    A-256–A-258, ¶¶121–34.    The NYAG Action seeks to recover, primarily for the benefit of investors in the Merkin Funds, hundreds of millions of dollars in fees paid to the Merkin Defendants by the Merkin Funds.[8]

The NYAG's principal claims are premised on the same fraudulent enterprise and conduct, are directed at the same defendants, and seek to recover much the same property as the Trustee's Recovery Action.[9] In particular, the NYAG alleges Merkin had actual or constructive knowledge of Madoff's fraud or was willfully blind to it,[10] and that Merkin collected "hundreds of millions of dollars in fees" by "turning all, or a substantial portion, of [his] funds over to Madoff and others."[11]

---

[8]Amended Complaint, ¶1, Prayer for Relief B, *Cuomo v. Merkin*, Index No. 450879/2009 (N.Y. Sup. Ct. May 28, 2009), Docket No. 10.

[9]*Compare* A-125–A-126; A-134–A-135; A-137–A-143; A-157, ¶¶1–4, 32–37, 44, Prayer for Relief xi, xv, *with* Amended Complaint, ¶¶1–6, 16–21, Prayer for Relief B, C, *Cuomo v. Merkin*, Index No. 450879/2009 (N.Y. Sup. Ct. May 28, 2009), Docket No. 10.

[10]Amended Complaint, ¶¶106–19, *Cuomo v. Merkin*, *supra.*

[11]*Id.* ¶6.

14

These fees—denominated "management fees" and "incentive fees"—were not paid by Merkin Fund investors but came from transfers from BLMIS, based on the total invested assets and their fictitious appreciation.[12]  The NYAG specifically alleges Merkin received $169 million in such fees from Ascot, which was almost entirely invested with BLMIS.[13]  The NYAG also alleges Merkin collected more than $500 million in such fees from Ariel and Gabriel, a disproportionate share of which came from its investments with BLMIS, due to "double-dipping" and Madoff's unusually low fees relative to other investment options.[14] The NYAG seeks recovery of these fees—the very same fees which the Trustee seeks to recover as fraudulently transferred BLMIS customer property—to hand over to Merkin's investors.[15]

The NYAG acted to ensure Merkin's ability to pay any judgment against him.  Days after filing suit, the NYAG forced the Merkin Defendants into a stipulation freezing their assets.  A-312; A-2507, ¶6.

---

[12]*Id.* ¶¶34–35.

[13]*Id.* ¶35.

[14]*Id.* ¶¶69, 80–81.

[15]*Id.* ¶137, Prayer for Relief B.

Subsequently, when Merkin and his wife sold their artwork collection, the hundreds of millions of dollars in proceeds were placed in an escrow account under the NYAG's control.  A-316; A-2507, ¶6.

In October 2010, the NYAG filed a motion for partial summary judgment.  A-187.  The NYAG later asked the state court to withhold decision on that motion in light of ongoing global settlement negotiations involving the Merkin Defendants, the Receivers, and the Trustee.  A-995, ¶9.

### 2.    The Schwartz Action

On September 16, 2010, Bart Schwartz, court-appointed Receiver for the Ariel and Gabriel Funds, sued the Merkin Defendants in New York County Supreme Court on behalf of investors in Ariel and Gabriel (the "Schwartz Action").  The complaint acknowledges that "it arises from many of the same operative facts" as the NYAG Action and was brought as a precautionary measure to preserve claims and relief "that may not be available in" the NYAG Action.  A-353, ¶44.

Schwartz's claims—for breach of fiduciary duty, gross negligence, fraud, breach of contract, and unjust enrichment—also parallel the Trustee's claims, in that they are premised on the same fraudulent

16

enterprise and conduct, are directed at the same defendants, and seek to recover much the same funds. Schwartz alleges Merkin had actual or constructive knowledge of Madoff's fraud or was willfully blind to it, A-357–A-359, ¶¶56–62; invested substantial portions of Ariel's and Gabriel's assets with Madoff, A-355, ¶¶48, 49; and "improperly collected enormous fees" from those investments with BLMIS. A-359. BLMIS, Schwartz alleges, was a disproportionate source of Merkin's fees because Madoff himself "charged no management fee or incentive fee." A-352; A359–A-350, ¶¶43, 64. Again, Merkin's fees were not paid by investors, but came from transfers from BLMIS. A-359–A-360, ¶64. Schwartz seeks to recover these fees on behalf of Ariel and Gabriel investors through, *inter alia*, imposition of a constructive trust over "all management fees received by the Defendants." A-367, ¶103.

The Schwartz Action has been lightly litigated. In December 2010, the Merkin Defendants filed a motion to dismiss. A-337. That motion was never decided, and the state court marked it off the calendar in July 2012.[16]

---

[16]Decision & Order, *Schwartz v. Merkin*, Index No. 651516/2010 (N.Y. Sup. Ct. July 19, 2012), Docket No. 20.

### E.    The Trustee Asserts the BLMIS Estate's Interest in Merkin's Assets and Participates in "Global" Settlement Negotiations

From the very beginning, the Trustee was in regular contact with the NYAG, the Receivers, and the Merkin Defendants to put them on notice of the Trustee's interests and to attempt to reach a "global" settlement of all claims against Merkin.  These efforts began in the summer of 2009, when the Trustee, the Merkin Defendants, and the NYAG discussed disposition of the Merkin art collection proceeds, in which the Trustee asserted an interest.  In November 2009, the Trustee notified the NYAG of the BLMIS estate's interest in Merkin's assets as customer property and position that any attempt to "collect" those assets would be met with an application for an injunction to effectuate the automatic stay and SIPA's requirements.  A-1669.  The NYAG, in turn, proposed that "the best course of action is to try to enter into a global resolution."  A-2508, ¶9; A-2527.  That proposal was consistent with Merkin's insistence throughout that any settlement achieve "global peace" for him.

Beginning in August 2009, the Trustee negotiated with David Pitofsky, then Ascot's Receiver, seeking a joint settlement of their

18

claims against the Merkin Defendants.[17]    A-2510, ¶14.    Similarly, beginning around November 2009, the Trustee and Schwartz engaged in "multiple meetings and other communications" in pursuance of a joint settlement.  A-1013–A-1014, ¶¶9, 11.

Negotiations among all the parties continued over the next several years as the Trustee litigated his Recovery Action.    The Trustee's counsel met with counsel for the NYAG in November 2010 to discuss the possibility of a global settlement and exchanged numerous emails toward that end.  A-2510, ¶16; A-2558–A-2560.  From March through June of 2011, the Trustee engaged in further settlement discussions with the Receivers and Merkin Defendants.  A-2510, ¶17; A-2562.  In June 2011, the Trustee received a proposed term sheet for a global settlement from counsel for the other parties.  A-2510, ¶17; A-2539.

In mid-2011, having heard that a settlement between the NYAG and the Merkin defendants was imminent, the Trustee contacted the NYAG to warn again that "the Trustee would sue the AG to enjoin implementation of any settlement with Merkin."  A-997, ¶15.  But no final settlement was forthcoming at that time, and in December 2011,

---

[17]Pitofsky was recently succeeded by Ralph Dawson.

the NYAG's counsel met with the Trustee's counsel to request the Trustee's participation in a proposed settlement agreement that the NYAG had reached with Merkin earlier that month.  A-994, ¶8. Consistent with Merkin's position throughout, that settlement proposal was conditioned on the Trustee's releasing his claims against the Merkin Defendants. A-2142, ¶3; A-2577–A-2578, ¶III(C); A-2631.

From the end of 2011 through April 2012, the Trustee, Merkin, and the Receivers conducted extensive negotiations toward settlement, meeting numerous times.  A-995, ¶9; A-2512, ¶21.  In light of these negotiations, the NYAG asked the state court to stay consideration of its pending summary judgment motion.  A-995, ¶9.  Although these negotiations reached a standstill by May 2012, the Trustee expected that, as before, they would be revived and the parties would continue to make progress to a final agreement.

### F.    The Settlement Dissipates the Same Assets Sought by the Trustee

But one month later, on June 25, 2012, the NYAG publicly announced that he had reached a $410 million settlement with Merkin that excluded the Trustee.  According to a press release, the settlement would force Merkin to disgorge "hundreds of millions of dollars in

20

management fees"—that is, among the same assets sought by the Trustee as fraudulent transfers.  A-61.  Although unable to obtain a copy of the settlement agreement, which remains confidential, the Trustee followed through on his promise and promptly filed an action to enjoin the settlement.  The Trustee ultimately obtained a redacted copy of the agreement, after signing a confidentiality agreement, several weeks later.  The full terms of the settlement have never been disclosed to the Trustee or to the public.

████████████████████████████

██████████

According to the parties to the settlement, the settlement also contains a "hold-back" provision setting aside money for the Trustee's potential future recovery on his claims. This provision was redacted from the copy provided to the Trustee, but given the sizes of the settlement and the distribution tranches, it is necessarily far smaller than the amounts sought by the Trustee. Indeed, the NYAG has confirmed as much.[18]

The Merkin Defendants, the NYAG, and the Receivers have never disputed that the Merkin Defendants lack sufficient assets to satisfy both the $410 million settlement and the nearly $560 million sought in the Trustee's Recovery Action. Indeed, the NYAG demanded an asset freeze and escrow arrangement to preserve Merkin's ability to pay on

---

[18]A-678 (NYAG Withdrawal Memo at 10) ("Most of the proceeds from the Merkin Settlement will be paid to victims of the Merkin Defendants, who are not BLMIS customers. The remainder will be utilized to defend against, or settle, claims brought by the Trustee against the Receivers and the Merkin Defendants, or to pay the costs of the Receivers and the NYAG."). The settlement's total proceeds ("most" of which would be unavailable to the Trustee) are $410 million, itself less than the transfers to Ascot that the Trustee seeks to recover.

its claims, which are of similar magnitude as the Trustee's.  The NYAG even conceded at oral argument in this matter that Merkin's assets are limited and that the question before the court was "[w]ho gets them?" A-1859, 52:6–7.  He also conceded his basis for collecting ahead of the Trustee was simply that he "beat Mr. Picard to the courthouse or beat him to settlement."  A-961, 19:3–9.  Merkin has never attempted to show that he is capable of paying both sets of claims.  To the contrary, he has complained that he "suffered major losses" due to the unraveling of Madoff's fraud and has sold off real estate and other personal assets to reduce monthly expenses.[19]

### G. The District Court Denies the Trustee's Request To Enjoin the Settlement Pending Resolution of His Recovery Action Against Merkin

On August 1, 2012, the Trustee filed the Injunction Action in bankruptcy court to block the settlement pending resolution of the Trustee's Recovery Action.  A-24.  The Trustee argued that the

---

[19] Alison Leigh Cowan, "Firm That Trusted a Disgraced Investor," *New York Times*, Dec. 15, 2008, *available at* http://www.nytimes.com/2008/12/16/business/16merkin.html?dbk&_r=0 (last visited June 3, 2013); Murray Weiss, Bruce Golding & Dan Mangan, "No 'Criminal Exposure' For Ruth Madoff: Feds Lack Evidence Against Bernie's Wife," *New York Post*, July 1, 2009, *available at* http://www.nypost.com/f/print/news/regional/item_NfqzeEZsXDIkjGu3K Jou4L (last visited June 3, 2013).

settlement should be enjoined on three bases: first, that the Trustee was entitled to an injunction under § 105(a) of the Bankruptcy Code to prevent impairment of the bankruptcy court's jurisdiction and economic injury to the BLMIS estate; second, that SIPA preempted the settlement's resolution of the Third Party Actions' state law claims; and, third, that the settlement violated the automatic stay and related orders entered at the outset of the BLMIS liquidation. The Injunction Action was later withdrawn to district court. A-989.

On April 15, 2013, the district court (Rakoff, J.) denied the Trustee's motion to enjoin the settlement and *sua sponte* dismissed the entire Injunction Action. The court first found the action barred by laches because the Trustee "waited more than three years" before filing suit to enforce the automatic stay and have the NYAG and Schwartz Actions declared void *ab initio* and permanently enjoined—ignoring that the Trustee had moved only for a preliminary injunction pending the completion of the Trustee's own action against the Merkin Defendants. SPA-6–SPA-8. The court held that it was the Trustee's "burden" to sue to enforce the stay and that his notice of objections to

24

the other parties and participation in negotiations were therefore no defense to laches. SPA-10–SPA-11.

The court also denied the Trustee's claims on the merits. The automatic stay, it held, did not apply to the Third Party Actions, because they brought "independent claims against a non-debtor" and did not seek to recover assets that the Trustee had already proven to be property of the BLMIS estate. SPA-16; SPA-18. And it held that the Trustee was not entitled to a Section 105 injunction because he had not shown that the settlement would prevent the Merkin Defendants from satisfying the Trustee's Recovery Action claims. SPA-22. The court also based its decision on the settlement's provision of a "hold-back" for the Trustee's recovery, apparently rejecting, without any reasoning, the amounts sought in the Trustee's underlying claims. SPA-19. Finally, the court held that SIPA does not preempt "independent state law causes of action," even where they may conflict with SIPA's requirements and objectives. SPA-25.

The Trustee filed a notice of appeal on May 2, 2013. A-2118.

## SUMMARY OF ARGUMENT

Absent an injunction, the settlement will prevent the Trustee from recovering in full the nearly $560 million in BLMIS customer property that was fraudulently conveyed to Merkin, ████████████ ████████████████████████ The Trustee is entitled to an injunction because the NYAG and Receivers concede that the settlement dissipates property transferred from BLMIS in connection with fraud that is sought by the Trustee and because it leaves the Merkin Defendants unable to satisfy the amounts sought by the Trustee's Recovery Action. In refusing to grant an injunction pending completion of the Trustee's Recovery Action, the district court made four fundamental errors.

*First*, the court was wrong to hold that a Section 105 injunction is not available to preliminarily enjoin a settlement that dissipates assets that no one disputes are necessary for the Merkin Defendants to satisfy the amounts sought by the Trustee in his SIPA Recovery Action. Indeed, the Third Party Actions and the settlement itself make clear that a substantial portion of the assets that would be diverted from the SIPA liquidation to Merkin's investors is actually BLMIS customer

26

property that was fraudulently transferred to the Merkin Funds and subsequently to the Merkin Defendants as "fees." This is, of course, the same property that the Trustee seeks to recover for *pro rata* distribution to all BLMIS customers under SIPA. The settlement will necessarily frustrate the Trustee's Recovery Action and therefore cause immediate economic injury to the BLMIS estate, while impairing the bankruptcy court's jurisdiction to marshal assets for distribution to BLMIS creditors. The district court's denial of an injunction to prevent that result, even when no party disputed that the settlement will impair the Trustee's ability to collect in full on his claims, misconstrued the standard for a Section 105 injunction and imposed an improper burden on the Trustee. That holding should be reversed.

*Second*, the court held incorrectly that a SIPA liquidation may be compromised by competing state law claims. Congress intended that, following the collapse of a brokerage, SIPA would govern, even in cases involving multiple entities like feeder funds. The statute empowers a single trustee to recover all property that should have been maintained on behalf of the brokerage's customers and mandates that those assets be returned to their rightful owners first, the customers, before any

other parties are paid.  These provisions are how Congress chose to achieve its objectives of establishing a comprehensive, orderly, and fair liquidation process that would rapidly recover and return property to the customers of failed brokerages.  The settlement's dissipation of assets precludes compliance with SIPA and frustrates Congress's objectives.  A Section 105 injunction is required to carry out Congress's intentions.  The district court's holding that SIPA is no bar to third-party claims on customer property sought by a SIPA trustee is incorrect and should be reversed.

*Third*, the court was wrong to hold that third-party claims seeking property fraudulently transferred from the debtor are not subject to the automatic stay.  The  NYAG and Receivers seek to recover "fees" that they allege the Merkin Defendants took from assets withdrawn from BLMIS, on the basis that the Merkin Defendants had knowledge of Madoff's fraud.  In substance, these claims seek to recover fraudulent transfers from BLMIS—except for the benefit of the plaintiffs, not BLMIS customers.  Under this Court's precedent, such claims may be brought only by the estate, for the benefit of its creditors.  The district

court's refusal to enforce the automatic stay consistent with its terms and this Court's decisions is grounds for reversal.

*Finally*, the court's alternative holding that the Trustee's Injunction Action was barred by laches is also in error, as a matter of law and fact. Most egregiously, the court simply ignored that the Trustee moved not to enjoin the settlement for all time, but only until the completion of the Trustee's recovery action. It therefore applied laches to dismiss the Trustee's Section 105 claim seeking such relief without any reasoning at all, which was *per se* abuse of discretion. Equally mistaken, and directly contrary to Circuit precedent, was its holding that the Trustee had an obligation to rush to the courthouse and file suit to enjoin the Third Party Claims rather than attempt to reach a negotiated settlement. Because the other parties were always on notice of the Trustee's objections, and were engaged in long-running negotiations with the Trustee, laches is inapposite. There was no delay, and any possible "prejudice" to the other parties is due to the operation of SIPA and the Bankruptcy Code—which require the Trustee have first claim on fraudulently transferred customer property—and not the

Trustee's timing.  The district court's holding is directly contrary to this Court's precedents and should be reversed.

## STANDARD OF REVIEW

In general, when reviewing a district court's denial of a preliminary injunction, this Court reviews the district court's legal holdings *de novo* and its ultimate decision for abuse of discretion.  *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011).  The scope and application of the automatic stay, however, is an issue of law subject to *de novo* review.  *United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012); *Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc. (In re Palmdale Hills Prop., LLC)*, 654 F.3d 868, 875 (9th Cir. 2011); *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003).  Dismissal based on laches is also reviewed *de novo*.  *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 106–07 (2d Cir. 2000); *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997).  *But see Perez v. Danbury Hosp.*, 347 F.3d 419, 426 (2d Cir. 2003) (reviewing denial of laches defense for abuse of discretion).

## ARGUMENT

## I.    The District Court Erred in Holding That a Section 105 Injunction Was Legally Unavailable

The purpose of a Section 105 injunction is to allow for "prompt and orderly liquidation of SIPC members" and to protect the SIPA estate against third-party actions that "would draw down assets" sought as fraudulent transfers.  *Lautenberg*, 2013 WL 616269, at *2 (quotation marks omitted).  The settlement is an obstacle to those ends because it dissipates the very same fraudulently transferred customer property that the Trustee seeks to recover and because it leaves the Merkin Defendants with insufficient funds to satisfy the Trustee's claims.  On that basis, the Trustee is entitled to an injunction under Section 105 to preclude the settlement from depleting the assets otherwise available to compensate the victims of Madoff's fraud.

### A.    A Section 105 Injunction Is Appropriate To Prevent the Settlement from Impeding the Liquidation of BLMIS

Section 105 authorizes courts to issue any order "necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a) (SPA-41).  It applies in SIPA liquidations, *see* 15 U.S.C. § 78fff(b) (SPA-87), and is "construed liberally to enjoin suits

31

that might impede" the liquidation process. *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988). Section 105 extends to claims against third parties. *See, e.g.*, *id.*; *Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45, 53 (2d Cir. 2012). The bankruptcy court's authority to enjoin such suits is consistent with its equitable power to preliminarily enjoin persons alleged to have wrongfully obtained property from disposing of it pending a decision on the merits of a claim. *See, e.g.*, *Republic of Philippines v. Marcos*, 806 F.2d 344, 354–55 (2d Cir. 1986).

In this regard, a Section 105 injunction should issue where third-party actions against a non-debtor "will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). Thus, in *Lautenberg*, this Court affirmed the issuance of a Section 105 injunction against litigation brought against certain close insiders of BLMIS where the insiders' assets were "claimed by the Trustee as a fraudulent transfer from BLMIS." 2013 WL 616269, at *2. The *Lautenberg* court reached its decision based on two primary considerations: (1) the injunction preserved the debtor's estate rather than encouraging "a chaotic rush to

the courthouse . . . seeking assets that the trustee claims are properly part of the BLMIS estate"; and (2) the claims threatened to "draw down assets almost all of which could otherwise be expected to return to the BLMIS estate as a consequence of the Trustee's fraudulent transfer action." *Id.*

Case law from other circuits is consistent with *Lautenberg.* For example, in *Unsecured Creditors' Comm. of DeLorean Motor Co. v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223, 1231 (6th Cir. 1985), the Sixth Circuit affirmed the issuance of a preliminary injunction under Section 105 that required the owners and insiders of a company that a bankruptcy estate's creditors alleged had received funds fraudulently conveyed from the estate to place in escrow any proceeds from the sale of that company, pending the resolution of the status of those funds in bankruptcy proceedings. *See also O'Donnell v. Royal Bus. Group, Inc. (In re Oxford Homes, Inc.)*, 180 B.R. 1, 12–13 (Bankr. D. Me. 1995) (preliminarily enjoining under Section 105 a third-party company and its president from disposing of or encumbering $740,000 that a Chapter 11 trustee alleged had been fraudulently transferred from a debtor and was properly part of the debtor's estate).

33

*Lautenberg* and *DeLorean* are specific applications of the broader principle, long embraced by the courts, that Section 105 injunctions are appropriate to preserve the bankruptcy court's jurisdiction or to preserve the debtor's estate:

> The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate.  To protect this jurisdiction, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), including a stay.

*Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) (Wood, J.) (quotation marks and citations omitted); *see also Gonzalez Hernandez v. Borgos*, 343 F.2d 802, 807 (1st Cir. 1965) (explaining that the purpose of the predecessor statute to Section 105(a) "is to give the court power to protect its custody of the estate and the administration thereof").  And as this Court has recognized, in light of the purposes of the Bankruptcy Code (not to mention SIPA), the bankruptcy court's jurisdiction is exceedingly broad, extending to matters that have "any 'conceivable effect' on the bankrupt estate." *Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992).  *See also Megliola v. Maxwell*, 293 B.R. 443, 447 (N.D. Ill. 2003) (holding

34

that Section 105(a) "empowers the Bankruptcy Court to block adjudication of a nationwide class action lawsuit, brought by non-creditors against non-debtors, upon a finding that the Class Action is 'related to' an adversary proceeding filed by the Trustee") (quotation marks omitted).

### B. The Settlement Will Have Adverse Economic Consequences By Diminishing the Recovery Available to All Victims

The considerations that swayed the *Lautenberg* Court likewise require an injunction here. To begin with, there is no reasonable dispute that the settlement will frustrate the Trustee's Recovery Action. Over 90 percent of the nearly $560 million that the Trustee seeks to recover is property that was unlawfully transferred to Ascot, which is insolvent, and subsequently, in part, to the Merkin Defendants as "fees." The Trustee has been engaged in litigation with the Merkin Defendants for over four years, and offered a sworn statement, premised on knowledge from that litigation and compelling circumstantial evidence, that the insolvent Ascot fund and Merkin, as its general partner and a subsequent transferee, cannot satisfy both the settlement and the Trustee's claims. A-57, ¶8. Indeed, no party has

ever claimed, or offered factual evidence suggesting, that the Merkin Defendants can satisfy fully both the settlement and the amounts sought by the Trustee's claims.

Moreover, the Third Party Actions seek assets that they acknowledge the Merkin Defendants should never have received from BLMIS in the first place. They allege that the Merkin Defendants acted unlawfully by retaining management and performance fees based on the fictitious profits garnered from the Merkin Funds' investments with BLMIS—not from payments made by those funds' investors.[20]  These "fees" are (according to their own pleadings) proceeds of the same fraudulent transfers from BLMIS that the Trustee seeks to recover. Because the claims to these assets brought in the Third Party Actions are not superior to the Trustee's, the NYAG's sole claim to them is that he was first in time.  *See* A-961, 19:3–9 (NYAG's counsel acknowledges that the basis for NYAG's collecting ahead of the Trustee is that he "beat Mr. Picard to the courthouse or beat him to settlement").  In this

---

[20]*See* Amended Complaint, ¶¶24, 34–35, 69, 80–81, *Cuomo v. Merkin*, Index No. 450879/2009 (N.Y. Sup. Ct. May 28, 2009), Docket No. 10; A-346, ¶24; A-352, ¶43; A-359, ¶64.

36

instance, an injunction is necessary to preserve the estate and the bankruptcy court's jurisdiction over these assets.

That the beneficiaries of the settlement, the Merkin Funds, are themselves BLMIS customers only reinforces the need for injunctive relief to prevent circumvention of SIPA's statutory priority scheme by being the first in time to collect. In both the BLMIS customer claims process and the settlement, the Receivers are acting exclusively on behalf of Merkin Funds investors. Each of the Merkin Funds had an account with BLMIS and, following its collapse, filed a customer claim seeking distributions in the SIPA proceeding. Those Funds' investors, in turn, are entitled to recover from any *pro rata* distributions of customer property that the Funds ultimately receive from the BLMIS estate. They are, in addition, general, unsecured creditors of BLMIS.[21] *See Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011). *Cf. In re Bullion Reserve of N. Am.*, 836 F.2d 1214, 1218 (9th Cir. 1988) (under "the Bankruptcy Code's

---

[21]Of course, as a prerequisite to allowance and possible satisfaction, any claim by a creditor must be submitted in accordance with the procedural requirements of SIPA and the Bankruptcy Code. *See, e.g.*, 15 U.S.C §§ 78fff-2(a)(2), (3) (SPA-93).

37

broad definitions" of "creditor" and "claim," a person becomes a "creditor" the moment he accrues a right to payment). By settling with Merkin, and usurping assets that would otherwise be expected to flow through the BLMIS liquidation for equitable, *pro rata* distribution to all BLMIS customers, the Receivers circumvent the SIPA claims process in which they are already participating on behalf of Merkin Funds investors.

The Funds and their investors may be dissatisfied with their place in line to recover, but this does not somehow deprive Section 105 of its force to protect the BLMIS estate against creditors' jockeying for preference. It simply reflects the consequences of Congress's decision to establish a priority scheme favoring a failed broker's "customers" and that requires *pro rata* distributions among those customers. Accordingly, the district court's point that "indirect investors . . . are not considered customers for purposes of SIPA," SPA-16, is simply irrelevant to application of Section 105 in these circumstances.

## C.    The District Court Erred in Denying an Injunction

The district court's decision denying a preliminary injunction is erroneous. Rather than focusing on the core purpose of Section 105—

38

preliminarily enjoining claims that "will have an immediate adverse economic consequence for the debtor's estate," *Queenie, Ltd.*, 321 F.3d at 287—the district court offered incorrect and unsupported conclusions about the Trustee's ability to recover fraudulently transferred assets and the standard of proof necessary to merit an injunction.

### 1. The District Court Misconstrued the Standard for a Section 105 Injunction

The district court held the Trustee to an improper standard in finding that the Trustee had not adequately substantiated the point that the Merkin Defendants are unable to satisfy both the settlement and the Trustee's claims. SPA-19. As explained above, the Trustee offered a sworn statement explaining, based on years of litigation with the Merkin Defendants, that they are unable to satisfy both sets of claims, amounting to nearly $1 billion. A-57, ¶8. The Trustee's evidence is strongly supported by additional circumstantial evidence, including the fact that the NYAG demanded an asset freeze and required that the Merkin Defendants hold nearly $200 million in escrow pending resolution of his action. A-1666. Nor have the Merkin Defendants disputed the transfers that are the basis of the Trustee's claims for nearly $560 million or offered any factual evidence—which is

readily available to them—to rebut the Trustee's claim that Merkin cannot satisfy both the settlement and the amounts sought by the Trustee.

This unrebutted evidence is more than sufficient to merit the issuance of a preliminary injunction under either Bankruptcy Code Section 105 or the more proscriptive requirements of Federal Rule of Bankruptcy Procedure 7065, which incorporates the standard of Federal Rule of Civil Procedure 65. In *Marcos*, this Court affirmed the issuance of a Rule 65 preliminary injunction against the transfer or encumbrance of five New York properties allegedly purchased for the benefit of former Philippine dictator Ferdinand Marcos and his wife with the proceeds of assets stolen from the Philippine government. 806 F.2d at 347–48, 351–52. The Philippines mounted primarily "circumstantial" evidence, as is often the case regarding complex financial frauds at the initial pleadings stage. *Id.* at 349. Still, this Court held that this evidence was sufficient to merit the injunction where "no proofs had been submitted to rebut the inferences on which The Republic relies." *Id.* at 351–52. *See also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011) (holding that a

40

permanent injunction was appropriate even when the moving party did not provide "overwhelming" evidence, where there party to be enjoined "fail[ed] to introduce any rebuttal evidence").

Accordingly, the standard applied by the district court goes far beyond even the "likelihood of success on the merits" standard that prevails under Rule 65 and Bankruptcy Rule 7065, let alone Section 105's more permissive standard to protect the bankruptcy court's jurisdiction.[22]  Application of an improper legal standard in the denial of a preliminary injunction is *per se* abuse of discretion.  *Hsu by and through Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 852 (2d Cir. 1996).

---

[22]The standard for a Fed. R. Civ. P. 65 injunction does not apply to a Section 105 injunction.  "[T]he legislative history of section 105 reflects congressional intent that the section be similar in effect to the All Writs Act, 28 U.S.C. § 1651 . . . ."  *Casse v. Key Bank N.A. (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999) (internal quotation marks and citations omitted).  *See, e.g., In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003); *LTV Steel Co., Inc. v. Bd. of Educ. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571–72 (S.D.N.Y. 1987).  Tellingly, *Lautenberg* did not apply the Rule 65 standard.  2013 WL 616269, at *2.

## 2.    Dollar-for-Dollar Accounting Is Not Necessary To Recover Fraudulently Transferred Property

The district court's holding that an injunction was unavailable because some of Merkin's assets may have come from other sources misses the mark. *See* SPA-18. BLMIS's conveyance of property to the Merkin Funds is undisputed. Each of the Merkin Funds is liable for the return of that property. To the extent that one of those funds, Ascot, is unable to do so, Merkin is personally liable as its general partner. He is additionally liable, with respect to the monies he took, as a subsequent transferee.

Under neither theory is the identity of the fraudulently transferred assets with Merkin's current assets relevant. "[A]ny transfers received by Ascot can be recovered from Merkin, as Ascot's only general partner, pursuant to Delaware partnership liability law." *Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC)*, 440 B.R. 243, 269 (Bankr. S.D.N.Y. 2010). *See also* Restatement (Third) of Agency § 3.03 cmt. e(2) (2006) ("General partners are subject to liability for partnership obligations . . . .").

The same is true regarding Merkin's liability as a subsequent transferee. To begin with, all parties agree that Merkin took fees from

42

money that had been withdrawn from BLMIS. But in addition, as the NYAG found in his investigation, Merkin "commingled his personal funds with the funds of GCC [Gabriel Corp.]" and "used GCC funds to make purchases for his personal benefit, including purchases of over $91 million worth of artwork for his apartment."[23] A-255, ¶120.

Merkin's BLMIS-derived fees and commingling of assets support the Trustee's Recovery Action. Fraudulent transfers, of course, may be avoided and recovered, even as to subsequent transferees such as Merkin. *Picard v. Merkin*, 440 B.R. at 269–70 (denying Merkin's motion to dismiss subsequent-transferee claims). Commingling of assets does not defeat recovery. In *Picard v. Charles Ellerin Revocable Trust* (*In re Bernard L. Madoff Inv. Secs. LLC*), Case No. 10-4095, 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012), the Trustee filed complaints against a revocable trust and subsequent transferees, where the trust had "received transfers from BLMIS and subsequently transferred some of those funds" to third parties. *Id.* at *1. A subsequent transferee argued that the comingling of funds from BLMIS

---

[23]*See also* Amended Complaint, ¶125, *Cuomo v. Merkin*, Index No. 450879/2009 (N.Y. Sup. Ct. May 28, 2009), Docket No. 10.

with funds from other sources should prevent the Trustee's recovery. *See id.* at \*2. The court rejected this reasoning, holding that "it is not necessary for the Trustee to specify what portion of the Subsequent Transfers . . . was derived from BLMIS." *Id.* at \*3. "Rather, the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS" to the transferee. *Id.*

That is literally black-letter law. *See* Restatement (Third) of Restitution and Unjust Enrichment § 59 (2011) (where funds have been commingled, "[w]ithdrawals that yield a traceable product and withdrawals that are dissipated are marshaled so far as possible in favor of the claimant."). Indeed, as many courts have recognized, avoidance and recovery are pragmatic actions that rely on the court's equitable powers, particularly where assets have been commingled. *See also IBT Int'l, Inc. v. Northern (In re Int'l Admin. Serv.s, Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005) ("proper tracing does not require dollar-for-dollar accounting"); *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) (where funds have been commingled, "[t]he goal of 'tracing' is not to trace anything at all . . . , but rather to serve as an equitable

44

substitute for the impossibility of specific identification.") (quotation marks omitted); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007). Quite reasonably, the law does not require dollar-for-dollar accounting as a requirement for recovery.

By contrast, under the district court's approach, *see* SPA-18–SPA-19, the essential fungibility of cash would defeat nearly all attempts to recover fraudulently transferred assets, rendering the Bankruptcy Code's and state law's provisions for avoidance and recovery ineffective and easily circumvented. There is no basis in law or common sense, however, to reward a knowing recipient of fraudulently transferred funds for his further bad acts of commingling assets and treating others' money as his own.

## II. The Settlement Is Inconsistent with SIPA

The text and history of SIPA demonstrate that Congress intended it to function as a comprehensive scheme controlling the recovery and distribution of assets following the collapse of a broker-dealer. Congress knew, in particular, that the unraveling of fraudulent investment schemes inevitably leads to a scrum of competing claims, to

45

the ultimate detriment of investors and confidence in the securities market. Congress therefore sought to channel all legal proceedings through a single trustee who would recover missing assets and return them, on a fair and equitable basis, to the class of investors whom it deemed in need of special protection, broker-dealer "customers." Third-party lawsuits that divert assets from the SIPA proceeding are necessarily and fundamentally incompatible with this comprehensive remedial scheme. Because the settlement would do precisely that to satisfy state law claims, it cannot proceed at this time and should be enjoined.

### A. SIPA Establishes a Comprehensive Remedial Scheme To Protect "Customers" of Failed Brokerages by Returning Their "Customer Property"

SIPA's specific provisions regarding the recovery and distribution of "customer property" would be deprived of their force and effect if, in any fraud that involved third parties like feeder funds, assets that had been transferred to those third parties were not fully subject to SIPA. In that case, the failed brokerage's "customers" would recover from only the limited assets held by the estate, while claimants on the third parties could jump to the head of the line in recovery if they were fast to

file or settle lawsuits.  The best that could be said of this "musical chairs" view of the law is that, in some cases, the SIPA trustee (and thereby the brokerage's own "customers") might be first to collect contested assets and, through that fluke of luck, actually manage to carry out the terms of the SIPA statutory scheme.  But in other cases, the trustee would not, and some other party—whether a "customer" or not—would prevail.  This kind of arbitrary and inequitable result is precisely what Congress sought to preempt by enacting a comprehensive and specific liquidation process in SIPA.

Congress knew that its purposes could be achieved only by means of a comprehensive mechanism to protect the customers of failed brokerages.  The SEC report that prompted SIPA's enactment bemoaned "the difficulty of developing a system which assures a fair result to all claimants against the assets of a broker-dealer" and therefore recommended that "the Bankruptcy Act should be amended to empower the Commission to petition that an insolvent broker-dealer be adjudicated a bankrupt, so as to assure equitable treatment of claimants."  Report of Special Study of Securities Markets of the SEC, H.R. Doc. No. 88-95, pt. 1, at 414–16 (1963).  To that end, SIPA built on

bankruptcy law—which already "provides a comprehensive federal system of penalties and protections to govern the orderly conduct of debtors' affairs and creditors' rights," *E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank, Bennington*, 236 F.3d 117, 120 (2d Cir. 2001)—by establishing a special priority scheme for the benefit of certain statutorily defined "customers" and empowering a trustee to investigate transfers of "customer property" from the brokerage, recover wrongfully transferred customer property, and distribute the proceeds in accordance with the priority scheme.  15 U.S.C. §§ 78fff-1(d), 78fff-2(c)(1), (3) (SPA-91; SPA-95).

Congress was not blind to the fact that persons who had wrongfully acquired customer property prior to the failure of a brokerage could, and in many instances would, be subject to competing claims, not least for securities fraud.  Congress knew that fraud, conversion and other unlawful conduct might cause a broker-dealer's failure. *See, e.g.*, H.R. Rep. No. 95-746, at 21 (1977) (discussing "stolen" securities).  For that reason, SIPA's expansive definition of "customer property" encompasses "property transferred by the debtor, including

property *unlawfully converted*."  15 U.S.C. § 78*lll*(4) (emphasis added) (SPA-104).

Congress also understood and addressed the dangers posed by piecemeal litigation over failed brokerages in fraud cases.  A primary impetus for SIPA was the 1963 "Salad Oil Swindle," which led to the failure of the broker Ira Haupt & Co. and a proliferation of lawsuits that proved an obstacle to attempts to equitably satisfy its customers' claims.  *See* 1970 U.S.C.C.A.N. at 5256–57; *Mittendorf v. J. R. Williston & Beane Inc.*, 372 F. Supp. 821, 831 n.5 (S.D.N.Y. 1974) ("[T]he collapse of Ira Haupt & Co. and the subsequent deluge of customer claims litigation . . . was in part responsible for the enactment of the Securities Investor Protection Act . . . ."); Securities Investor Protection: Hearings Before the Subcomm. on Commerce & Fin. of the H. Comm. on Interstate & Foreign Comm., 91st Cong. 91-67, at 1 (1970) (statement of Rep. John E. Moss, Chairman).  The bankruptcy trustee in that case recognized that "it was impossible to compartmentalize [his] investigation" to particular claims or claimants, *In re Ira Haupt & Co.*, 361 F.2d 164, 168 n.6 (2d Cir. 1966) (quotation marks omitted), and the courts charged with sorting out the competing claims acknowledged the

"magnitude and difficulty" of the trustee's task. *In re Ira Haupt & Co.*, 287 F. Supp. 318, 320 (S.D.N.Y. 1968). The result was a multiplication of litigation, with often-inequitable results. *Cf.* 116 Cong. Rec. 39,352 (1970) (remarks of Rep. Boland) ("When brokerage houses fail . . . the small investor is the principal victim. A veritable labyrinth of litigation awaits him should he seek redress in the courts.").

It was precisely to prevent another morass of competing claims following the failure of a brokerage that Congress enacted SIPA to establish a comprehensive liquidation process that would "as promptly as possible . . . distribute customer property and . . . satisfy net equity claims of customers," 15 U.S.C. § 78fff(a)(1)(B) (SPA-87), in a fair and equitable fashion as determined by Congress. The whole point was to displace the operation of otherwise applicable laws that impeded achievement of that result.

### B.    To the Extent They Conflict, SIPA Preempts the NYAG's and Receivers' State Law Claims

"[T]he laws of the United States . . . shall be the supreme law of the land . . . , anything in the constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl. 2. Even when Congress has not expressly preempted state law or occupied the field,

50

"state law is nevertheless pre-empted [1] to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or [2] when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989) (quotation marks and citations omitted). The settlement's resolution of state law claims clearly fails both tests.

First, the settlement of the NYAG's and Receivers' state law claims is preempted to the extent it prevents compliance with SIPA's requirements regarding the recovery and distribution of "customer property." *See id.* SIPA defines "customer property" to include "property unlawfully converted" and "any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers . . . ." 15 U.S.C. § 78*lll*(4)(E) (SPA-104–SPA-105). It specifically authorizes the Trustee to avoid and recover wrongful transfers of stolen customer property from the debtor, 15 U.S.C. §§ 78fff-1(a), 78fff-2(c)(3) (SPA-90; SPA-95), and mandates that "[s]uch recovered property shall be treated as customer property," § 78fff-2(c)(3) (SPA-95), and therefore

51

distributed on a *pro rata* basis and in accordance with SIPA's priority scheme. § 78fff-2(c)(1) (SPA-95).

Carrying out these provisions, the Trustee brought an action against the Merkin Defendants to recover customer property that was wrongfully transferred to them. Should the Trustee prevail in that action, federal law entitles the BLMIS estate to recover such property, and it is the Merkin Defendants' commensurate obligation under federal law to return it. It is also the Trustee's obligation, upon recovery of such property, to distribute it in accordance with SIPA's priority scheme. § 78fff-2(c)(1)(B), (d) (SPA-95–SPA-96). This is how SIPA treats property that should have been set aside or held for the benefit of customers but was instead wrongfully transferred to third parties; under SIPA, those parties have no legitimate claim to retain such stolen property and certainly no right to dissipate it.

The settlement clashes with those federal obligations by relying on state law to deny the Trustee possession of customer property that federal law entitles him to recover and circumventing the congressionally mandated priority scheme. And it would do this, while the Trustee's Recovery Action is pending, to settle state law claims that

52

are premised on the operation of the same fraudulent enterprise that is the subject of the SIPA liquidation proceedings and that seek the same customer property that is the subject of the Trustee's claims under SIPA—*i.e.*, the "fees" that the Merkin Defendants withdrew from BLMIS. Because compliance with both federal law and the settlement's execution of state law is not possible until the Trustee's claims against the Merkin Defendants are resolved, the settlement may not be carried out at this time.

Second, the settlement is preempted to the extent it interferes with the Trustee's ability to recover customer property because it is plainly "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *ARC Am.*, 490 U.S. at 101 (quotation marks omitted). Congress's avowed purpose was to end the pre-SIPA litigation free-for-all, which resulted in arbitrary and unfair recoveries and undermined investor confidence in securities markets, by establishing a comprehensive and orderly liquidation process that would rapidly recover and return property to the customers of failed brokerages. 15 U.S.C. § 78fff(a) (SPA-87); *see also* 1970 U.S.C.C.A.N. at 5255 (describing purpose of and need for SIPA). Congress intended that

53

this process would be used to simplify the resolution of massive fraud cases involving numerous parties in complex arrangements, like the collapse of Ira Haupt & Co., by putting a single trustee at the helm of the recovery process and placing certain "customers" at the front of the line for distributions.

The NYAG has plainly acknowledged that the purpose of his action against the Merkin Defendants was to obtain special recoveries for two groups of Merkin investors: New York citizens and New York charities.    A-1666; A-1784.    The Receivers, of course, seek special recoveries for investors in their respective funds.    And Merkin, facing liability that exceeds his assets, may well prefer to facilitate special preferential recoveries for his own former investors rather than return assets to the BLMIS estate for the benefit of all Madoff's victims.    But especially where assets are limited, such special preferences necessarily conflict with Congress's objective of providing an orderly and fair liquidation process, while avoiding multiple recovery proceedings and arbitrary distributions based on such factors as state of citizenship or non-profit status.    The sole fact that the NYAG was first in time to seek to collect on his claims cannot be allowed to present an obstacle to that

objective and therefore must be enjoined pending resolution of the Trustee's claims under SIPA.

The NYAG's assertion below that his claims are premised on exercise of state police power makes no difference because an actual conflict, as here, overcomes any presumption against preemption. *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). In any case, the settlement is plainly not an exercise of the police power. First, a state "is no longer acting in its 'police or regulatory capacity'" when it attempts to collect money. *SEC v. Brennan*, 230 F.3d 65, 73 (2d Cir. 2000). Even if the NYAG could rely on its police power to obtain judgment on its claims at this time, any attempt to *collect* on that judgment, as here, would not be an exercise of the police power and would therefore be barred by the automatic stay. *See infra* § III. Second, the settlement, like the claims it resolves, seeks to benefit select private parties, and it does not exact any fine or other legal sanction or even enjoin Merkin from undertaking any activity. Accordingly, the NYAG is not acting in his police or regulatory capacity, *see Brennan*, 230 F.3d at 71, 73, but is instead facilitating a financial recovery by private investors. *See* Slip Opinion at 28 n.4, *Beacon*

*Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I (In re Beacon Assocs. Litig.)*, No. 09-6910 (S.D.N.Y. May 15, 2013) (citing *Connecticut v. Physicians Health Services*, 287 F.3d 110 (2d Cir. 2002), and *New York v. 11 Cornwell Co.*, 695 F.2d 34, 38 (2d. Cir. 1982), as indicating that the NYAG likely lacks standing to pursue claims against Madoff feeder funds because he "cannot bring claims for damages on behalf of private citizens") (Add-28).

## III.   The Settlement Violates the Automatic Stay

The automatic stay "should not be undermined by artful pleading that depends on form rather than substance." *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1187 (5th Cir. 1986) (quotation marks omitted).  Otherwise, it would be entirely ineffective to preserve the assets of a bankrupt estate for the benefit of all its creditors.  While purporting to seek remedies for wholly "independent" injuries different from those of Madoff's other victims, certain of the NYAG's and Receivers' claims seek to recover assets that they allege were transferred from BLMIS to the Merkin Defendants, on the basis that the Merkin Defendants had actual or constructive knowledge of Madoff's fraud.  The settlement, in turn, would dissipate those precise

56

assets.   Thus, the substance of certain of the NYAG's and Receivers'
claims, if not their form, is fraudulent conveyance, which this Court has
held to be the paradigmatic example of a true "claim against the debtor"
that is subject to the automatic stay under 11 U.S.C. § 362(a)(1).  *See*
*FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131-32 (2d Cir.
1992).   The settlement, which makes no distinction between these and
other claims, therefore violates the stay.

       This Court held in *Colonial Realty* that "a third-party action to
recover  fraudulently  transferred  property  is  properly  regarded  as
undertaken 'to recover a claim against the debtor' and subject to the
automatic stay" under Bankruptcy Code Section 362(a)(1).  *Id*.  That is
because, "'[a]bsent a claim against the debtor, there is no independent
basis for the action against the transferee.'"  *Id*. at 132 (quoting *In re*
*Saunders*, 101 B.R. 303, 305 (N.D. Fla. 1989)).   In fact, the legislative
history of Section 362(a)(1) indicates that it was intended precisely "to
prevent the issuance of a writ of execution by a judgment creditor of the
debtor to obtain property that was property of the debtor before the case
but that was transferred." *Id*. (quoting H.R. Rep. No. 95-595, *reprinted*

57

*in* 1978 U.S.C.C.A.N. 5787, 6297). *See also Saunders*, 101 B.R. at 305 (applying automatic stay to third-party action).

On that reasoning, *Colonial Realty* affirmed the injunction of an FDIC action seeking to recover millions that an executive of several failed banks' leading borrower, by then in bankruptcy, had transferred to his wife. *Id.* at 127–28. Although those funds were not yet "property of the estate" within the meaning of 11 U.S.C. § 362(a)(3) (SPA-43), the action against the wife was an "action . . . to recover a claim against the debtor" and therefore subject to the automatic stay. *Id.* at 132.

Certain of the NYAG's and Receivers' claims here are, in substance, indistinguishable from those in *Colonial Realty*. In particular, these claims (as pleaded) seek to recover "fees" that the Merkin Defendants took from assets withdrawn from BLMIS, on the basis that the Merkin Defendants had actual or constructive knowledge of Madoff's fraud. *See* A-61; ████████████████████ ████████████████████████████████████████ ██████████████████████ That is, of course, the same basis as the avoidance action brought by the Trustee on behalf of all BLMIS creditors. These are, in essence, fraudulent transfer claims, creatively

58

pleaded, and duplicate the Trustee's own claims.  As such, they are subject to the stay.

For the same reasons, these claims are, at the absolute least, "intertwined" with the BLMIS estate's fraudulent transfer claims, which are unquestionably "property of the estate" subject to the automatic stay under 11 U.S.C. § 362(a)(3) (SPA-62).  *See 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987).  Accordingly, such claims by the NYAG and Receivers are equally subject to the stay.  *Id.*

The district court erred in holding that, because the Merkin Fund investors are not direct BLMIS customers, claims on their behalf are not subject to the automatic stay.  SPA-16.  First, the automatic stay is not limited to claims by creditors, and would be entirely ineffectual if it were.  By its terms, it bars any action "to recover a claim against the debtor," "to obtain possession of property of the estate or . . . to exercise control over property of the estate," or to "to collect, assess, or recover a claim against the debtor," irrespective of whether such attempts are undertaken by creditors.  11 U.S.C. § 362(a)(1), (3), (6) (SPA-43).  The point is not just to block creditors from obtaining undue preferences,

but "to prevent dissipation of the debtor's assets before orderly distribution to creditors can be effected." *Brennan*, 230 F.3d at 70 (quotation marks omitted).

Second, as described in § I.B *supra*, Merkin Funds investors *are* creditors of BLMIS, indirectly through their respective Funds' customer claims and directly as low-priority unsecured creditors due to the injury that they suffered as a result of Madoff's fraud. By seeking recovery of the same assets sought by the Trustee, the settlement and the underlying Third Party Actions are seeking to collect on the Trustee's claims, thus prejudicing the Trustee's ability to pursue his claims on behalf of all BLMIS creditors. That is "inconsistent with the basic purpose of the automatic stay." *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.)*, 108 F.3d 881, 884 (8th Cir. 1997). On that basis, the settlement's attempt to recover from the proceeds of fraudulent transfers received by the Merkin Defendants is additionally precluded by 11 U.S.C. § 362(a)(6). *See id.* Application of the automatic stay is essential in this instance "'to prevent creditors from stealing a march on each other.'" *Id.* (quoting *Brown v. Armstrong*, 949 F.2d 1007, 1010 (8th Cir. 1991)).

60

The district court's holding that the automatic stay was inapplicable because the Trustee lacked "standing" to bring the NYAG's and Receivers' precise claims, as pleaded, *see* SPA-15, is contrary to precedent. In *Colonial Realty*, it was undisputed that the claim at issue "belongs exclusively to the FDIC as receiver." 980 F.2d at 130. But that was irrelevant because "the FDIC is clearly seeking to recover a claim against [the debtor]." *Id*. at 132. Whether the Trustee could or could not bring the precise claims asserted by the NYAG and Receivers has no bearing on application of the automatic stay. *See also Fox v. Picard (In re Bernard L. Madoff)*, 848 F. Supp. 2d 469, 483–86 (S.D.N.Y. 2012).

Finally, exercise of the state's police power is no bar to application of the automatic stay where the state attempts to go beyond fixing liability and seeks to collect money. *Brennan*, 230 F.3d at 73.

## IV. The Trustee's Injunction Action Is Not Barred by Laches

Laches is "designed to promote justice by preventing surprises," *In re Becker*, 407 F.3d 89, 97 (2d Cir. 2005) (quoting *Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296, 301 (1946)), and not, as here, as an offensive weapon to defeat claims that all parties knew were inevitable.

61

The Trustee told the NYAG and Receivers repeatedly, from the very beginning, that he would seek to block any attempt to collect fraudulently transferred assets held by the Merkin Defendants. Moreover, the Trustee made clear that certain of the NYAG's and Receivers' claims were subject to the automatic stay. The Trustee negotiated with the other parties over the course of the litigation, in the hope of reaching a global settlement. Only when the other parties struck a deal to dissipate the Merkin Defendants' assets was the estate's interest placed in jeopardy—at which point the Trustee immediately filed suit. In these circumstances, the other parties could only have been surprised if the Trustee *had not acted to protect the estate's interest* by seeking an injunction.

The district court misconstrued and misapplied the law governing laches, ruling that notice to and negotiations with the other parties could not justify the Trustee's waiting to seek an injunction. *See* SPA-10–SPA-11. It dismissed the Trustee's entire action without even evaluating the application of laches to his claim for relief under Section 105, which differs from application of the automatic stay in terms of both timing and potential prejudice. It disregarded the relief sought by

the Trustee in a way that suggested prejudice to the injunction defendants and settlement beneficiaries where, in fact, none existed. And it ignored that the "automatic stay" is, in fact, automatic, such that its enforcement cannot be barred by laches when the party breaching it knows that it is in force.

Because the NYAG and Receivers have plainly failed to carry their burden to demonstrate (1) that the Trustee unreasonably delayed in bringing suit and (2) that such delay caused them substantial prejudice, *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004), the district court could have no basis to find that laches bars the Trustee's Injunction Action.

### A. The District Court's Application of Laches to the Trustee's Section 105 Claim Was *Per Se* Abuse of Discretion

As an initial matter, the district court abused its discretion by holding, without any analysis, that laches bars the Trustee's claim for relief under Section 105. SPA-12–SPA-13 (finding delay and prejudice regarding application of automatic stay alone). The court proceeded as if the only relief requested by the Trustee was to have the Third Party Actions declared void *ab initio* and permanently enjoined based on

63

application of the automatic stay. *See id.* It ignored entirely the Trustee's Section 105 claim, even while dismissing it.

The Trustee's claim for injunctive relief differs from typical application of the automatic stay in two crucial respects. First, relevant to delay, equitable relief under Section 105 is not automatic, but becomes available only when there is a ripened threat to the estate's interests or the bankruptcy court's jurisdiction. *Lautenberg*, 2013 WL 616269, at *2 (injunction appropriate to prevent "immediate" adverse consequences). That happened when the NYAG and Receivers sought to collect assets from the Merkin Defendants in the settlement. Second, relevant to prejudice, the Trustee expressly moved to enjoin the settlement not for all time, but only until resolution of the Recovery Action. The district court's laches dismissal of the Trustee's Section 105 claim without even addressing it is *per se* abuse of discretion. *See Sykes v. Anderson*, 625 F.3d 294, 323 (6th Cir. 2010); *United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir. 1976).

## B. The District Court's Application of Laches to the Trustee's Section 105 Claim Cannot Be Supported

Its ruling was, in any case, unsupportable, because neither delay nor substantial prejudice is present. There was no delay because the

64

Trustee brought suit as soon as he learned that the other parties had reached a settlement without his participation. The district court found that the Trustee's interest was threatened from the moment the NYAG's summary judgment motion had been briefed and argued in February 2011. SPA-11. But in fact, at that point, the NYAG had made absolutely no attempt to collect assets from the Merkin Defendants and would not be able to do so until and unless he first obtained judgment. Moreover, negotiations between the Trustee, the Receivers, and the Merkin Defendants resumed in 2011, and continued for months thereafter. A-994–A-995, ¶¶8–9; A-2510–A-2512, ¶¶17–21. Indeed, the parties to the settlement asked the state court to take the NYAG's pending motion for summary judgment off the calendar in light of the ongoing negotiations between all parties. A-995, ¶9. As explained below, those negotiations excuse any delay in the Trustee's seeking an injunction; they also reveal that the threat of dissipation was not immediate, and the Trustee's Section 105 claim not yet ripe, until the collapse of negotiations and the announcement of the non-global settlement in 2012. "Although a plaintiff cannot simply sleep on his rights, he has no obligation to sue until . . . his right to protection

[has] clearly ripened." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic*, 314 F.3d 62, 68 (2d Cir. 2002) (alteration original) (quotation marks omitted).

Any further delay would cause, at most, only minor prejudice to the other parties, because the Trustee seeks to enjoin the settlement only until the Recovery Action is complete. If the Merkin Defendants' assets ultimately prove insufficient to satisfy the settlement, that is due to the operation of SIPA and the Bankruptcy Code, which require that a SIPA trustee have first claim on fraudulently transferred assets necessary to provide for recovery to the estate's creditors, *see supra* §§ I, II. But that result would not be due to the Trustee's timing in bringing the Injunction Action, and so is not relevant to application of laches. *See also United States v. Oddo*, 314 F.2d 115, 119 (2d Cir. 1963) ("To make operative the defense of laches, the lapse of time must bring with it actual and demonstrable prejudice.").

## C.    Notice and Negotiation Bar Laches

The district court's holding that the Trustee had an obligation to rush to the courthouse and file suit to enjoin the Third Party Claims to preserve objections of which NYAG and Receivers were undisputedly on

66

notice is directly contrary to this Court's precedents. *See* SPA-8–SPA-10.

Laches is not available where a defendant "cannot claim to have been unfairly surprised by, nor can it claim to have been unable to plan to account for, a dispute of which it was promptly informed." *Veltri*, 393 F.3d at 326–27. On that basis, the Second Circuit reversed a district court's decision that a retiree's lawsuit against a pension fund, filed some eleven years after he first objected to his monthly payment, was barred by laches. *Id.* It was enough, the court explained, that the retiree "in fact informed the Fund of his concern within months of the initial determination." *Id.* at 326. *See also NML Capital v. Republic of Argentina*, 699 F.3d 246, 261 (2d Cir. 2012) (rejecting laches defense where nation was on notice, five years before suit, that bondholders might sue); *Hutton Constr. Co., Inc. v. Cnty. of Rockland*, 52 F.3d 1191, 1193 (2d Cir. 1995) (rejecting laches defense where defendants had "notice the Sureties might assert their rights"); *EEOC v. Local 638*, 753 F.2d 1172, 1179 (2d Cir. 1985), *aff'd*, *Local 28 v. EEOC*, 478 U.S. 421 (1986) (rejecting laches defense where "Defendants had ample notice that plaintiffs were dissatisfied"). Here, the district court acknowledged

67

that the other parties were on notice of the Trustee's objections, but declined to give that fact any legal effect.  SPA-10.  Its complete rejection of clear Circuit precedent on that point was legal error.

Moreover, the district court's holding that the Trustee was obligated to file suit despite the prospect of settlement is precisely contrary to "the interest of encouraging disputants to settle claims prior to the institution of litigation."  *Mogavero v. McLucas*, 543 F.2d 1081, 1083 (4th Cir. 1976).  In this case, it is uncontested that negotiations to reach a global settlement commenced in 2009 and continued through the spring of 2012, during which period the Trustee repeatedly warned the NYAG and Receivers that he would seek to enjoin any attempt to collect from the Merkin Defendants without resolving the estate's claims.  A-2507–A-2512, ¶¶4–21.  "Where plaintiff has not slept on her rights, but has been prevented from asserting them . . . because of ongoing settlement negotiations, the delay is reasonable and the equitable defense of laches will not bar an action."  *Stone v. Williams*, 873 F.2d 620, 625 (2d Cir.), *vacated on reh'g on other grounds*, 891 F.2d 401 (2d Cir. 1989) (laches unavailable where defendants lacked clean hands).  *See also A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960

F.2d 1020, 1033 (Fed. Cir. 1992) (plaintiff's "negotiations with the accused" excuse delay). Again, the district court committed legal error when it recognized the parties' ongoing negotiations but refused to accord them any legal effect.

### D. Laches Does Not Apply to Enforcement of the Automatic Stay

Finally, the district court erred in holding that it was the Trustee's obligation to file an action to enforce the automatic stay, rather the NYAG's and Receivers' to seek to lift it. SPA-10. Where a party's claims implicate the automatic stay, "the onus is on the party seeking to proceed to petition the Bankruptcy Court for relief from the stay." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259 (3d Cir. 2006) (Alito, J.). This is because a Section 362 stay "is automatic in that the debtor does not have to make any formal request that it be issued or that it apply to a particular proceeding." *Id. See also Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 776 (2d Cir. 1992) (a party seeking relief from the automatic stay must move the bankruptcy court in every instance); *In re Tampa Chain Co., Inc.*, 835 F.2d 54, 55 (2d Cir. 1987) ("Relief from the effect of the automatic stay . . . may be granted only by the bankruptcy court."). *Cf. Ostano*

*Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207 (2d Cir. 1986) ("Since the purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay."). That is so even when the property at issue is not yet definitively "property of the estate" because it arguably "has not matured, has no cash surrender value and is otherwise contingent." *ACandS*, 435 F.3d at 260. The NYAG and Receivers cannot argue that laches bars the Trustee's action where it was their obligation alone to seek relief by moving the bankruptcy court to lift the automatic stay.

Moreover, the district court's finding of prejudice with respect to application of the automatic stay was mistaken, because it misapprehended the nature of the relief sought. While it is black-letter law that a claim violating the automatic stay is void *ab initio*, *Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998), the Trustee recognized that the Third Party Actions violate the automatic stay only to the extent that they impede the Trustee's Recovery Action, and therefore sought a preliminary injunction to remain in force only "until the completion of the Trustee's Merkin Action." A-466. The district court's assumption that the

70

Trustee only sought to have those claims declared void for all time is without any support.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of the Trustee's application for an injunction and remand with instructions to enjoin the NYAG, Receivers, and Merkin Defendants from executing the $410 million settlement announced in the NYAG's June 25, 2012 press release or undertaking any further efforts at substantially depleting the Merkin Defendants' assets pending the completion of the Trustee's Recovery Action.

Dated:       June 6, 2013                    Respectfully submitted,

/s/   David J. Sheehan
DAVID J. SHEEHAN
DEBORAH H. RENNER
TRACY L. COLE
KEITH R. MURPHY
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, N.Y. 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
dsheehan@bakerlaw.com

DAVID B. RIVKIN, JR.
LEE A. CASEY
MARK W. DELAQUIL
ANDREW M. GROSSMAN
BAKER & HOSTETLER LLP

71

1050 Connecticut Ave., N.W.
Washington Square, Suite 1100
Washington, D.C. 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
drivkin@bakerlaw.com

*Attorneys for Trustee-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,910 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a 14-point proportionally spaced font.

<u>/s/    David J. Sheehan</u>
DAVID J. SHEEHAN

**ADDENDUM**

## Table of Contents

PAGE

Amended Decision and Order, dated May 15, 2013, *In Re Beacon Associates Litigation*, United States District Court for the Southern District of New York, Case No. 09 Civ. 777....................ADD-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――x

IN RE BEACON ASSOCIATES LITIGATION

This Document Relates to: ALL ACTIONS                    09 Civ. 777 (CM)

―――――――――――――――――――――――――x

IN RE J.P. JEANNERET ASSOCIATES, INC. et al,
                                                         09 Civ. 3907 (CM)
This Document Relates to: ALL ACTIONS

―――――――――――――――――――――――――x

BEACON ASSOCIATES MANAGEMENT CORP.,

                    Plaintiff,
                                                         09 Civ. 6910 (CM)
        -against-

BEACON ASSOCIATES LLC I,

                    Defendants.

―――――――――――――――――――――――――x

ERNEST A. HARTMENT et al.,

                    Plaintiffs,
                                                         09 Civ. 8278 (CM)
        -against-

IVY ASSET MANAGMEENT L.L.C. et al.,

                    Defendants.

―――――――――――――――――――――――――x

1

```
                                                  x
BOARD OF TRUSTEES OF THE BUFFALO
LABORERS SECURITY FUND, WELFARE FUND
AND WELFARE STAFF FUNDS, in their capacity
as fiduciaries of the respective funds, individually and
on behalf of all others similarly situated,

                    Plaintiffs,
                                                      09 Civ. 8362 (CM)
        -against-

J.P. JEANNERET ASSOCIATES, INC., JOHN P.
JEANNERET, PAUL L. PERRY, and IVY ASSET
MANAGEMENT CORPORATION,

                    Defendants.
                                                  x
HILDA L. SOLIS, Secretary of the United States
Department of Labor,

                    Plaintiff,
                                                      10 Civ. 8000 (CM)
        -against-

 BEACON ASSOCIATES MANAGEMENT CORP.,
et al.,

                    Defendants.
                                                  x
STEPHEN C. SCHOTT, as Trustee for the
STEPHEN C. SCHOTTA 1984 TRUST,

                    Plaintiff,
                                                      10 Civ. 8077 (CM)
        -against-

IVY ASSET MANAGEMENT CORP. et al.,

                    Defendants.
                                                  x
```

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
_____x

THE PEOPLE OF THE STATE OF NEW YORK
BY ERIC SCHNEIDERMAN, Attorney General
of the State of New York,

                    Plaintiff,

      -against-

IVY ASSET MANAGEMENT LLC, LAWRENCE
SIMON and HOWARD WOHL,

             Defendants.
_____x

Index No. 450489/2010

DONNA M. McBRIDE, individually and derivatively
on behalf of Beacon Associates LLC II,

             Plaintiff,

      -against-

KPMG INTERNATIONAL et al.,

             Defendants,
      -and-

BEACON ASSSOCIATES LLC II,

             Nominal Defendant.
_____x

Index No. 650632/2009E

ALISON ALTMAN et al.,

             Plaintiffs,
      -against-

BEACON ASSOCIATES MANAGEMENT CORP.,
et al.,
_____x

Index No. 652239/2010

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
_____x

JOEL SACHER and SUSAN SACHER, derivatively
on behalf of BEACON ASSOCIATES LLC II,

          Plaintiffs,

      -against-

BEACON ASSOCIATES MANAGEMENT CORP.
et al.,

          Defendants,

      -and-

BEACON ASSOCIATES LLC II,

          Nominal Defendant.
_____x

CHARLES J. HECHT, derivatively on behalf of
ANDOVER ASSOCIATES LLC I,

          Plaintiff,

      -against-

ANDOVER ASSOCIATES MANAGEMENT CORP.
et al.,

          Defendants.

      -and-
ANDOVER ASSOCIATES LLC I,

          Nominal Defendant.
_____x

Index No. 5424/2009

Index No. 6110/2009

4

```
                                                        x
THE JORDAN GROUP LLC, derivatively on behalf of
BEACON ASSOCIATES LLC I,

            Plaintiff,
                                          Index. No. 3757/2011
       -against-

BEACON ASSOCAITES MANAGEMENT CORP.
et al.,

            Defendants,

       -and-

BEACON ASSOCIATES LLC I,

            Nominal Defendant.
                                                        x

CIRCUIT COURT OF THE STATE OF FLORIDA
FIFTEENTH JUDICIAL CIRCUIT, PALM BEACH COUNTY
                                                        x
HARVEY GLICKER, et al.,

            Plaintiffs,
                                          Court File No.
       -against-                          502010CA029643
                                          XXXX MBAB

IVY ASSET MANAGEMENT CORP., et al.,

            Defendants.
                                                        x
```

5

**AMENDED DECISION AND ORDER APPROVING SETTLEMENT AND GRANTING PLAINTIFFS' COUNSELS' JOINT MOTION FOR AWARD OF ATTORNEYS' FEES**

McMahon, J.:

The above-captioned actions, brought in this court and in the New York State Supreme Court in New York and Nassau Counties, are among the plethora of lawsuits arising out of the Bernard Madoff disaster. These actions are among the so-called "feeder fund" lawsuits; in this case, they focus on the activity of defendant Ivy Asset Management ("Ivy"), through whom the other defendants – Beacon Associates, Andover Associates, and J.P. Jeanneret Associates ("Jeanneret"), together with various affiliates – invested client funds in the Madoff Ponzi Scheme.

This court, which superintended the Jeanneret actions from the beginning, inherited the Beacon actions in January, upon the retirement of The Hon. Leonard B. Sand.

The various New York and Florida state court actions appearing in the caption are temporarily before this court in the context of a motion to approve a global settlement of all actions in which Ivy is named as a defendant. The settlement extends to all defendants in all of those actions. This court's approval is required for the Rule 23 class actions that were filed and prosecuted here (SDNY Civil Action Nos. 09 Civ. 0777, 39078 and 8362). The State Court actions (principally derivative suits) and the other federal actions (notably the Hartman Action, brought by the Trustees of 17 ERISA benefit funds) were settled simultaneously. Certain aspects of the settlements in the non-Rule 23 cases (notably a cap on attorneys' fees that would not ordinarily require court approval) were voluntarily made contingent on this court's approval. Adopting the parties' nomenclature, I will hereinafter refer to these lawsuits as the "Settling Actions."

I do not here intend to recite the history of the Madoff scandal; it is too well known to bear repeating. Decisions by Judge Sand and me denying the motions to dismiss in *In re Beacon* and *In re Jeanneret* recount the asserted background of the investment decisions that are the subject of this litigation. The reader is referred to them for background information.

For the reasons set forth below, the settlement, the Plan of Allocation, and the request for reimbursement of expenses are all granted without modification. The request for attorneys' fees is granted with one modification, explained below. The objections are disallowed.

## BACKGROUND

**I.    Settlement**

After laborious negotiations, including several full-day mediations sessions involving all parties interested in these actions – a group that included the NYAG and the United States Department of Labor ("DoL"), as well as the Class, Derivative, and Individual Plaintiffs (hereinafter, the "Private Plaintiffs") – a settlement in the amount of $219,857,694 was reached. The Settlement was expressly made subject to the execution of a Settlement Agreement between the Parties to the Madoff Trustee Proceeding in the United States Bankruptcy Court for the Southern District of New York, pursuant to which the Madoff Trustee has agreed to approve the claims of the Beacon and Andover Funds in certain stipulated amounts. This means that the Madoff Bankruptcy Estate will also make payments to the investors whose interests are represented by the Private Plaintiffs in the Settling Actions.

The Gross Settlement Amount consists of $216,500,000 in cash, plus the waiver of management fees of $3,357,694 accrued by the Beacon Defendants. Ivy is putting up $210,000,000 of the Settlement Amount; Jeanneret $3,000,000; and Beacon cash and waived fees totaling $6,857,694.

From this Gross Settlement Amount, $7 million is to be paid to the DoL and $5 million to the NYAG. Court-approved attorneys' fees and expenses, notice and administration expenses and taxes and tax expenses will then be deducted. If the court approves the fee and expense request in its entirety, this settlement would represent approximately 70% of the net dollars invested by the plaintiffs with Madoff (using the formulation endorsed in the Madoff Bankruptcy proceedings). *In re Bernard L, Madoff Inv. Sec. LLC*, 654 F. 3d 229, 235-42 (2d Cir. 2011). The settlement, coupled with the recoveries these investors can anticipate from the bankruptcy estate, is expected to return to the Private Plaintiffs collectively all or nearly all of the money they invested with Madoff.

Not a single voice has been raised in opposition to this remarkable settlement, or to the Plan of Allocation that was negotiated by and between the Private Plaintiffs, the NYAG and the DoL.[1] I approved the settlement orally at the Fairness Hearing, held on March 15, 2013, and I endorse that approval in writing today.

The settlement, taken as a whole, is fair, reasonable, and adequate. In fact, the Private Plaintiffs and regulators have collectively achieved a remarkable result. Counsel and the regulatory agencies who participated in its negotiation are to be congratulated.

### A.    The Settlement is Procedurally Fair.

The settlement was reached after protracted arms-length negotiations conducted over the span of nine months by experienced counsel after meaningful discovery. It was reached despite the high bar imposed by defendants' insistence that any settlement resolve the full scope of their exposure in all lawsuits anywhere, and that the settlement of investors' claims be completed in conjunction with the resolution of the Madoff Trustee Proceeding. All formal negotiations were

---

[1] The court did receive one letter from a Christine Duttweiler, objecting to the payments to the DoL and NYAG, but I find no merit in the objection.

conducted with the assistance of two independent mediators – one to mediate disputes between defendants and the investors and another to mediate claims involving the Bankruptcy Estate. Class Representatives and other plaintiffs were present, in person or by telephone, during the negotiations. The US Department of Labor and the New York State Attorney General participated in the settlement negotiations. Rarely has there been a more transparent settlement negotiation. It could serve as a prototype for the resolution of securities-related class actions, especially those that are adjunctive to bankruptcies.

    **B.**    **The Settlement is Substantively Fair.**

The settlement ticks off all the important "*Grinnell* factors":

1. The actions involved difficult and complex factual issues, especially because the defendants were not themselves the alleged perpetrators of the underlying securities fraud (Madoff), but were themselves Madoff customers, who cast themselves as among his victims, and whose "sin" was variously described as (i) their failure to recognize Madoff's duplicity, or (ii) their failure to share with their clients their suspicions about Madoff's *bona fides*. The theories of liability were novel and untested.

2. Both Private Plaintiffs' Counsel and the regulators had access to considerable discovery, and so were in an excellent position to evaluate what the settlement really offered to the investors.

3. There were a number of open legal questions concerning the liability of third parties like Ivy and Jeanneret, which made settlement an attractive alternative to litigation – especially since many of Madoff's investors were older people who do not need to

wait years and years to get back the money that was stolen from them in his

extraordinary Ponzi scheme.

4.  There was no risk at the District Court level that the action could not be maintained as

a class action through trial,[2] but Judge Sand's class certification orders were before

the Second Circuit and there was no guarantee that they would not be overturned if

the Circuit chose to entertain Ivy's Rule 23(f) petitions (though this court believes

that was a highly unlikely proposition).

5.  Ivy could easily have withstood a greater judgment.

6.  The recovery in this case is unlike anything this court has ever seen, affording well

over 50% recovery to the Madoff investors involved in these lawsuits. It is, in a word,

unprecedented.

Factors 1, 2, 3, and 6 strongly favored settlement; Factor 4 was neutral. Only Factor 5

might have counseled against settlement; but given the Settlement Amount, the prospect of years

of litigation before investors would see any money, and the cost of obtaining full recovery rather

than a 70% recovery, the game was simply not worth the candle. The fact that the investors are

all but certain to recover additional sums through the efforts of the Madoff Trustee also counsels

in favor of approving the settlement.

7.  Above all, the members of the class overwhelmingly approve of the settlement.

The Court-approved Notices that were sent to Class Members to apprise them of the

settlement and the procedures devised by the parties for disseminating same to the Class

Members proved to be remarkably effective. The notices were in fact reasonably calculated to

---

[2] Judge Sand had already certified classes in the Beacon and Buffalo Laborers cases (while excluding from those classes the plaintiffs in *Hartman v. Ivy Asset Management*, 09 Civ. 8278). This court was asked to stay its hand on the class certification motions in *Jeanneret* pending the outcome of the settlement negotiations, and I did so, but the likelihood that I was going to certify a class was overwhelming.

apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The proof of the pudding is that an astonishing 98.72% of the Rule 23(b)(3) Class Members who were eligible to file a proof of claim did so (464 out of 470), and only one Class Member opted out (that Class Member was not entitled to recover anything under the Plan of Allocation). I have never seen this level of response to a class action Notice of Settlement, and I do not expect to see anything like it again.

Additionally, of the 83,022 Rule 23(b)(1) Class Members who received notice, only one filed an objection to the terms of the settlement.

The strong support for the settlement demonstrated by the Class Members and the absence of any serious objection indicates that the real parties in interest – the investors who were ensnared in the Madoff Ponzi scheme – are satisfied with the results achieved by the settlement. The only objection recorded to the settlement is, in effect, to the contents of the Notice, since the objector (Duttweiler) principally protests that she has insufficient information about the resources of the defendants. But the court has previously concluded that the Notice provided all the information that a Class Member needed in order to decide whether to participate in the settlement. The fact that this Class Member's objection was not echoed by anyone else reinforces my inclination to reject the Duttweiler Objection, and I do so.

The court also approves the Plan of Allocation. In this case, there were multiple classes and groups of investors. Recovery had to be allocated among four separate investment vehicles (Beacon, Income Plus, Andover, and the Direct, or DIMA, Investors). The parties balanced many factors, including the net amount invested with Madoff through each vehicle, the timing of investments and lost opportunity costs (particularly important to those investors who received more in distributions from Madoff than they actually invested), fees paid to defendants, SIPC

advances, and money paid to resolve the Madoff Trustee litigation. The negotiations over the

Plan of Allocation included a separate, one day mediation. The regulators were actively involved

in the process of setting up the Plan of Allocation. No one has objected to it or suggested any

reason why it is inadequate, except for Objector Duttweiler, who thinks it inappropriate for the

regulators to receive any payment out of the Settlement Fund. I disagree; the taxpayers have

borne considerable costs as a result of the investigations into Madoff and those who, like

defendants, dealt with him. Reimbursement for at least part of those costs is entirely appropriate.

I thus approve the entire Plan of Allocation, including allocation of $5 million to the NYAG and

$7 million to the DoL.

In short, there is no reason to reject the settlement and every reason to approve it. And I

do.

## II.    Attorneys' Fees and Expenses

Approving the settlement was the easy part.

The real issue before the court is whether the requested fee award should be approved.

The NYAG and several other parties have objected to that award, arguing that it should be

substantially reduced.

After considerable thought, I am prepared to accept the negotiated fee award, with one

minor but, in my view, necessary adjustment to the fees to be paid to the attorneys in the Class

Actions. I also grant the unopposed motion for an award of expenses in the amount of

$1,213,292.58, plus additional expenses that may have accrued in the Class Actions. I note that

the expenses of Hartman Counsel and Ross & Orenstein are being paid by their clients, and are

not subject to court approval, even as part of the overall settlement.

**A.    Principles Governing Approval of Fee Applications**

We start by recognizing several propositions.

The first is that counsel for a class is entitled to be paid a fee out of the common fund created for the benefit of the class. *Guippone v. BH S&B Holdings, LLC*, No. 09 Civ. 1029, 2011 WL 5148650, at *8 (S.D.N.Y. Oct. 28, 2011). In this case, we are in the unusual posture that the fee request is being made on behalf of all Private Plaintiffs' Counsel, even those who are not litigating in this court (principally the plaintiffs in various derivative actions) or who were retained to litigate direct actions and are not representing Rule 23 classes (the Hartman Plaintiffs). This is an artifact of the global nature of the settlement; counsel have agreed to participate in a carefully negotiated "common fund" settlement, rather than billing their respective clients separately.

The second is that a court overseeing a class action can only approve a fee request that is fair and reasonable.

The third is that the trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases, reserving the traditional "lodestar" calculation as a method of testing the fairness of a proposed percentage award. *See, e.g., In re Bisys Sec. Litig.*, No. 04 Civ. 3840, 2007 WL 2049726, at *2 (S.D.N.Y. July 16, 2007). In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund. *See, e.g., Velez v. Novartis Pharmaceuticals Corp.*, No. 04 Civ. 9194, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) (collecting cases).

**B.    Relevant Facts: What Private Plaintiffs' Counsel Did**

Herewith the factual background leading to the application for fees in these cases.

Both the Beacon and the Jeanneret actions were client-driven from the beginning, unlike all too many class actions, which are lawyer-driven. The Lead Plaintiffs in *In re Beacon* and *In re Jeanneret* held a multi-law firm "beauty contest," in which a number of firms competed for the position of Lead Counsel. The beauty contest was won by Lowey Dannenberg, which offered to serve as Lead Securities Counsel for fees the *lesser* of (i) four times the hourly rate as calculated under the lodestar method, or (ii) 22% of any amount recovered. The 22% number represented a significant reduction from the size of fee awards that are routinely approved in this Circuit – although I hasten to add that it does not automatically make the fee a reasonable one.

Both Judge Sand and I approved the retention of Lowey Dannenberg as Lead Counsel – specifically, as Lead Counsel in *In re Beacon*, Lead Securities and Derivative Counsel in *In re Jeanneret,* and Liaison Counsel in all the coordinated actions. Kessler Topaz Meltzer & Check, LLP were appointed Lead Counsel in the *Buffalo Laborers* Action, which was the ERISA case in *Jeanneret*. Cohen Milstein Sellers & Toll PLLC were appointed ERISA Class Counsel in *In re Beacon*. Other subclasses were identified in In re Beacon and counsel were appointed to represent those subclasses – Bernstein Liebhard LLP to represent the "Investor Class" and Wolf Haldenstein Adler Freeman & Herz (which was already prosecuting three separate derivative actions in the Supreme Court: Nassau County[3]) to represent a different "Investor Class."

Neither Judge Sand nor I placed any special conditions on these appointments in terms of cost containment. In retrospect, I wish that I had imposed conditions to keep down the cost of document review, and I undoubtedly will in the future when approving the appointment of Lead Counsel (this will be discussed further below).

---

[3] The Nassau county derivative actions were brought by the firm of Hecht & Associates, P.C., which was "absorbed" (to use counsel's term) by Wolf Haldenstein during the pendency of this litigation. This left Wolf Haldenstein wearing two hats at the end of the day.

14

Private Plaintiffs' Counsel in the Beacon and Jeanneret cases (including the Hartman

Plaintiffs, who were not part of any class action and who, while consolidated with the rest of the

Beacon cases for discovery purposes, were proceeding on their own track and were litigating

ERISA-related issues) responded to two motions to dismiss in each case – one filed prior to May

2010 (when the NYAG filed his complaint in the New York State Supreme Court) and one filed

shortly thereafter. They attended at least seventeen conferences with Magistrate Judge Peck, who

was appointed by Judge Sand and myself to superintend discovery. (I have the transcripts of all

conferences in my chambers.) Counsel in the class actions coordinated the review of documents

already produced to the regulators that will be discussed below; the Hartman Plaintiffs' Counsel

conducted their own parallel review of those documents. All Private Plaintiffs' Counsel

responded to discovery requests from defendants – Class Counsel to requests for class-related

discovery; the Hartman Plaintiffs to requests for discovery about the seventeen ERISA employee

benefit plans that were plaintiffs in their direct action. All counsel participated in the arduous

settlement negotiations, with Lowey Dannenberg taking the lead – not just in dealing with the

defendants, but in coordinating the negotiating strategies of the various Private Plaintiffs, who

were not allied in interest much of the time.

Needless to say, no one was planning to work *pro bono*. The cases were taken on

contingency.

During the settlement negotiations, the plaintiffs themselves engaged in a separate

mediation session over attorneys' fees, during which all Private Plaintiffs' Counsel (including

counsel in actions that are (1) not subject to Rule 23 approval, and even (2) not pending in this

court!) agreed to accept a stipulated amount in fees, subject to the approval of this court. The

proposed payments to the DoL and NYAG that were to be made as part of the settlement were

15

deducted from the sum against which fees for Private Plaintiffs' Counsel would be calculated, as was a payment of $4 million to Named Plaintiffs in the Class Actions. Put otherwise, the Gross Settlement Fund was reduced by $16 million (yielding an Adjusted Settlement Fund) before any percentage was applied in order to calculate a fee. Then, at the insistence of the DoL – which participated actively in the negotiations, and which supports approval of the request – *Private Plaintiffs' Counsel agreed as a group to cap the sum of all fee awards at 20% of that Adjusted Settlement Fund.* This represents a significant reduction in the total amount of fees to be paid by the Madoff investors since, absent these negotiations, Lowey Dannenberg alone would have ordinarily been entitled to seek approval of a fee of 22% of the Gross Settlement Fund (almost $5 million in additional fees) – with everyone else's attorneys being paid on top of that amount!

The parties agree that the Secretary of Labor played a critical role in reducing the Fee Award Cap from 22% to 20%.

At the end of the day, the proposed total fee award amounts to $40,771,538, plus expenses of $1,213,292.58. The breakdown, together with a lodestar calculation from each firm, is attached to this opinion as Appendix A.

### C.    Objections to the Fee Request

Objections to the request for fees have been filed by the NYAG, an attorney purporting to represent four of the Beacon and Andover investment funds in which some of the plaintiffs invested, and two individual investors (Siegel and Medrick). For the most part the objections are mere copycat objections of the one filed by the NYAG, on which I will focus most of the discussion.

The NYAG mounts two separate objections to the fee award. One, predictably, is to the number of hours expended and the amount being charged for those hours – so-called *Goldberger* objections. Those will be dealt with in due course.

The other, however, is unique to this situation and to the involvement of the NYAG in the Madoff investigations. It needs to be separately discussed.

### (i)    *The NYAG Investigation and Settlement Negotiations*

The so-called "Madoff feeder fund" cases, including *In re Beacon* and *In re Jeanneret*, were filed within months of the December 2008 revelation that Madoff had been engaged in a Ponzi scheme for virtually the entire life of Bernard Madoff Investment Services (BMIS). BMIS was in bankruptcy; Madoff was under indictment; and investors were casting about for deep pockets to reimburse them for the loss of the profits (real and imaginary) that they had accrued (or thought they had accrued) because they had been permitted to invest with the wizard who seemingly never lost any money in the market. The securities fraud complaints, filed under the Private Securities Litigation Reform Act (PSLRA), proceeded on the slow and deliberative track dictated by Congress back in 1995. In other words, for long stretches of time, nothing happened because nothing was allowed to happen; the statute effectively prohibits a court from fast-tracking or managing the progress of a securities fraud case. ERISA class actions were also filed, but as has become customary in this court, they were consolidated with and put on the same slow track as the securities fraud cases. The Hartman Plaintiffs (trustees of 17 ERISA benefit funds) declined to rely on the class action track and retained separate counsel to pursue a private, direct action, although that, too, was consolidated with *In re Beacon* for purposes of discovery.

In April 2009, during the long period when the PSLRA effectively imprisoned the actions pending in this court in a state of suspended animation, then-Attorney General Andrew Cuomo

opened an investigation into the Madoff-related activities of feeder fund defendant Ivy Asset

Corporation, a subsidiary of The Bank of New York. Proceeding with (relative) dispatch, since

he was subject to no congressionally-mandated stay – and possessed of subpoena power, which

Private Plaintiffs lacked – the NYAG conducted a year-long investigation into Ivy and several

other entities. The investigation involved the production of over 11 million documents and 37

depositions. The discovery convinced the NYAG that Ivy had fraudulently misled clients about

Madoff for more than a decade, while knowing or strongly suspecting that his was not a

legitimate operation. Among those who were misled, according to the NYAG, were the

managers of Beacon, Andover, and Income Plus Funds, who had collectively invested over $227

of client assets with Madoff.

In May 2010, the NYAG filed a 55 page complaint against Ivy and two of its former

principals, Lawrence Simon and Howard Wohl, detailing the facts uncovered during its

investigation. The complaint identified numerous letters and oral statements sent or made by Ivy

to Beacon, Andover, and/or Income Plus that affirmatively misrepresented Ivy's views about

Madoff, supporting each allegation of non-disclosure with quotations from internal Ivy emails

and documents, and from deposition testimony.

In the months prior to filing the complaint, the NYAG and Ivy engaged in settlement

negotiations. According to the NYAG, Ivy indicated that it would pay an aggregate of $140

million to settle the NYAG's claims – but only as part of a settlement that, among other things,

contemplated the global resolution of all claims by investors in the Beacon, Andover, and

Income Plus Funds; Beacon, Andover, and Income Plus themselves; and all Direct (DIMA)

Investors, including those who had invested with Jeanneret. In short, Ivy told the NYAG that it

would pay $140 million to obtain the settlement it ultimately obtained here for the payment of $210 million.

Had the NYAG been able to effect a settlement, the entire $140 million would have been paid to the investors who are represented in the Private Plaintiffs' Actions – i.e., the Madoff victims who will be receiving payment from the Settlement Fund just approved by this court. There would have been no attorneys' fees, because there would have been no need to pay any attorneys – the NYAG, acting *in parens patriae*, would have created the common fund.

Unfortunately, there was no settlement. Ivy's offer was plainly a conditional offer and the condition – global peace – was not fulfilled. So negotiations broke off and the NYAG complaint was filed.

The existence of the negotiations between Ivy and the NYAG was not disclosed to any of the Private Plaintiffs, whose various lawsuits (see the caption at the head of this opinion) were starting to come to life in this court, the New York State Supreme Court (in two counties), and the state court in Palm Beach County, Florida. No effort was made during the winter and spring of 2010 to bring anyone else into the NYAG/Ivy discussions, or to figure out a way to make the global settlement happen. Apparently no effort was made to involve the Madoff Trustee in Bankruptcy, either, even though his prodigious efforts on behalf of the Madoff "investors" make him the elephant in the room whenever private actions involving Madoff investors are under discussion. Because Beacon and Andover were involved in the NYAG investigation, it appears that they or their attorneys were aware of Ivy's settlement offer, but they never told anyone about it, either – although the law firm that purports to represent four of the Beacon and Andover Funds (Herrick Feinstein) insists that it was pushing for mediation rather than litigation all along

19

because it knew that Ivy had already suggested a serious figure to resolve the cases against it.

(Memorandum of Law at Docket #344, pages 10-11.)

### (ii)     *Proceedings in this Court Following the Filing of the NYAG Complaint*

The filing of the NYAG's complaint led to a round of frenzied activity in the Beacon and

Jeanneret actions that were pending in this court. As originally filed, the complaints in these

actions alleged that Ivy had failed to uncover Madoff's fraud; they did not allege that Ivy had

uncovered the fraud early on but kept that knowledge to itself. The pleadings in both federal

class actions were bereft of the detailed and damning allegations contained in the NYAG

complaint; they were of the "missed red flags" genre of pleading. This was entirely

understandable, since the PSLRA's congressionally-mandated waiting periods and automatic

stay of discovery pending the expiration of a notice/waiting period, the appointment of lead

counsel, and the resolution of motions to dismiss the original complaints had robbed the Private

Plaintiffs of any opportunity to learn via discovery what Ivy had been forced to disclose to the

NYAG.

But as soon as the NYAG filed its complaint, both the Beacon and the Jeanneret

complaints were amended to reflect the results of the year-long, subpoena-aided, public

regulator-led investigation. Eventually, Judge Sand and I denied a second round of motions to

dismiss that were directed to those amended complaints – which, as both of us recognized, relied

heavily for their well-pleaded allegations on the discoveries made by the NYAG.

Denial of the motions to dismiss finally unleashed Lead Counsel and ERISA Class

Counsel (who had also successfully fended off motions to dismiss) to begin discovery in the

federal actions, superintended by Magistrate Judge Andrew J. Peck of this court. Of principal

relevance to the dispute over counsel fees, Judge Peck directed class counsel to review the

documents that had been produced to regulators before making any document requests of their own. He also ordered that this be done on an expedited schedule.

Securities and ERISA Lead Counsel, obedient to the court's directive, devised a plan for reviewing the millions of documents that had already been reviewed by the NYAG. This plan included protocols for dividing the documents among the various law firms involved and for eliminating duplication in the documents themselves. Private Plaintiffs' Counsel did not assume that the NYAG had found all the important documents among the 11 million that had been produced to it; they conducted a *de novo* review. Private counsel also examined some 3 million documents that had been produced to other regulators; it is highly likely that this lot included many duplicates of documents that had been produced to the NYAG, though no one can confirm this fact.

The NYAG insists that private counsel uncovered not a single significant document that it had not already located in the production made during its Ivy investigation; Private Plaintiffs' Counsel insist that they found numerous additional documents of evidentiary value. I am sure that the Private Plaintiffs found some documents that the NYAG overlooked – and since the NYAG did not conduct any investigation into Jeanneret, that alone was a source of some new evidence. I am equally sure that the NYAG managed to find much of the significant documentary evidence in the case during its investigation.

In addition to document discovery, Private Plaintiffs' Counsel had to familiarize themselves with the 37 depositions taken by the NYAG. This of course cut down substantially on the merits-based litigation that would have been required had these lawsuits continued.

Lead Counsel in the securities and ERISA class actions also moved for class certification in both *In re Beacon* and *In re Jeanneret*. Defendants were entitled to, and took, considerable

21

class discovery in order to fashion opposition to those motions. The Beacon motion as granted by Judge Sand; I stayed the Jeanerette motion after full briefing because settlement negotiations had gotten serious.

Private Plaintiffs' Counsel also responded to substantive discovery requests. The lion's share of that work appears to have been borne by counsel for the Hartman Plaintiffs, who were required to, and did, produce detailed information about their 17 clients from a variety of sources. Indeed, counsel for the Hartman Plaintiffs spent twice as much time responding to discovery requests from defendants as they did reviewing document produced by plaintiffs to the regulators in this case.

In Nassau County, motions to dismiss three derivative actions were filed and denied, as were motions for reargument. As is customary in the state court, interlocutory appeals were taken from all three denials (the appeals have been briefed and remain pending. There was considerable additional motion practice, including motions for stays of proceedings and for a change of venue in at least one of the cases to Westchester County – as well as a motion made in this court to lift a litigation stay imposed by (I believe) Judge Sand.

In all, counsel for the Private Plaintiffs briefed a total of 26 motions. Three interlocutory appeals were taken in the Nassau County cases. The parties had prepared to take some 20 depositions in the ERISA cases when the settlement mediation process began. Private Plaintiffs' Counsel, not the NYAG, demonstrated the will to litigate. And that is what ultimately led to the commencement of serious settlement negotiations. The potential cost of dealing with the multipronged attack from the Private Plaintiffs has to have been a significant factor motivating Ivy to return to settlement mode – a mode from which it had walked away prior to the filing of the NYAG complaint– and in inducing the other defendants to enter into settlement negotiations.

22

Contrary to the NYAG's assertion, the pendency of its action in the New York State Supreme Court does not appear to have played any role in inducing the defendants to commence serious settlement negotiations. That is undoubtedly because the NYAG displayed no interest in actually litigating the charges it had filed against Ivy. Once the action was filed, the NYAG effectively stopped doing anything at all. I have obtained a copy of the docket sheet from the NYAG's civil action, filed in the Supreme Court, New York County. It contains a total of eight docket entries. Nothing whatsoever happened after the complaint and the answer were filed. No motions were filed; there was no further discovery. No one served a Request for Judicial Intervention, which is the usual mechanism for moving a case along in the State Supreme Court. The lawsuit served as nothing more than a placeholder.

It is undisputed – indeed, it is conceded by the NYAG – that the Private Plaintiffs carried the laboring oar in the settlement negotiations, which began late in 2011 and took approximately 9 months to be concluded. Those efforts are described in more detail above. The NYAG and the DoL participated in those negotiations – both in negotiations to settle the lawsuits, and in what the NYAG disparagingly refers to as "time consuming ancillary negotiations" that resulted in the overall settlement and fee award request. The DoL participated more actively in the "time consuming ancillary negotiations" than did the NYAG, and was identified by the Private Plaintiffs as being exceedingly helpful in bringing matters (especially the amount of an agreed fee request) to a successful conclusion. Private Plaintiffs' Counsel have a lower opinion of the helpfulness of the NYAG in connection with these ancillary matters, but I will proceed on the assumption that he participated in the negotiations and did not hinder the resolution of the matters.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.    **Objections**

Objections to the request for attorneys' fees have been filed by the NYAG; by the law firm of Herrick Feinstein, which apparently represents four funds (Beacon Associates LLC I, Beacon Associates LLC II, Andover Associates LLC I, and Andover Associates QP LLC); by Beacon 23(b)(3) class members Howard M. Siegel and Charles T. Medrick; and by Max Folkenflik, an attorney who is himself a party to the fee request.

The objections break down into two categories.

The NYAG (echoed by other objectors) argues that the requested fee award is excessive because the efforts of Private Plaintiffs' Counsel added at most $76 million to a pot of $140 million that had already been obtained by the NYAG from Ivy – the principal target of the NYAG's 2009-2010 investigation.

Herrick Feinstein also argues that the award is unreasonable because counsel spent an excessive number of hours "duplicating" work already done by the NYAG and other regulators before agreeing to mediate claims that Beacon and Andover (if no one else) were willing to mediate rather than litigate from the outset. The NYAG echoes the contention that the number of hours expended by Private Plaintiffs' Counsel were excessive and cannot reasonably be compensated, even on the basis of a settled fee request that was mediated and is endorsed by the United States Secretary of Labor.

Mr. Folkenflik objects to the fact that some of the attorneys who are participating in the fee request are getting too much money. He does not object to the three quarters of a million dollars that is his share of the joint fee request, although I cannot see that he did much of anything to earn his proposed fee.

24

The principal objector is the NYAG. I will deal with his objections first; I will then add a section addressing the Herrick Feinstein, Siegel/Medrick, and Folkenflik objections.

The objections originally filed by the so-called "Banfield" group of investors (Docket #339) have been resolved consensually. The objection of Christine Duttweiler (Docket #354-3) have already been rejected.

## II.    The Objection That The Fee Award Should Be Calculated Off the Difference Between Ivy's Original Settlement Offer to the NYAG and The Ultimate Settlement Amount is Denied

I reject the NYAG's contention that the fee award for Private Plaintiffs' counsel should be reduced because their work contributed at most $76 million to the settlement pot that had already been funded to the tune of $140 million in it as a result of the efforts of the NYAG.

When the Private Lawsuits revved up for litigation, and when settlement negotiations commenced, the settlement pot did not contain $140 million. The settlement pot was empty. It is, therefore, not correct for the NYAG to assert that it had obtained a $140 million settlement before the private lawsuits effectively got off the ground.

Ivy may well have offered $140 million to settle with the NYAG sometime prior to the filing of the NYAG's complaint, but it did so on a condition the NYAG was either unwilling or unable to fulfill – namely, that all the lawsuits filed against Ivy be resolved at the same time. As a result, Ivy took its offer off the table and began litigating – not with the NYAG, which has not demonstrated the slightest interest in actually preparing its case for trial, but with the Private Plaintiffs. Their counsel – all of them blissfully unaware of Ivy's pre-suit offer to the NYAG – worked assiduously to assimilate the knowledge that the NYAG had compiled during the year when Class Counsel were statutorily barred from taking any substantive steps toward pursuing the merits, and to produce discovery from and make and oppose motions on behalf of their

clients. It is noteworthy that Ivy's conditional settlement offer was not put "on suspense;" it was withdrawn, while Ivy (and the other defendants) litigated the viability of the Amended Class Action Complaints, the Derivative Actions, and the Hartman Complaint with Private Plaintiffs' Counsel.

The cases on which the NYAG relies for the proposition that counsel's "piggybacking" onto its work should result in any fee award's being calculated as a percentage of the amount by which the ultimate settlement exceeded Ivy's original offer are neither binding on this court nor factually apposite.

For example, in *Swedish Hospital Corp v. Shalala*, 1 F. 3d 94 (D.C. Cir. 1993), the class action complaints were not even filed until after the underlying issue – whether HHS was obliged to pay the copying expenses of the hospital plaintiffs – had already been decided and "represented binding precedent in this Circuit." *Id*. at 105. Here, there has been no final adjudication of defendants' liability on the merits, as was the case in *Swedish Hospitals*; there was no law of the case to apply to latterly-filed class actions. No matter how strong the NYAG believes its fraud claims against Ivy to be, I have already noted that these cases raised novel issues relating to the liability, not of Bernard Madoff Investment Services ("BMIS"), but of so-called third party "feeder funds," whose clients invested with BMIS, and which were arguably themselves victims of Madoff's fraud. It is true that the Private Plaintiffs would have had to prove elements that the NYAG did not – notably reliance and scienter – in order to prevail, but all plaintiffs, including the regulators, had numerous litigation hurdles to surmount. And the NYAG was not helping them surmount those hurdles, since the NYAG was not litigating its claims at all.

26

Similarly, in *In re First Databank Antitrust Litigation*, 209 F. Supp. 2d 96 (D.D.C. 2002), the private class actions were litigated in tandem with a proceeding brought by the FTC. The court approved a settlement in the form of a consent judgment in the FTC case. That judgment implemented a complex plan of divestiture of the defendant's assets, disgorgement of profits, and payment of civil penalties. The FTC represented to the court that it and the defendant had the disgorgement of profits was intended to be "for the purpose of settling the [private] class action lawsuits," and that of the total amount, $16 million had been agreed to (or, as the court put it, $16 million was the amount "to which defendants had already committed themselves") before the class plaintiffs filed their lawsuit. There is no indication in the record that this money was ever withdrawn; plaintiffs' counsel were required only to negotiate the supplemental recovery over and above what was already "on the table." The opinion also suggests that class counsel did not engage in any meaningful motion practice or discovery; it appears that the FTC did the lion's share of litigating, which is exactly the opposite of what happened here.

Here, by contrast, (1) no separate settlement with the NYAG preceded the negotiation of the global settlement – and, indeed, the NYAG was unable to consummate any sort of settlement on its own; (2) the feeder fund class actions were filed months before the NYAG filed its lawsuit, although because of the constraints imposed by the PSLRA and consolidation, they had not been allowed to proceed on the merits; (3) the $140 million for which the NYAG wants to take sole credit was taken off the table precisely because the NYAG was unwilling or unable to consummate the kind of global deal that was negotiated principally by the Private Plaintiffs; and (4) Private Plaintiffs' Counsel were negotiating from scratch, since they had no idea (because the NYAG did not disclose) that Ivy had once offered $140 million to settle the case.

27

I do not in any way minimize the important the work done by the lawyers at the NYAG office. Their investigation unquestionably jump-started the process that resulted in the extremely favorable settlement I have here approved. But I will not allow the NYAG to take credit for a settlement that, for whatever reason, it did not obtain. And once that prospect of settlement disappeared, so, for all intents and purposes, did the Attorney General.[4]

I am especially disinclined to punish private counsel by subtracting the portion of the ultimate settlement fund represented by Ivy's undisclosed and ultimately withdrawn settlement offer because I consider what was presented to this court for approval to be nothing short of extraordinary. Private Plaintiffs obtained a generous, global settlement, one that covers a significant portion of their clients' losses with no penalty to those plaintiffs in the Madoff Bankruptcy (in which they remain eligible to recover from the bankruptcy estate). It is a settlement that has proved acceptable not only to the members of the classes and to every private plaintiff, but also to the Department of Labor and the Madoff Trustee.

The NYAG cannot take credit for bringing about this happy result, because he did not herd all the cats that needed to be rounded up in order to bring it to fruition. I am not aware of any other Madoff-related case in which counsel have found a way to resolve all private and regulatory claims simultaneously and with the concurrence of the SIPC/Bankruptcy Trustee. Indeed, I am advised by Private Plaintiffs' Counsel that the Madoff Trustee is challenging

---

[4] There is a serious question whether the NYAG even had standing to pursue the lawsuit he filed. The action was brought in *parens patriae*, but the NYAG cannot bring claims for damages on behalf of private citizens; a state that sues in *parens patriae* must seek to redress an injury to an interest that is separate from that of individuals. *Connecticut v. Physicians Health Services*, 287 F. 3d 110 (2d Cir. 2002); *People of the State of New York by Abrams v. 11 Cornwell Co.*, 695 F. 2d 34, 38 (2d. Cir. 1982). So having failed to obtain a pre-suit settlement that could have been used to satisfy at least some of the claims of the Private Plaintiffs. the NYAG had no real ability to recover through litigation the money that plaintiffs lost -- even on behalf of citizens of the State of New York (and not all the class members and Private Plaintiffs are citizens of the State of New York). The NYAG could have attempted to obtain injunctive relief to forestall future violations of law in the public interest, but since Ivy was in the process of winding down its operations in May 2010, when the NYAG filed its lawsuit, the request for injunctive relief may very well have been moot. This issue need not be decided, but the weakness of the NYAG's position as a party to litigation might well explain its failure to take even a single step to move its lawsuit forward.

settlements reached by the NYAG in other feeder fund cases (Merkin, Fairfield Greenwich) –

which makes the achievement here all the more impressive.

So I deny the NYAG's motion (and the copycat objections) asking that I calculate the

reasonable fee award off a base of $76 million instead of $219 million (or $207 million). If the

fee request is to be reduced, it will be because counsel is asking for too much in light of the

*Goldberger* factors. I turn to them now.

**III.    Except in One Respect, the *Goldberger* Factors Support the Requested Fee Award**

The factors to be considered in deciding what constitutes a reasonable fee include the

followings: (1) time and labor expended by counsel; (2) risks of litigation; (3) magnitude and

complexity of litigation; (4) requested fee in relation to the size of the settlement; (5) quality of

representation; and (6) public policy considerations. *Goldberger v. Integrated Resources, Inc.*,

209 F. 3d 43 (2d Cir. 2000).

The only factor that warrants extended discussion is the first, so I will leave it for last.

**A.    Risks of Litigation/Magnitude and Complexity of Litigation**

The risks of litigation and the magnitude and complexity of the litigation conflate. The

issues relating to the liability of third parties (the Madoff "feeder funds") for losses suffered by

Madoff investors as a result of the fraud committed by Bernard Madoff are, as I have said earlier,

novel and uncertain. The defendants here are not accused of being accessories to the Madoff

fraud; rather, the theory of the various amended complaints was that the fund managers knew or

should have known that Madoff was engaged in a Ponzi scheme. There is some evidence,

discussed in the pleadings, that managers at various funds suspected as much, but whether that

would have sufficed to impose liability on third parties for imprudent investments is not a matter

that has been definitively litigated. The subsidiary issues, particularly in the ERISA context, are

entirely novel. And all of these matters were taken on contingency, so in view of the novelty of the issues there was some possibility that counsel would recover nothing at all.

The pendency of the NYAG's entirely dormant lawsuit does not seem to have put any additional pressure on the Ivy Defendants to settle (especially given what appear to be very real impediments to jurisdiction, see below and n. 3, *supra*), but it probably reduced somewhat the risk of proving some elements of fraud. But the NYAG's lawsuit could not have *eliminated* the litigation risk. As Private Plaintiffs point out, the NYAG cannot sue for damages owed to private plaintiffs. *See Connecticut v. Physicians Health Services*, 287 F. 3d 110 (2d Cir. 2002); *People of the State of New York by Abrams v. 11 Cornwell Co.*, 695 F. 2d 34, 38 (2d. Cir. 1982). The Private Plaintiffs in these cases thus could not have simply "piggybacked" their way to victory by allowing the NYAG to litigate his case (assuming he had shown any inclination to do so) and abiding the result. Even if he had standing to pursue an action for injunctive relief, the NYAG would not have had to prove either reliance or scienter in order to prevail – both necessary to plaintiff's recovery in the securities fraud cases – so the Private Plaintiffs had absolutely no choice but to litigate their matters actively if they wanted their money back. Which they did.

Because the NYAG did not actively litigate its case once the complaint was filed, according to publicly available records, there is little reason to compare this case to *In re Renaissance Holdings ltd. Sec. Litig.*, No. 05 Civ. 6764, 2008 WL 236684 (S.D.N.Y. Jan. 18, 2008), where my colleague, Judge Pauley, concluded that the risk of non-recovery was small because the SEC had commenced its own parallel investigation. The one thing the NYAG could have done to advance the interests of the Private Plaintiffs – get a settlement without having to file a lawsuit – it conspicuously failed to do. From the moment Ivy withdrew its offer, the Private Plaintiffs' hope of recovery rested squarely on the shoulders of private counsel.

30

**B.    Quality of Representation**

The quality of representation is not questioned here, especially for those attorneys
(principally from Lowey Dannenberg) who worked so hard to achieve this creative and, in my
experience, unprecedented global settlement.

**C.    Size of Fee in Relation to Size of Settlement**

This being an unusual case, the size of the fee in relation to the size of the settlement can
be measured in several different ways.

The fee request is for $40,771,538. That represents either 18.5% or 20% of the settlement
amount, depending on whether one includes or deducts the payments that are to be made to the
DoL and the NYAG as part of the settlement. Either way, the negotiated amount to pay all the
plaintiffs' lawyers in all of these cases is a lower percentage of the recovery than was negotiated
by Lowey Dannenberg during the Lead Counsel "beauty contest." Because I reject the NYAG's
contention that it obtained the first $140 million in settlement funds, I necessarily reject its
argument that the fee request is a patently unreasonable 53% of the settlement achieved by
Private Plaintiffs' Counsel.

20% of the settlement amount is not only within the range of amounts awarded in similar
actions where court approval of fees is required, it is actually below the range of 25%-33% that
is often allowed in this court. *See, e.g., Velez,* 2010 WL 4877852, at *21. The requested fee
award, when viewed in its totality, is lower as a percentage of the settlement fund than is
customarily seen in this court. It is lower than the amount to which Lead Counsel Lowey
Dannenberg would have been entitled under its agreement with Lead Plaintiffs (which was, of
course, subject to court approval), yet it also includes fees for counsel in the ERISA class actions

31

and for the attorneys who are representing the plaintiffs in the various direct and derivative actions pending in all the various courts, including principally the Hartman Plaintiffs.

As a purely technical matter, the only fees that must be approved by this court are the fees for work performed in the *In re Beacon* and *In re Jeanneret* class actions (whether securities or ERISA). The proposed fees for counsel in those actions that are statutorily subject to this court's approval pursuant to Rule 23 total $28,625,000 which is about 70% of the requested fee award, and about 13.8%, or a little over one-eighth, of the Settlement Amount (including the Beacon fee waiver) after deduction of the sums to be paid to the DoL and the NYAG. When only the Rule 23 fee applications are viewed separately, the amount is far below the percentage of settlement that is customarily asked for and approved in this Circuit.

The rest of the $40.7 million fee request comes from counsel who are under no obligation to submit their fees to this court for approval – except insofar as they have voluntarily agreed to do so in order to effectuate a settlement that will obtain an expeditious (relatively speaking) and highly favorable recovery for their clients. Of that $12.1 million, 60% is to go to counsel in the Hartman Individual Actions. This amount represents about 53.5% of their lodestar, and is below what their clients agreed to pay them in order to induce them to undertake the representation (and get out from participation in the class actions). The amounts to be paid to the other attorneys reflect the paucity of proceedings in any of the other actions, except for the three derivative actions before Justice Bucaria in Nassau County Supreme Court, where the Wolf Haldenstein firm engaged in a substantial amount of procedural litigation, including interlocutory appeals of denials of motions to dismiss.

As can be seen in the chart annexed as Appendix A to this opinion, the proposed fee award compares favorably with lodestar recovery. The Second Circuit encourages a crosscheck

against counsel's lodestar. *See In re Bisys Sec. Litig.*, 2007 WL 2049726, at *2 (citing *Goldberger*, 209 F.3d at 50). In this case, Private Plaintiffs' Counsel and their paralegals have spent, in the aggregate, 118,475.74 hours in the prosecution of this case. The lodestar amount, using the hourly rates proposed by counsel, is $48,967,217.35 – a negative collective multiplier of 0.8325.[5]

### D.    Public Policy Considerations

Settlement is to be encouraged – and that includes settlement of fee applications. This particular settlement was mediated and overseen by a representative from the United States Department of Labor. It results in an award of less in fees than the Lead Plaintiffs had been prepared to submit for approval to this court, and less in fees than Private Plaintiffs had been prepared to pay. Lead Plaintiffs support the fee request. The private Hartman plaintiffs support the request. A number of individuals who invested with the "objecting" Beacon and Andover Funds support the request (and object to the objection, which comes from they know not whom). Almost no class members have objected to the fee award.

Finally, it is highly significant to the court that the Department of Labor endorses the fee request and was instrumental in negotiating the percentage down from 22% to the 20% here requested.

In short, *Goldberger* factors 2 through 6 strongly favor allowing the fee request. The only remaining issue is whether the number of hours expended and the hourly rates charged for those hours are reasonable.

---

[5] Under the plan of distribution agreed to among all participating counsel, Co-Lead Counsel Lowey Dannenberg (in the securities cases) and Kessler Topaz (in the ERISA cases) would recover a tiny fraction more than their lodestar amount if the fee award were approved, with other counsel recovering proportionally less. With the adjustment I am making to the fees attributable to the review of documents produced to regulators, Lead Counsel's fees should come in at just about lodestar.

### E.   Reasonableness of Hours Worked and Rates Charged

As noted, the total number of hours expended by all counsel in all matters comes to something close to 118,000. That is, admittedly, a lot of attorney and paralegal hours.

Of that total, just under 30,000 hours were spent reviewing documents produced by the defendants, including principally documents that were also reviewed by the NYAG during the course of its investigation. Approximately two thirds of those 30,000 hours were expended by attorneys from the firms that were appointed to represent various classes and subclasses, working under the lead of the Lowey Dannenberg firm. As Lead and Liaison Counsel, it developed a protocol and divided the responsibility for reviewing documents previously produced by defendants to all regulators (not just the NYAG). This document review was conducted principally by Lowey Dannenberg, Wolf Haldenstein, Kessler Topaz, and Cohen Milstein.

Counsel from Keller Rohrback and Lewis Feinberg, representing the Hartman Plaintiffs, did not participate in the coordinated document review with the attorneys representing the class plaintiffs (as indeed they had no obligation to do), but proceeded to do their own discovery on behalf of their clients – although Judge Sand and I consolidated the Hartman Actions with *In re Beacon* and *In re Jeanneret* for discovery purposes. The Hartman Plaintiffs proceeded on the assumption that their case would either settle or be tried separately from the class actions and that their counsel (who were also working on contingency) would be paid from the fund created by that separate settlement or verdict. Their work accounts for approximately one third of the hours spent on reviewing documents produced by defendants.

The rest of the time for which all of these attorneys seek reimbursement was spent doing all of the other things that were discussed exhaustively above: reviewing and producing documents that were requested from the various plaintiffs; responding to interrogatories;

34

preparing for and participating in depositions (which did not duplicate the NYAG depositions);

reviewing and responding to motions or making motions; and participating in the arduous

settlement negotiations. While I am certain that not every hour billed was absolutely necessary,

the NYAG and other objectors have offered no good reason why the fee request should be cut as

a result of time spent on any of those activities, which were not in any way duplicative of work

performed by the NYAG. The NYAG simply states, in wholly conclusory fashion, that it could

not possibly have taken so many hours to perform these myriad tasks, especially given the fact

that it handed Private Plaintiffs their case on a silver platter.

But the fact that the NYAG's work was instrumental in allowing the Private Actions to

proceed does not reflect badly on plaintiffs' counsel, as my colleague Judge Kaplan observed in

*In re Lehman Bros. Securities and ERISA Litigation*, 09 MD 2017, a case in which private

counsel were similarly able to take advantage of someone else's investigation and detailed report

(in that case, a bankruptcy examiner) in crafting a viable pleading. Judge Kaplan concluded that

class counsel's heavy reliance on the examiner's lengthy report in fashioning their case

warranted a reduction in the multiplier to be applied to the lodestar in that case – from 2.18, as

proposed by counsel, to 1.5. But he refused to penalize private counsel by denying them

compensation simply because they were able to "piggyback" (if I may use a loaded term) on the

work of the Lehman Bankruptcy Trustee. I am no more inclined to punish Private Plaintiffs for

taking advantage of the work done by the NYAG than Judge Kaplan was.

Given the number of lawsuits, the number of motions that had to be litigated, the number

of in-court conferences, and the number of perfectly legitimate tasks involved in responding to

discovery requests that were addressed to plaintiffs by the defendants (this is especially true for

the Hartman Plaintiffs), I cannot say that the fee request attributable to these activities is

unreasonable – particularly since all counsel except for Lowey Dannenberg and Kessler Topaz will be taking a haircut on lodestar in order to obtain immediate recovery for their clients.

Could the cases have been litigated more efficiently? Without a doubt.

Does the result justify the fee? Absolutely.

So I turn to the one item that sticks in the craw of the Objectors – the 30,000 hours spent by two groups of attorneys (Class Counsel and Counsel for the Hartman Plaintiffs) reviewing documents that the defendants had originally produced to the NYAG and/or other regulators. The NYAG and Objectors contend that this work was purely duplicative of the NYAG's infinitely more efficient efforts, such that it is presumptively unreasonable to compensate Private Plaintiffs' Counsel for undertaking it. Furthermore, the NYAG insists that it found all the really useful evidence in the case; as proof, the NYAG notes that its complaint served as a template for the amended complaints that were served in the various Private Plaintiffs' Actions (including the class actions).

But I cannot fairly conclude, as Objectors wish me to, that the "duplicative" review of documents by Private Plaintiffs' Counsel is objectionable and non-compensable, because *counsel were required by the court to review the documents that had already been reviewed by the NYAG!* Magistrate Judge Peck quite sensibly refused to permit Private Counsel to make new document requests until they had first familiarized themselves with the documents previously produced to, *inter alia*, the NYAG.

Furthermore, as pointed out by the Hartman Plaintiffs' counsel, the NYAG may have reviewed the same documents as Private Plaintiffs' Counsel, and done so first, but there is no evidence in the record before me that he offered plaintiffs' counsel any information that would have assisted them in circumscribing their work – other than its selection of quotable quotes for

its complaint. And because the NYAG (assuming it ever had any intention of actually litigating its lawsuit) did not have to prove many of the issues confronting the Private Plaintiffs (reliance, scienter, anything having to do with ERISA fiduciary status), it was not necessarily looking for the same things that Private Plaintiffs hoped to find when reviewing the same documents. Private Plaintiffs' Counsel would have been remiss to rely on the NYAG's review given the different litigation burdens they bore.

So we must put to one side any suggestion that Private Plaintiffs' Counsel did something wrong by not "relying" on the NYAG's document review and foregoing familiarizing themselves with the documents that had been produced to regulators.

I am left to opine on the reasonableness of the time expended in this aspect of counsel's work. The 30,000 hours put in by dozens of lawyers and paralegals employed by private counsel on the review of defendants' documents vastly exceeds the number of hours put in by the much smaller number of NYAG staff members who reviewed documents during his year-long investigation into Ivy. The difference is striking even when you divide this number between the Class Plaintiffs and the Hartman Plaintiffs (who conducted their own document review, since they were litigating independently of any class) – 10,500 hours expended by counsel in Hartman, and nearly twice that by Class Counsel – although the most striking disparity by far is the difference between the time expended by counsel for the Hartman Plaintiffs reviewing previously-produced documents and the time expended by Class Counsel reviewing the same documents!

Like my colleague Judge Kaplan in *Lehman*, I wonder whether all of the hours for which recovery is sought were efficiently and usefully devoted to this matter. Unlike him, I cannot rely on the fact that the regulator on whose efforts the Private Plaintiffs built their case had devoted a

like number of hours to his investigation in order to corroborate the order of magnitude of plaintiffs' efforts in furtherance of this case.

There are, of course, reasons that would account for at least some of the difference between the number of hours spent by the NYAG team on its document review and the number of hours spent by Hartman Counsel and by Class Counsel. I can attribute part of the disparity to the fact that these hours include hours that Private Counsel spent reviewing documents that were produced to regulators other than the NYAG. I can attribute part of it to the fact that it includes documents produced by defendants who were not investigated by the NYAG at all (principally the Jeanneret Defendants). And I can attribute part of the disparity to the fact, noted above, that Private Plaintiffs' Counsel were looking for different and additional types of evidence when they reviewed the documents produced to the regulators.

I can also attribute some of the disparity to the fact that Magistrate Judge Peck put the Private Plaintiffs on a "rocket docket" schedule for reviewing the regulatory document productions and directed them to devote as many personnel as necessary to that endeavor in order to meet his (short) deadline for its completion. It has been my experience, both in private practice and on the bench, that haste often makes waste, and that expedited discovery, while sometimes necessary, can often end up taking more hours, and costing more money, than does a more leisurely pursuit of evidence.

The sum of these differences probably wipes out most, if not all, of the disparity between the amount of time the NYAG spent reviewing Ivy's documents and the amount of time that Keller Rohrbach and Lewis Feinberg spent reviewing defendants' documents.

It does not, however, account for the fact that Class Counsel spent significantly more time on this task as the Hartman Plaintiffs' Counsel did. Not only did the attorneys working in

the Class Action regulatory document review rack up twice as many hours as did the attorneys working on behalf of the Hartman Plaintiffs, they did so at significantly higher blended rates – ranging from $300 to $456 per hour , as against the blended rate of $275 per hour for document review by counsel for the Hartman Plaintiffs.

I have struggled for several weeks with this whole issue of compensation for document review. Had I thought ahead to the end of the case at the beginning, I would have included in my order appointing Lead Counsel specific directives about how much this court was prepared to authorize in terms of an hourly rate for document reviewers – and it would likely have been significantly below even the $275 blended rate achieved by Keller Rohrback and Lewis Feinberg. There is little excuse in this day and age for delegating document review (particularly primary review or first pass review) to anyone other than extremely low-cost, low-overhead temporary employees (read, contract attorneys) – and there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes.

But I did not think ahead, and I did not include any such limitation in my order appointing Lead Counsel, and neither did Judge Sand. I believe it unfair to impose such a rule *ex post facto*. So I will not.

But since I am left with the firm conviction that Class Plaintiffs expended unnecessary hours reviewing the regulatory documents (and have the example of Keller Rohrback/Lewis Feinberg against which to compare their work), I am going to reduce by 25% the fee requested by the five Class Action Firms for the work they did reviewing documents that had been produced to the regulators. That is, each firm must reduce the number of hours billed for this one activity by 25%:

- Lowey Dannenberg from 4559 to 3419.25

- Kessler Topaz from 6139 to 4626.75

- Bernstein Liebhard from 1473 to 1104.75

- Cohen Milstein from 5320 to 3990

- Wolf Haldenstein from 3381 to 2,535.75 (this covers hours charged to both the Federal securities and state derivative actions)

Each firm must reduce the dollar amount of its share of the fee request accordingly – which will reduce the overall amount of fees awarded (I will let counsel do the math for me).

I would likely have imposed a harsher remedy, but I believe that the concession extracted during settlement negotiations by the DoL – which convinced Private Plaintiffs' Counsel to reduce their request to less than the 22% of recovery originally negotiated between Lead Counsel and Lead Plaintiffs in the securities class actions – takes care of the matter to the satisfaction of the court.

With this adjustment, I conclude that the fee request is reasonable and appropriate and I grant the motion for an award of attorneys' fees.

There has been no objection to the request for expenses. That motion is granted in its entirety.

**F.    Other Objections**

I have already disallowed the Duttweiler and NYAG objections.

At oral argument on March 15, 2013, I denied the Folkenflik objection as untimely and granted the motion to strike it, for substantially the reasons set forth in the Memorandum of Law in support of the motion to strike, which was filed by all counsel in all actions. I adhere to that

oral decision today and disallow the objection. It really does not lie in Mr. Folkenflik's mouth to object to what anyone else is getting paid, since he is being compensated generously for doing very little.

The objection to the fee award filed by Herrick Feinstein on behalf of four Beacon and Andover Funds is denied. I have already dealt with the merits of Herrick's objection; I have rejected the notion that the amount of the undisclosed, unconsummated, highly conditional settlement offer made by Ivy to the NYAG should be excluded from the base on which the Private Plaintiffs' fee award is calculated, and I have blessed as reasonable (for the most part) the hours expended by counsel (in the circumstances of the case). I decline to resolve objections to its status to file objections.

Finally, the Siegel and Medrick objections are simply copycat objections echoing the NYAG's objection to the fee request. Those objections are also disallowed.

## CONCLUSION

I ask Lead and Liaison Counsel to submit a Final Order, adjusting the attorneys' fee award in accordance with my decision and otherwise granting all motions and disallowing all objections that were not resolved prior to the hearing.

I thank everyone for the amazing work that you did in resolving these matters. Your clients – all of them – have been well served.

I also express my appreciation to my colleagues in the New York State Supreme Court and in the state courts in Palm Beach County, Florida, whose support and cooperation permitted this matter to be resolved. The actions pending in those courts in which special appearances have

41

been made by counsel for settlement purposes are now remitted to those courts for whatever final proceedings need to occur in light of today's decision and order.

This constitutes the decision and order of the court. The Clerk of the Court is directed to remove all outstanding motions in any of the cases listed in the caption from the Court's list of pending motions, as they have all been disposed of, in one way or another, by this opinion.

Dated: May 15, 2013

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

BY FIRST CLASS MAIL TO ALL JUDGES IN ALL ACTIONS

| PLAINTIFFS' FIRM | LODESTAR THROUGH 1/31/13 | PAYMENT UNDER FEE AGREEMENT (ASSUMING APPROVAL OF 20% OF NET SETTLEMENT) | CURRENT MULTIPLIER IF 20% AWARDED | LEAD COUNSEL MULTIPLIER AT FEE AGREEMENT (5/20/12) |
|---|---|---|---|---|
| Lowey Dannenberg Cohen & Hart, P.C. *Lead Counsel in In re Beacon, Lead Securities and Derivative Counsel in In re Jeanneret, Co-Liaison Counsel for All Actions with DOL* | $14,201,725.10 | $14,300,000.00 | 1.0069 | 1.16 (est.) |
| Keller Rohrback L.L.P. and Lewis, Feinberg, Lee, Renaker & Jackson, P.C. *ERISA Counsel to Hartman Individual Action Plaintiffs* | $13,730,226.85 | $7,350,000.00 | 0.5353 | |
| Cohen Milstein Sellers & Toll PLLC *ERISA Sub-Class Counsel in In re Beacon* | $7,359,505.75 | $6,140,000.00 | 0.8343 | |
| Kessler Topaz Meltzer & Check LLP (including local counsel Dealy & Silberstein, LLP) *Lead ERISA Class Counsel to Buffalo Laborers' Class, Income Plus Beneficiary Class, and Direct Participant and Beneficiary Class* | $4,709,238.00 | $5,200,000.00 | 1.1042 | 1.16 (est.) |
| Wolf Haldenstein Adler Freeman & Herz LLP* (including Jordan co-counsel Deutsch & Lipner) *Participant and Beneficiary Class, Andover Participant and Three State Derivative Actions Before Justice Bucaria* | $3,609,066.00 | $2,600,000.00 | 0.7204 | |
| Wolf Haldenstein Adler Freeman & Herz LLP *Investor Plaintiffs' Sub-Class Counsel in In re Beacon* | $2,353,261.50 | $1,930,000.00 | 0.8201 | |
| Bernstein Liebhard LLP *Investor Plaintiffs' Sub-Class Counsel in In re Beacon* | $1,734,688.75 | $1,595,000.00 | 0.9195 | |
| Folkenflik & McGerity** *Fastenberg Intervenors* | $773,605.00 | $750,000.00 | 0.9695 | |
| Cotchett, Pitre & McCarthy, LLP *State Derivative Action Before Justice Lowe* | $594,122.00 | $425,000.00 | 0.7153 | |
| Ross & Orenstein LLC** *Gluck, Altman and Glicker Individual and Arbitration Actions* | $414,612.50 | $400,000.00 | 0.9648 | |
| Gordon & Gordon *School Individual Action* | $91,157.00 | $81,538.00 | 0.8945 | |
| **Total:** | $49,571,208.45 | $40,771,538.00 | 0.8225 | N/A |

*Litigated as Hecht & Associates P.C. pre-merger with Wolf Haldenstein.

**Under the fee agreement, the payments for Folkenflik & McGerity and Ross & Orenstein LLC are fixed even if the Court awards a different percentage.