# 13-1785

## United States Court of Appeals
## for the Second Circuit

IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,

*Plaintiff - Appellant*,

v.

ERIC T. SCHNEIDERMAN, BART M. SCHWARTZ, RALPH C. DAWSON, J. EZRA MERKIN, GABRIEL CAPITAL CORPORATION,

*Defendants - Appellees*,

SECURITIES INVESTOR PROTECTION CORPORATION, Statutory Intervenor pursuant to Securities Investor Protection Act, 15 U.S.C. section 78eee(d),

*Intervenor.*

On Appeal from the United States District Court
for the Southern District of New York

### BRIEF FOR APPELLEES
### ERIC T. SCHNEIDERMAN, BART M. SCHWARTZ, RALPH C. DAWSON

REED SMITH LLP
  *Attorneys for Bart M. Schwartz as
  Receiver for Ariel Fund Ltd. and
  Gabriel Capital, L.P.*
599 Lexington Avenue
New York, NY 10022
(212) 521-5400

FULBRIGHT & JAWORSKI LLP
  *Attorneys for Ralph C. Dawson as
  Receiver for Ascot Partners, L.P.*
666 Fifth Avenue
New York, NY 10103
(212) 318-3000

ERIC T. SCHNEIDERMAN
  *Attorney General of the
  State of New York*
120 Broadway
New York, New York 10271
(212) 416-8096

Dated: July 19, 2013

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................iv

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED ........................................................................... 4

STATEMENT OF THE CASE .................................................................. 6

    A.   The 2009 Filing of the New York Actions against
        Merkin ..................................................................................... 6

    B.   The Years of Discovery, Summary Judgment
        Proceedings, and Settlement Negotiations in the New
        York Actions ......................................................................... 10

    C.   The Trustee's August 2012 Filing to Halt and Declare
        Void the New York Actions after They Had Already
        Been Settled ......................................................................... 13

    D.   The District Court's Order Denying the Trustee's
        Motion and Dismissing the Complaint ................................. 14

SUMMARY OF ARGUMENT AND
STANDARD OF APPELLATE REVIEW ................................................. 19

ARGUMENT ...................................................................................... 23

POINT I   -   THE NEW YORK ACTIONS ARE NOT COVERED
            BY THE AUTOMATIC BANKRUPTCY STAY ................ 23

    A.   The State Law Actions Do Not Seek to Recover a Claim
        against BLMIS. .................................................................... 24

    B.   The State Law Actions Do Not Seek to Recover
        Property of the BLMIS Estate ............................................. 27

i

# TABLE OF CONTENTS (Cont'd)

**Page**

POINT II  -  THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DENYING THE TRUSTEE'S MOTION FOR AN INJUNCTION ................................... 30

    A.  The BLMIS Estate Will Not Suffer Any Immediate Adverse Economic Consequence Absent an Injunction ........ 31

        1.  It is uncertain whether the Trustee will prevail on his fraudulent transfer claims. ...................................... 33

        2.  The Trustee failed to show that he would be unable to recover a judgment against the Merkin funds. .............................................................................. 35

    B.  The Trustee Would Not Be Entitled to an Injunction Even If Distribution of Settlement Funds Might Reduce His Ability to Recover from Merkin. ........................ 42

    C.  An Injunction Would Be Inequitable for Further Compelling Reasons. .............................................................. 48

POINT III -  THE SECURITIES INVESTOR PROTECTION ACT DOES NOT PREEMPT THE STATE LAW ACTIONS OR SETTLEMENT .......................................... 51

POINT IV -  THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN RULING THAT THE TRUSTEE'S BELATED APPLICATION IS INDEPENDENTLY BARRED BY LACHES ...................................................... 56

    A.  The Record Supports the District Court's Finding that the Trustee's Minimal Involvement in Settlement Talks Did Not Justify His Years of Delay ............................. 58

## TABLE OF CONTENTS (Cont'd)

**Page**

B.   The Trustee's Two Empty Threats to File for a Stay Did Not Entitle Him to Wait Years to Do So. ....................... 60

C.   The Trustee's Argument That No Prejudice Would Result from Halting the New York Actions, Rather Than Declaring Them Void, Is Meritless. ............................. 62

D.   The Automatic Stay Is Not Immune from Laches Principles. ................................................................. 65

CONCLUSION ................................................................. 67

iii

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Aris Isotoner, Inc. v. Berkshire Fashions, Inc.,*
924 F.2d 465 (2d Cir. 1991) ............................................................... 61

*California v. ARC Am. Corp.,*
490 U.S. 93 (1989) ............................................................................. 52

*Commerzanstalt v. Telewide Sys., Inc.,*
790 F.2d 206 (2d Cir. 1986) (per curiam) ........................................... 66

*Eastern Refractories Co. v. Forty Eight Insulations, Inc.,*
157 F.3d 169 (2d Cir. 1998) ............................................................... 66

*Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) ........................................................................... 47

*Harley-Davidson, Inc. v. Estate of O'Connell,*
13 F. Supp. 2d 271 (N.D.N.Y 1998) ................................................... 58

*Hearn 45 St. Corp. v. Jano,*
283 N.Y. 139 (1940) ........................................................................... 26

*In re 48th Street Steakhouse, Inc.,*
835 F.2d 427 (2d Cir. 1987) ......................................................... 28, 29

*In re Bernard L. Madoff Inv. Sec. LLC,*
654 F.3d 229 (2d Cir. 2011) ........................................................ 33, 34

*In re Colonial Realty Co.,*
980 F.2d 125 (2d Cir. 1992) ........................................... 25, 26, 27, 53

*In re Crysen/Montenay Energy Co.,*
902 F.2d 1098 (2d Cir. 1990) ............................................................. 28

*In re Dairy Mart Convenience Stores, Inc.,*
351 F.3d 86 (2d Cir. 2003) ................................................................. 30

iv

# TABLE OF AUTHORITIES (Cont'd)

**Cases**                                                                    **Page(s)**

*In re Enivid, Inc.,*
   364 B.R. 139 (Bankr. D. Mass. 2007) .................................................. 43

*In re Granite Partners, L.P.,*
   194 B.R. 318 (Bankr. S.D.N.Y. 1996) ................................................ 43

*In re J. Ezra Merkin & BDO Seidman Sec. Litig.,*
   817 F. Supp. 2d 346 (S.D.N.Y. 2011) .................................................. 34

*In re Phar-Mor Sec. Litig.,*
   164 B.R. 903 (W.D. Pa. 1994) .............................................................. 43

*In re Quigley,*
   676 F.3d 45 (2d Cir. 2012) ............................................................ 43, 46

*In re Reliance Acceptance Grp., Inc.,*
   235 B.R. 548 (D. Del. 1999) ................................................................ 43

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade
   Servs., Inc.,*
   295 F. Supp. 2d 366 (S.D.N.Y. 2003) .................................................. 47

*Lautenberg Found. v. Picard,*
   No. 11-5421-bk, 2013 U.S. App. LEXIS 3523 (2d Cir. Feb. 20,
   2013) ........................................................................................... 20, 44

*Matthews v. Rosene,*
   739 F.2d 249 (7th Cir. 1984) .............................................................. 65

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.),*
   277 B.R. 520 (Bankr. S.D.N.Y. 2002) ................................................ 41

*People v. Coventry First LLC,*
   13 N.Y.3d 108 (2009) ......................................................................... 51

# TABLE OF AUTHORITIES (Cont'd)

**Cases**                                            **Page(s)**

*People v. Greenberg,*
95 A.D.3d 474 (1st Dep't 2012), *aff'd*, 2013 N.Y. Slip Op. 4726
(N.Y. Ct. App. June 25, 2013) .................................................................. 34

*People v. Lexington Sixty-First Assocs.,*
38 N.Y.2d 588 (1976) ............................................................................... 34

*Perez v. Danbury Hosp.,*
347 F.3d 419 (2d Cir. 2003) ............................................. 22, 56-57, 61

*Picard v. Estate of Chais,*
445 B.R. 206 (Bankr. S.D.N.Y. 2011) .................................... 28, 55, 56

*Picard v. Fairfield Greenwich Ltd.,*
490 B.R. 59 (S.D.N.Y. 2013) ........................................................ passim

*Picard v. Katz,*
462 B.R. 447 (S.D.N.Y. 2011) .................................................. 33, 34, 37

*Picard v. Merkin,*
440 B.R. 243 (Bankr. S.D.N.Y. 2010) .................................................. 56

*Picard v. Stahl,*
443 B.R. 295 (Bankr. S.D.N.Y. 2011) .................................................. 46

*Pope v. County of Albany,*
687 F.3d 565 (2d Cir. 2012) ................................................................ 20

*Queenie, Ltd. v. Nygard Int'l,*
321 F.3d 282 (2d Cir. 2003) ................................................................ 30

*SEC v. N. Am. Planning Corp.,*
No. 72 Civ. 3158, 1975 U.S. Dist. LEXIS 14183 (S.D.N.Y. Jan.
24, 1975) .................................................................................................. 41

*SEC v. Packer, Wilbur & Co.,*
498 F.2d 978 (2d Cir. 1974) ................................................................ 41

# TABLE OF AUTHORITIES (Cont'd)

**Cases**     **Page(s)**

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005) ................................................................... 26

*Sinatra v. Gucci (In re Gucci)*,
309 B.R. 679 (S.D.N.Y. 2004) ............................................................. 65

*Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*,
502 F.3d 1086 (9th Cir. 2007) ............................................................. 32

*State v. Sonifer Realty Corp.*,
212 A.D.2d 366 (1st Dep't 1995) ......................................................... 35

*Thornton v. First State Bank of Joplin*,
4 F.3d 650 (8th Cir. 1993) ................................................................... 65

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
17 F.3d 38 (2d Cir. 1994) ............................................................. 22, 61

*U.S. Smokeless Tobacco Mfg. Co. v. City of N.Y.*,
708 F.3d 428 (2d Cir. 2013) ............................................................... 21

*United States v. Colasuonno*,
697 F.3d 164 (2d Cir. 2012) ............................................................... 19

*Veltri v. Bldg. Serv. 32b-J Pension Fund*,
393 F.3d 318 (2d Cir. 2004) ............................................................... 61

*Zervos v. Verizon N.Y., Inc.*,
252 F.3d 163 (2d Cir. 2001) ............................................................... 20

## TABLE OF AUTHORITIES (Cont'd)

**Federal Statutes**                                    **Page(s)**

11 U.S.C.
  § 105 ............................................................................ passim
  § 362 ............................................................................ passim
  § 502 .................................................................... 36, 38, 39
  § 510 ................................................................................ 42
  § 542 ................................................................................ 56
  § 548 ................................................................................ 33

15 U.S.C.
  § 78eee ............................................................................ 52
  § 78fff ............................................................................. 52
  § 78fff-2 ............................................................... 53, 54, 55
  § 78*lll* ............................................................... 53, 54, 55

**State Statutes**

Executive Law § 63 ......................................................... 51

Gen. Bus. Law § 352 ...................................................... 51

**Miscellaneous Authorities**

4-510 Collier on Bankruptcy ¶ 510.05 (LEXIS 2013) ............................ 42

5-548 Collier on Bankruptcy ¶ 548.01 (LEXIS 2013) ............................ 25

## PRELIMINARY STATEMENT

Irving Picard, the trustee for the bankruptcy estate of Bernard L. Madoff Investment Securities LLC (BLMIS), applied for an order declaring void *ab initio* two already-settled state court actions brought against a third party by the New York Attorney General and a court-appointed receiver, and enjoining implementation of the settlement. The United States District Court for the Southern District of New York (Rakoff, J.) denied the Trustee's application.

The New York actions, filed in 2009, asserted fraud and fiduciary duty claims against J. Ezra Merkin, a financier and investment advisor who is unrelated to the bankruptcy debtor, BLMIS. Those claims, which the Trustee does not own and could not bring, sought restitution of management fees and investment losses from Merkin, based on his own fraud and breach of duties to investors in the funds that he managed (the "Merkin funds"). In 2012, three years after the Attorney General commenced his action against Merkin, the parties settled the New York actions for $410 million, principally for distribution to investors in the Merkin funds.

The Trustee's appeal rests entirely on the assertion that the distribution of settlement funds by Merkin to Merkin's victims would impair the Trustee's ability to recover on claims that the Merkin funds' withdrawal of some of their own investment principal from BLMIS constitutes void or voidable transfers. But the district court found, as a matter of fact, that no such impairment had been established (SPA 20, 22), and the Trustee provides no basis to disturb the district court's dispositive factual finding.

The Trustee's effort to nullify the New York actions, post-settlement, has no support in either the Bankruptcy Code or the Securities Investor Protection Act (SIPA). The automatic bankruptcy stay does not apply because the New York actions were brought against a non-debtor and did not seek property of the estate or assert claims belonging to the bankruptcy estate. And the district court's refusal to enjoin the state actions as a discretionary matter was proper, both because the Trustee failed to establish that the New York settlement would cause immediate adverse consequences for the bankruptcy estate, and also because the Trustee has no right to priority over the

Attorney General's independent claims against a non-debtor in any event.

The Trustee is wrong to argue that he is entitled to an injunction to prevent Merkin's victims from "jumping" a line. The "line" he envisions does not exist: the Trustee has no absolute priority as to claims against a non-debtor, and thus no right to block Merkin's victims from recovering on independent claims against the investment advisor who defrauded only them. The unprecedented injunction sought by the Trustee would also be deeply inequitable. It would prevent Merkin's victims, who have received nothing to date, from receiving *any* settlement compensation from Merkin for at least several more years, when BLMIS customers with allowed claims have already received substantial payments from the BLMIS estate and Securities Investor Protection Corporation.

In addition to rejecting the Trustee's application on the merits, the district court also properly concluded that it was independently barred by laches. The Trustee has failed to justify his delay of years before seeking judicial intervention. And granting the injunction sought by the Trustee at this late stage would cause enormous prejudice to many

parties, including (a) the Attorney General and receiver; (b) Merkin's victims, most of whom refrained from filing their own proceedings against Merkin in reliance on the New York actions; (c) the New York court that presided for years over the actions; and (d) New York taxpayers who funded the prosecution of the actions. The judgment below may be affirmed on this ground alone.

## ISSUES PRESENTED

1.    Whether the Bankruptcy Code's automatic stay, 11 U.S.C. § 362(a), applies to state law actions brought by the Attorney General and receiver against a non-debtor third party, where the plaintiffs' claims are based on the third party's own conduct, allege violations of an independent duty owed by the third party, and do not seek to recover or assert control over the property of the debtor's estate.

2.    Whether the district court abused its discretion in refusing to enter an order under 11 U.S.C. § 105 enjoining the state law actions against the non-debtor third party, including implementation of an executed $410 million settlement of those actions, where the court found no adequate showing that implementation of the settlement

4

would impair the bankruptcy trustee's ability to collect on a possible future judgment in a fraudulent transfer action.

3.    Whether SIPA preempts these state law actions against a non-debtor third party.

4.    Whether the district court abused its discretion in holding that the Trustee's application to enjoin these state law actions was barred by laches, where the Trustee made the application more than three years after learning of the state court actions against the non-debtor investment advisor, and during that period victims of the advisor's wrongdoing were relying on relief from the actions, and time and resources were spent on the management, prosecution, and defense of the actions by the New York courts and the parties to those actions.

## STATEMENT OF THE CASE

### A. The 2009 Filing of the New York Actions against Merkin

The Attorney General filed his state law enforcement action against Merkin and the investment management company that Merkin controlled, Gabriel Capital Corporation, in April 2009 (A. 206-207).[1] The complaint alleges fraud and breaches of fiduciary duty by Merkin that are distinct from and independent of the wrongdoing of Bernard Madoff, as described below.

In written offering memoranda and investor presentations, Merkin misled investors to believe that he would be the full-time manager of the funds' portfolios, implementing a trading strategy described in the offerings (A. 217-228 [¶¶ 32-54], 236-247 [¶¶ 77-100]).[2] Instead of managing the funds, however, Merkin simply passed their

---

[1] The Attorney General subsequently filed an amended complaint on May 28, 2009, *see People v. Merkin*, No. 450879/2009 (Sup. Ct. N.Y. County) (Doc. No. 10), *available at* https://iapps.courts.state.ny.us/webcivil/FCASMain, which is substantially identical to the initial complaint in all respects relevant to this appeal. We refer here to the initial complaint included in the appendix for ease of reference.

[2] The full names of the Merkin funds are Ascot Partners, L.P.; Ariel Fund Ltd.; and Gabriel Capital, L.P.

money along to other investment advisors, while hiding that fact, and took hundreds of millions of dollars in fees for his non-service.

Merkin divided the Ariel and Gabriel funds among three outside investment managers—one of whom was Madoff (A. 234-235 [¶¶ 73-74]). He invested nearly all of the Ascot fund with BLMIS. As one investor put it, Merkin was just a "'glorified mailbox'" (A. 209 [¶ 2]); he did not directly manage any of his investors' money. Most investors in the Merkin funds first learned that Merkin was not actively managing their money when Bernard Madoff was arrested and the Ponzi scheme was exposed (A. 216 [¶ 28]). Merkin's misrepresentations and conduct violated New York's anti-fraud statutes—Gen Bus. Law §§ 352, 352-c(1) (the Martin Act), and Executive Law § 63(12). (A. 256-258 [¶¶ 121-26, 133-34].)

Merkin not only deceived his investors, he also breached his fiduciary duties to them. Among other things, he failed to disclose that he was simply turning over all their money to other investment managers, and failed to make diligent inquiry into the risks of investing with these other managers (A. 258 [¶ 131]; *see* 247-253 [¶¶ 101-114]).

Merkin also breached his fiduciary duties to non-profit organizations to which he served as an investment advisor or member of its investment committee. He steered these organizations' money into funds that he managed without disclosing that these investments would result in additional fees for him. Merkin's failure to disclose this blatant conflict of interest, and his recklessness in recommending that these non-profit organizations invest in funds that placed significant assets with BLMIS, violated New York's Not-for-Profit Corporation Law (A. 257 [¶¶ 127-129].)

Merkin's fraud and breach of fiduciary duty caused investors in the Merkin funds to suffer substantial losses. First, Merkin charged hefty management fees to his investors, taking over $169 million in management fees from Ascot investors (A. 216 [¶ 30]), and over $519 million in fees from Ariel and Gabriel investors (some of which remained with Ariel because Merkin deferred payment on his fees from that fund (A. 231 [¶ 64])). Merkin also caused investors to lose their principal by investing the funds' money in BLMIS while concealing that fact from the vast majority of them (A. 210 [¶ 6]). The Merkin funds— which, unlike the investors in the funds, qualify as "customers" of

BLMIS—have submitted claims for loss of principal in the amounts of over $560 million (Ascot), $166 million (Ariel), and $159 million (Gabriel), respectively.[3] The Trustee does not dispute the amounts claimed by Ariel and Gabriel. As for Ascot, the Trustee does not dispute that the fund suffered $226 million in losses under the Trustee's own net equity formula.

The court-appointed receiver for the Ariel and Gabriel funds, Bart M. Schwartz, also filed suit against Merkin. His complaint is based on many of the facts alleged in the Attorney General's action, but asserts different causes of action, because some claims are available only to the Attorney General (*e.g.*, the Martin Act and Executive Law § 63(12)), and some claims may be available only to the funds (*e.g.*, breach of contract, A. 365 [¶¶ 90-95]). The Schwartz complaint sought damages, the imposition of a constructive trust, and rescission of the investment

---

[3] The Merkin funds' customer claims are attached as exhibits to the Affidavit of Matthew Cohen in Support of the Trustee's Application for Enforcement of Automatic Stay and Issuance of Preliminary Injunction, *Picard v. Schneiderman*, No. 12-01778 (Bankr. S.D.N.Y. Aug. 1, 2012) (ECF No. 5).

9

advisory agreement between Merkin's management company and the Ariel fund (A. 369).

## B. The Years of Discovery, Summary Judgment Proceedings, and Settlement Negotiations in the New York Actions

The Attorney General and the New York court committed substantial public resources to the Attorney General's state law action for more than three years before the Trustee filed his suit to declare the New York actions null and void *ab initio*. The Attorney General conducted a pre-complaint investigation as well as extensive discovery after the complaint was filed. Seven attorneys interviewed hundreds of investors and reviewed thousands of pages of documents. Merkin himself was deposed twice over a total of four days. New York Supreme Court (Lowe, J.) denied a motion to dismiss the Attorney General's complaint in early 2010. The parties thereafter litigated numerous discovery disputes and ultimately briefed and argued a motion for partial summary judgment in February 2011. (A. 993-994 [¶ 7].)

While litigation was ongoing, the Trustee twice threatened to sue the Attorney General to stay the action, but did not follow through either time. In November 2009, seven months after the Attorney

10

General brought suit against Merkin, the Trustee informed the Attorney General that he would seek to enjoin the state law action unless the Attorney General agreed to turn over funds recovered in that action to the Trustee. The Attorney General expressly refused to give the Trustee such assurances, yet no lawsuit by the Trustee followed. (A. 996-997 [¶ 14], 1666-1672, 1784, 1815:16-1816:1.)

The Trustee made a similar threat in April 2011, after hearing that the Attorney General was close to settlement with Merkin. On this occasion, one of the Trustee's attorneys asserted that if the Attorney General did not agree within forty-eight hours that the bankruptcy court had exclusive jurisdiction over the matter, the Trustee would seek an injunction. As before, this threat proved to be an empty one. The Attorney General refused the demand, but offered to meet with the Trustee. The Trustee did not respond to this offer, or seek intervention from the court when his threatened deadline passed (A. 997 [¶ 15], 2654 [¶ 8], 2657).

By December 2011, the Attorney General had reached an agreement with Merkin, which contemplated that Merkin and the Merkin funds would be able to obtain a release from claims against them by the

11

Trustee. The parties then presented the proposed agreement to the Trustee, but the Trustee did not agree to it. In April 2012, the Trustee advised the parties that he was uninterested in further negotiations (A. 994-995 [¶¶ 8-9]).

The settlement was thereafter re-negotiated without any involvement by the Trustee. On June 13, 2012, the Attorney General, Merkin, and the funds entered into a final settlement agreement. (A. 994-995 [¶¶ 8-10], 2149-2189.) The executed agreement provides that Merkin will pay $410 million to settle the Attorney General's and receiver's claims, principally for distribution to investors in the Merkin funds (A. 995 [¶ 11]). The agreement calls for a portion of the settlement funds to be held back to satisfy, among other things, claims by the Trustee against Merkin, and to be distributed to investors to the extent not otherwise spent.[4] Distribution of settlement funds has been suspended by

---

[4] The amount to be held back from the settlement distribution was not disclosed to the Trustee because doing so would prejudice the parties in potential future negotiations with the Trustee. The copy of the settlement agreement in the sealed appendix volumes for this case (A. 2149-2189) redacts the amount of the hold-back. We will provide an unredacted copy of the settlement agreement to this Court upon request.

stipulation of the parties pending resolution of this appeal (A. 2123 [¶ 2]).

## C.  The Trustee's August 2012 Filing to Halt and Declare Void the New York Actions after They Had Already Been Settled

Over three years after the Attorney General commenced his state law action against Merkin, and several weeks after the New York settlement was publicly announced (A. 61-62), the Trustee filed a complaint against the Attorney General, the receivers for the Merkin funds, and Merkin in the bankruptcy court (A. 24-45).[5] The complaint asked the court to declare the state law actions "void *ab initio*" on the ground that they violated the automatic stay provisions of the Bankruptcy Code, and to prohibit the parties to the state law actions from implementing their already-executed settlement until the Trustee had fully litigated his separate fraudulent transfer action against the Merkin funds and obtained satisfaction of any judgment in his favor (A.

_____

[5] The district court subsequently withdrew the reference to the bankruptcy court, and the Trustee's action against the Attorney General, receivers, and Merkin thereafter proceeded before it (*see* SPA 29-40).

44). The Trustee alleged that if the court did not block the settlement, the Merkin funds would not have sufficient assets to satisfy the Trustee's claims against the Merkin funds and, if necessary, Merkin himself (A. 26 [¶ 6]).[6]

## D.  The District Court's Order Denying the Trustee's Motion and Dismissing the Complaint

The district court received extensive briefing, oral argument, and evidentiary materials on the Trustee's application, including a voluminous record of declarations and exhibits. The court denied the Trustee's motion for an injunction, holding that (1) his motion and complaint were barred by laches; (2) the New York actions were not subject to an automatic stay under 11 U.S.C. § 362; (3) the Trustee had

---

[6] The Trustee's fraudulent transfer action alleges that the Merkin funds withdrew a portion of their investments in BLMIS, and seeks to recover these amounts for pro rata redistribution to BLMIS investors. To the extent that the funds cannot satisfy the Trustee's claims, he seeks to recover from Merkin as a subsequent transferee and as a general partner jointly and severally liable for the funds' obligations (A. 153-154). The bankruptcy court's most recent scheduling order contemplates that Picard will file his third amended complaint by August 30, 2013. *See* Fourth Amended Case Management Plan, *Picard v. Merkin*, No. 09-1182 (Bankr. S.D.N.Y. July 2, 2013) (ECF No. 148).

failed to establish a factual basis for an injunction under 11 U.S.C. § 105; and (4) SIPA does not preempt the New York actions.

With respect to laches, the district court made two critical findings of fact. First, the court found that the Trustee "unreasonably and inexcusably slept on his rights" (SPA 12). And second, the court found that "the prejudice [caused by the Trustee's delay] to the defendants here, to the investors in the Merkin funds, and even to the New York Supreme Court that managed the NYAG's case for three years, cannot be overstated" (SPA 12). The court found that the elements of laches were therefore easily met (*see* SPA 8 (identifying elements)).

The district court based its findings of fact on record evidence showing that the Trustee failed to seek judicial intervention for years, even after the Attorney General advised the Trustee in writing that the Trustee had no basis for enjoining the Attorney General's state law action (SPA 9-10). The Trustee also took no action when several individual investors commenced litigation or arbitration against Merkin (SPA 9). The Trustee even remained silent after the Attorney General's motion for partial summary judgment was briefed and argued in 2011. The court noted that "from that point, Merkin's assets were at risk of an

15

adverse judgment . . . and the Trustee still failed to take any action for over a year." (SPA 11.)

The district court specifically rejected the Trustee's argument that his participation in settlement negotiations and occasional empty threats to stop the state law actions excused his failure to seek a court order halting those actions. The district court found that the Trustee was involved only "sporadically and tangentially" in settlement discussions (SPA 11). And although Merkin had understandably expressed preference for a "global" settlement of all claims against him, neither he nor the Attorney General nor the court-appointed receivers agreed not to settle the state law actions without the Trustee's consent (SPA 11).

The district court found that the prejudice caused by the Trustee's delay was "enormous" (SPA 13 (quotation marks omitted)) for two main reasons. First, the Attorney General had "expended substantial public resources and engaged in extensive investigation and litigation in bringing its enforcement action against the Merkin defendants," and second, investors in the Merkin funds—who are not direct customers of BLMIS and cannot file claims in the Trustee's claims administration

16

process—had refrained from bringing their own action against Merkin in reliance on the Attorney General's and receiver's actions (SPA 12-13). Thus, declaring the state law actions void *ab initio*, as the Trustee demanded, would waste public resources and cause investors to lose their claims, "and all because the Trustee chose to wait so long before seeking to enforce the automatic stay" (SPA 13).

The district court also addressed the merits of the Trustee's complaint, holding that the Trustee was not entitled to relief under the automatic stay provisions of the Bankruptcy Code or a discretionary injunction under 11 U.S.C. § 105. The court reasoned that the automatic stay did not apply under 11 U.S.C. § 362(a)(1) because the state law actions were independent claims against Merkin, not claims against the debtor, *i.e.*, BLMIS (SPA 14-17). The court also rejected the Trustee's argument that the state law actions sought to recover "property of the estate." 11 U.S.C. § 362(a)(3). The court found that, "as a factual matter," the Trustee had failed to establish that "assets to be used for the settlement are property of [BLMIS]," because "Merkin made significant amounts of money from sources other than [BLMIS]" (SPA 18). For example, the majority of Ariel's and Gabriel's assets were

17

*not* invested in BLMIS, and so it is clear that Merkin obtained management fees that were not derived from the funds' investments in BLMIS (SPA 18).

The district court further found that "the Trustee has failed to show by more than conclusory and speculative assertions that, if the settlement goes forward, the Merkin defendants would be unable to pay any fraudulent transfer judgment obtained by the Trustee" (SPA 19). The court observed that Ariel and Gabriel each have substantial assets that could be used to satisfy any judgment (SPA 19). As to Ascot, the court noted that the settlement of the state law actions "provides for a hold-back for potential recovery by the Trustee" (SPA 19). And the court found that the Trustee had failed to show that Ascot's large net equity claims against the BLMIS estate could not be used to offset a fraudulent transfer judgment (SPA 20). The court rejected the Trustee's application for a discretionary injunction under 11 U.S.C. § 105 based on the same factual finding—that the Trustee had "failed to show that the estate's fraudulent transfer claims would be unable to be satisfied if the settlement goes forward" (SPA 22).

18

Finally, with respect to the Trustee's claim that SIPA preempted the state law claims, the district court concluded that "there is no evidence that Congress intended to preempt the independent state law causes of action brought in this case through enactment of SIPA" (SPA 25). Having made findings of fact and law that were dispositive with respect to all of the Trustee's arguments and claims, the district court dismissed the action in its entirety (SPA 25).[7]

## SUMMARY OF ARGUMENT AND
## STANDARD OF APPELLATE REVIEW

1. *Automatic Stay*. The scope of the automatic stay is a question of law subject to *de novo* review. *See United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012). The Attorney General and receiver brought independent state law actions against the non-debtor Merkin based on Merkin's conduct, and these actions do not seek

---

[7] In a parallel case, Judge Marrero rejected very similar claims brought by the Trustee on similar grounds. *See Picard v. Fairfield Greenwich Ltd.*, 490 B.R. 59 (S.D.N.Y. 2013). This Court has directed that the appeals in both cases be heard in tandem. *See* Order, *Picard v. Schneiderman*, No. 13-1785-bk (2d Cir. June 12, 2013) (ECF No. 118).

to obtain or exercise control over property of the BLMIS estate. The automatic stay under 11 U.S.C. § 362(a) accordingly does not apply.

2.    *Injunction*. The district court's denial of a motion for an injunction under 11 U.S.C. § 105 is reviewed deferentially for abuse of discretion. *See Lautenberg Found. v. Picard*, No. 11-5421-bk, 2013 U.S. App. LEXIS 3523, at *3-4 (2d Cir. Feb. 20, 2013) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010)). On such review, the district court's decision will be upset only when it "rests on an error of law or a clearly erroneous finding of fact," *Pope v. County of Albany*, 687 F.3d 565, 571 (2d Cir. 2012), or "cannot be located within the range of permissible decisions," *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

The district court did not abuse its discretion in denying the Trustee's motion for an injunction under Section 105 of the Bankruptcy Code. As the district court expressly found, the Trustee failed to show that the BLMIS estate would suffer *any* immediate adverse economic consequence if the New York actions were not enjoined. Nor could the Trustee make that showing. The Merkin funds would be able to pay any judgment that the Trustee has any hope of obtaining in his actions to

20

recover the Merkin funds' withdrawals of principal. Even if the funds could not cover all of such a judgment, Merkin's remaining personal assets and a portion of the settlement set aside for such a contingency would cover the rest. And while the likelihood of any adverse consequence for BLMIS is vanishingly small, enjoining distribution of the settlement funds would cause certain harm to the victims of Merkin's wrongdoing, who, quite unlike BLMIS customers, have to date received no compensation for their substantial losses.

3.    *SIPA Preemption*. This Court reviews *de novo* the question whether Congress has preempted state law. *U.S. Smokeless Tobacco Mfg. Co. v. City of N.Y.*, 708 F.3d 428, 432 (2d Cir. 2013). The Court's "[p]reemption analysis is guided by the presumption that a federal statute does not displace the local law unless Congress has made such an intention clear and manifest," and the presumption against preemption is particularly strong where the State exercises its police powers or acts in a field of traditional state regulation. *Id.* (quotation marks omitted). Thus, any doubt as to whether state and federal laws can coexist must be resolved in favor of the State. *See id.*

21

The Trustee fails to identify any indication that Congress intended to preempt the state law actions at issue here. Congress provided that the automatic stay provisions of the Bankruptcy Code would apply in a SIPA liquidation proceeding, but declined to expand the scope of the automatic stay to include third-party actions against non-debtors, which it easily could have done had it intended such an expansion. The Trustee argues broadly that the state law actions interfere with his ability to gather and distribute "customer property," but neither Merkin's nor the Merkin funds' assets are "customer property" under SIPA. SIPA's text clearly excludes property in the hands of a third party from the definition of "customer property."

4. *Laches*. The district court's rulings regarding the doctrine of laches are reviewed for abuse of discretion. *See Perez v. Danbury Hosp.*, 347 F.3d 419, 426 (2d Cir. 2003); *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994). In addition to the points made above, the ruling below may be affirmed on the independent ground that the district court did not abuse its discretion in concluding that laches bars the Trustee's belated action to enjoin the New York actions and settlement. The Trustee had no valid reason for delaying

22

his suit to nullify the New York actions until *after* the settlement of those actions had been publicly announced. And as the district court found, awarding the relief sought by the Trustee would cause prejudice that "cannot be overstated" to the Attorney General, receivers, investors, and New York Supreme Court (SPA 12).

## ARGUMENT

### POINT I

### THE NEW YORK ACTIONS ARE NOT COVERED BY THE AUTOMATIC BANKRUPTCY STAY

The settled claims in the New York actions alleged that the non-debtor Merkin falsely promised his investors that he was actively managing their money, when he was not. The New York actions do not seek to recover from Merkin on the basis that he is a transferee of funds from BLMIS; rather, they assert claims that are entirely independent of any claim that could be asserted by the Trustee.

The Trustee nonetheless argues that the New York actions are covered by the automatic stay because they seek "to recover a claim

23

against the debtor" and "to obtain or exert control over property of the debtor." Neither characterization is supportable.[8]

## A. The State Law Actions Do Not Seek to Recover a Claim against BLMIS.

The Trustee invokes 11 U.S.C. § 362(a)(1) and (6), which stay the commencement or continuation of an "action or proceeding against the debtor" or "to recover a claim against the debtor." The Trustee does not contend that the New York cases constitute "action[s] or proceeding[s] against the debtor," and they plainly are not. The Attorney General and receiver have not sued BLMIS; they have sued Merkin, an unrelated third party.

The Trustee argues that the New York actions are proceedings to "recover a claim against the debtor," but this contention cannot

---

[8] The Attorney General's action is an exercise of his police and regulatory power to enforce state anti-fraud statutes, and accordingly that action is exempt from the automatic stay under 11 U.S.C. § 362(b)(4), except to the extent that he seeks to enforce a money judgment. Because the automatic stay under § 362(a) clearly does not apply to the New York actions against third-party non-debtors, this Court, like the district court (SPA 22 n.6), need not reach the question whether distribution of the settlement funds at issue here would constitute an action to enforce a money judgment.

withstand scrutiny. An action brought against a non-debtor may nonetheless seek to "recover a claim against the debtor" only under narrow circumstances—namely, when the plaintiff sues the non-debtor in order to satisfy the plaintiff's claim against the debtor. *See* 5-548 Collier on Bankruptcy ¶ 548.01(2)(b)(i). Thus, a plaintiff may not evade the stay simply by suing a non-debtor, where the sole basis for the claim against the non-debtor is that the non-debtor holds assets allegedly belonging to the debtor.

An action against a non-debtor is *not* subject to the automatic stay under § 362(a)(1) or (6), however, when the plaintiff has an independent basis for proceeding against the non-debtor that does not hinge upon (1) the existence of a claim against the debtor, and (2) the defendant's status as a transferee of funds from the debtor. *See In re Colonial Realty Co.*, 980 F.2d 125, 132 (2d Cir. 1992); *Picard v. Fairfield Greenwich Ltd.*, 490 B.R. 59, 66-68 (S.D.N.Y. 2013) (Marrero, J.). The New York actions easily pass this test. The Attorney General and receiver asserted claims against Merkin based on Merkin's own fraudulent conduct and breach of duties he personally owed, not to satisfy any underlying claim against BLMIS. And the validity of the

25

claims against Merkin is independent of whether he received any transfers from BLMIS.

The Trustee argues (Br. at 58) that the Attorney General's and receiver's claims are indistinguishable from those held subject to the stay in *Colonial Realty*, but this is incorrect. In *Colonial Realty*, the Federal Deposit Insurance Corporation unquestionably brought a fraudulent transfer action pursuant to its own statutory authority. *See* 980 F.2d at 127-28 & n.2. But the New York actions are not fraudulent transfer actions under any possible definition. In a fraudulent transfer action, a creditor alleges that (1) a debtor owes it money, and (2) the debtor has wrongfully transferred its assets to a third party, rendering the debtor unable to pay its debt to the creditor. *See, e.g., Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53-57 (2d Cir. 2005); *Hearn 45 St. Corp. v. Jano*, 283 N.Y. 139, 143 (1940). The New York complaints allege neither of these key elements.

The Trustee argues (Br. at 58) that the New York actions and Trustee's action "are, in essence, fraudulent transfer claims" because both seek "to recover 'fees' that the Merkin Defendants took from assets withdrawn from BLMIS." This argument fails; even if it were true that

26

the New York actions implicated property of the estate (and it is not true), this would not mean that the Attorney General or receiver brought a fraudulent transfer action. The fact that a plaintiff and a bankruptcy trustee have both asserted claims seeking the allegedly limited funds of a non-debtor says nothing about whether the plaintiff seeks "to recover a claim against the debtor."[9]

## B.    The State Law Actions Do Not Seek to Recover Property of the BLMIS Estate.

The Trustee's argument that the New York actions seek to obtain or exercise control over "property of the estate," 11 U.S.C. § 362(a)(3), fares no better. That argument is squarely foreclosed by *Colonial Realty*. This Court held there that property in the hands of a non-debtor "'is not to be considered property of the estate until it is recovered,'" whether via a fraudulent transfer action or similar device. *Colonial Realty*, 980 F.2d at 131 (quoting *In re Saunders*, 101 B.R. 303, 305

---

[9] The Trustee theorizes (Br. at 60) that investors in the Merkin funds might be deemed "indirect" creditors of the BLMIS estate, or even direct creditors based on some unidentified theory of liability. These assertions are doubtful. But in any event, it is the nature of the claim, not the status of the plaintiff, that matters in this analysis.

(Bankr. N.D. Fla. 1989)).[10] A trustee's mere assertion of a fraudulent transfer claim does not transform the funds sought into "property of the estate." Thus, even if it were true that the New York actions and the Trustee's fraudulent transfer claims were competing for the same limited non-debtor funds (something the Trustee has never established), those funds are not "property of the estate."[11]

The Trustee cites *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987), but that case is inapposite. There, the Court held that

---

[10] Indeed, a customer's deposit with a broker such as BLMIS is not property of the broker even while the broker-debtor has custody of the funds. The Trustee would therefore lack standing to seek transfers of such funds, but for a provision of SIPA that creates a legal fiction that such transferred funds "'shall be deemed to have been the property of the debtor' at the time of the transfer." *Picard v. Estate of Chais*, 445 B.R. 206, 238 (Bankr. S.D.N.Y. 2011) (quoting 15 U.S.C. § 78fff-2(c)(3) (emphasis omitted)). This provision's wording confirms that property in the hands of a third party following the transfer is not property of the estate. See *infra* at 55-56.

[11] Nor are the New York actions themselves "property of the estate" because neither the debtor nor the Trustee could bring them. *See In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir. 1990) ("If . . . the right of action belongs to the creditor, the action is not part of the debtor's estate and the stay does not apply."); *Picard v. Fairfield Greenwich Ltd.*, 490 B.R. at 69 (Marrero, J.) ("Because the Trustee could not raise [plaintiffs'] causes of action, they are not property of the BLMIS estate.").

the automatic stay barred a landlord's attempt to terminate a lease held by a non-debtor, because the bankruptcy debtor was the sublessee. The Court reasoned that the debtor's sublease constituted property of the estate, and that termination of the main lease was stayed because it would "inevitably" destroy the debtor's interest in the sublease. *Id.* at 431. The New York actions will have no such direct and immediate effect on any property of the BLMIS estate.

At bottom, the Trustee's position rests on a vastly overbroad conception of the automatic stay grounded neither in precedent nor common sense. By the Trustee's logic, anyone who sued Merkin for *any* reason—negligent driving, breach of contract, anything—would be subject to the automatic stay, because any settlement or judgment would allegedly be paid with the "same assets" that the Trustee seeks. *See Picard v. Fairfield Greenwich Ltd.*, 490 B.R. at 68-69 (Marrero, J.) (decrying "[t]he sweeping implications of the Trustee's logic"). Under this theory, the filing of a bankruptcy petition would immediately halt all litigation with every company with which a debtor had done business, and the subsequent transferees of those businesses, and so on. While this might increase recoveries for the estate in some cases

29

(though not this one), it would also be a "vast and unwarranted interference" with everyone else's ability to enforce their rights against non-debtor third parties. *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 288 (2d Cir. 2003). Neither this Court nor any other has ever embraced such a sweeping conception of the automatic stay.

## POINT II

## THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DENYING THE TRUSTEE'S MOTION FOR AN INJUNCTION

Section 105(a) empowers the lower court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). This Court has held that "[t]he equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003). The section does not authorize courts "to create substantive rights" and does not "constitute a roving commission to do equity." *Id.* (quotation marks omitted).

30

In the district court, the Trustee acknowledged "full awareness of the unusual, if not extraordinary, nature of the relief" he sought (A. 479). Having lost in the district court, he now contends that the district court was compelled to award this unprecedented injunction. But as shown below, the district court acted well within its discretion in denying the Trustee's motion for an injunction under Section 105.

## A. The BLMIS Estate Will Not Suffer Any Immediate Adverse Economic Consequence Absent an Injunction.

The Trustee argues that "a Section 105 injunction should issue where third-party actions against a non-debtor 'will have an immediate adverse economic consequence for the debtor's estate.'" Trustee Br. at 32 (quoting *Queenie*, 321 F.3d at 287). The Trustee contends that he meets this standard because the New York settlement will allegedly impair his ability to collect on any fraudulent transfer judgment he may obtain against the Merkin funds and Merkin. We demonstrate below that a showing of potential difficulty in collecting on a possible future money judgment against a non-debtor has never been sufficient to entitle a bankruptcy trustee to an injunction as a matter of law. But in

any event, the district court correctly found that the Trustee failed to satisfy even the standard he proposes.[12]

The district court rejected the Trustee's contention that the New York settlement will cause any immediate adverse consequence for the estate. The court expressly found that the Trustee "failed to show that the estate's fraudulent transfer claims would be unable to be satisfied if the settlement goes forward" (SPA 22). This factual finding is well supported in the record. And even if the Trustee had shown some possibility that he may not fully recover on his fraudulent transfer claims, he certainly has not established any "immediate" harm to the estate. The Trustee's argument depends on the occurrence of highly

---

[12] The parties disputed the appropriate standard below. In particular, the defendants argued that the traditional equitable factors apply to the grant of an injunction under Section 105, whereas the Trustee argued that they do not. The district court found it unnecessary to resolve this question because the Trustee had not made the required showing even under the standard he proposed (SPA 22). This Court likewise need not reach the question. But the majority of circuit courts to address the issue have held that the traditional equitable factors apply. *See Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1094 (9th Cir. 2007) (collecting cases). The legislative history also directly supports that conclusion. *See id.* (quoting S. Rep. No. 95-989, at 51 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5837).

contingent events over a period of years, including that (1) he would ultimately prevail on the fraudulent transfer claims; (2) the Merkin funds would be unable to satisfy the resulting judgment; *and* (3) the settlement's hold-back provision and Merkin's remaining personal assets would be insufficient to cover any portion of the judgment that the funds could not pay. The Trustee has not shown that any of these things, let alone all of them, is likely to happen, or to cause any immediate harm to the estate.

### 1. It is uncertain whether the Trustee will prevail on his fraudulent transfer claims.

The Bankruptcy Code provides a defense against a fraudulent transfer claim: "a transferee . . . that takes for value and in good faith . . . may retain such any interest transferred." 11 U.S.C. § 548(c); *see also Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011). The Trustee may well be unable to overcome the Merkin funds' defenses under this provision.

Any transfers received by the Merkin funds were taken "for value." Under this Court's ruling in *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011), the Merkin funds suffered massive

33

net equity losses on their investments with BLMIS. The funds "deposited more cash into their investment accounts than they withdrew," *id.* at 233; they did not receive any fictitious profits representing other customers' money; they received a return of part of their own principal investment. The Merkin funds accordingly took "for value," because, in accordance with the Trustee's net equity formula, their principal was reduced in the amount of the transfers received. Thus, the Trustee cannot recover the transfers of principal unless he establishes that the funds did not accept the transfers in good faith, which requires evidence of at least "willful blindness." *Picard v. Katz*, 462 B.R. at 456. The Trustee may not be able to surmount this obstacle, particularly given that proving state of mind is often difficult. Indeed, a federal class action complaint against Merkin was dismissed on scienter grounds, among others. *See In re J. Ezra Merkin & BDO Seidman Sec. Litig.*, 817 F. Supp. 2d 346, 355-57 (S.D.N.Y. 2011) (Batts, J.).[13]

---

[13] The Attorney General did not confront any similar obstacle in his state action, because New York's anti-fraud statutes do not require the Attorney General to prove scienter. *See, e.g.*, *People v. Lexington Sixty-First Assocs.*, 38 N.Y.2d 588, 595 (1976); *People v. Greenberg*, 95 A.D.3d 474, 483 (1st Dep't 2012), *aff'd*, 2013 N.Y. Slip Op. 4726 (N.Y.

(continued on the next page)

### 2. The Trustee failed to show that he would be unable to recover a judgment against the Merkin funds.

As to the Gabriel and Ariel funds, the face amount of the Trustee's fraudulent transfer claims is $17.4 million and $16.2 million, respectively. *See* Trustee's Br. at 11. Without the New York settlement, the Ariel and Gabriel funds collectively have a net asset value of about $775 million, and have established reserves totaling $37.6 million for the purpose of paying any judgment arising out of the Trustee's action against them.[14] Accordingly, the Ariel and Gabriel funds plainly could pay a judgment on the fraudulent transfer claims, if the Trustee were to obtain one. The Trustee does not suggest otherwise.

The Trustee also failed to show that Ascot would be unable to satisfy a fraudulent transfer judgment. While noting that Ascot

---

Ct. App. June 25, 2013); *State v. Sonifer Realty Corp.*, 212 A.D.2d 366, 367 (1st Dep't 1995).

[14] The facts are reflected in orders filed in *People v. Merkin*, Index No. 450879/2009 (Sup. Ct. N.Y. County), *see* Doc. No. 330, at 3-4 (net value); Doc No. 98, at 41 (proposed distribution plan, including reserves); Doc. No. 207, at 4 (order approving distribution plan as to Ariel); Doc. No. 264, at 6 (ordering distribution to Gabriel investors in accordance with plan).

presently has little cash (Br. at 12), the Trustee's brief completely ignores the critical point, undisputed below, that Ascot has net equity claims of at least $226 million *against* BLMIS.[15] This is because Ascot has suffered huge losses on its investments in BLMIS under the Trustee's own court-approved net equity formula, transfers notwithstanding. The Trustee further ignores that any recovery on his fraudulent transfer claims would only increase the amount of Ascot's net equity loss, and thus increase the size of its claims against the estate.

In the district court, the Trustee threatened to force the Merkin funds to pay any judgment that he might obtain in the fraudulent transfer action before he would allow their claims for net equity losses. There is no logical reason to force the Merkin funds to pay money to BLMIS, when the estate will ultimately pay an even greater sum to the

---

[15] The Trustee repeatedly describes Ascot as "nearly insolvent" or "insolvent," Br. at 1, 12, 35, but that is accurate only if one compares its available funds to the face amount stated in the Trustee's fraudulent transfer complaint, while also ignoring the value of Ascot's own net equity claims against the BLMIS estate and claims that would arise under 11 U.S.C. § 502(h) if the Trustee succeeded in his fraudulent transfer action against Ascot.

funds. In any event, Ascot almost certainly would be able to satisfy any fraudulent transfer judgment by selling or pledging its net equity claims. An affidavit of a third-party expert states that buyers are currently offering eighty to eighty-five cents on the dollar to purchase allowed net equity claims, because additional payouts are expected (*see* A. 1788 [¶ 12]; *see also* A. 1878:14-15 (counsel for the Trustee acknowledging that claims against the BLMIS estate are selling for "north of 66 cents" on the dollar).

Based on these figures, Ascot would be able to raise enough money by selling or pledging its net equity claims to pay any fraudulent transfer judgment. The district court has ruled that the Trustee may only recover for a period of two years prior to the bankruptcy petition as to any fraudulent transfer claim based on withdrawals of investment principal, *see Picard v. Katz*, 462 B.R. at 451-52 (citing 11 U.S.C. §§ 546(e) and 548(a)(1)(A)), with a possible exception for cases in which the Trustee proves that the transferee had "*actual knowledge*" of the Madoff fraud (Order, at 2-3, *In re Bernard L. Madoff Inv. Sec. LLC*, No. 12-mc-115 (S.D.N.Y. Feb. 13, 2013)). Under these rulings, the Trustee's

37

maximum recovery against Ascot would be $280 million.[16] If the Trustee recovered that amount, Ascot's claims would increase from $226 million (at a minimum) to $506 million (because Ascot would then claim the amount of the transfer judgment payment under 11 U.S.C. § 502(h)). Ascot would be able to sell those claims for an amount ranging from approximately $334 million (sixty-six cents on the dollar) to $405 million (eighty cents). Either figure would be sufficient to cover a $280 million judgment. The "hold-back" provision in the settlement agreement would provide further cushion. See *supra* at 12-13 & n.4. And Merkin may have personal assets available as well, as the district court found (*see* SPA 18).[17]

---

[16] The Trustee alleges that his total two-year claims are $313.6 million (A. 144 [¶ 49]). We subtract the two-year claims against Ariel and Gabriel totaling $33.6 million (*see* Trustee's Br. at 11) to arrive at the $280 million two-year claim against Ascot.

[17] Even if the district court's ruling limiting the Trustee to recovery of transfers for two years were overturned or the Trustee were able to prove "actual knowledge," Ascot would still be able to pay any judgment. The total six-year claim against Ascot is $461 million (*see* A. 143 [¶ 48] (494.6 − 33.6 = 461)). A judgment in that amount would increase Ascot's net equity losses to $687 million, and it could sell its claims for those losses for $453 million (sixty-six cents on the dollar) to $550 million (eighty cents). Though the lower amount is $8 million

*(continued on the next page)*

Even if one assumes that Ascot could not pay a fraudulent transfer judgment against it, this would leave the BLMIS estate with *more* money, not less. If that happened, the Trustee could disallow Ascot's net equity claims under 11 U.S.C. § 502(d), retaining the money that would have otherwise flowed to Ascot, and would not have to pay a claim arising under 11 U.S.C. § 502(h) based on payment of a fraudulent transfer judgment. Thus, the BLMIS estate could obtain more money from Ascot than it pays to Ascot only if the Trustee both obtained a fraudulent transfer recovery from Ascot *and* nevertheless disallowed Ascot's net equity claims. But the Trustee would have no legal basis to pursue this course of action, and he does not argue otherwise on appeal.

In a reply brief before the district court, the Trustee floated the idea that he might seek disallowance of the Merkin funds' net equity claims against the BLMIS estate, despite the Trustee's own approved net equity formula, on the ground that Merkin, personally, knew or

short, the difference could be met through the hold-back provision or Merkin's personal assets.

39

should have known about the Madoff fraud.[18] Thus, the Trustee asserted that not only is he entitled to recover the Merkin funds' withdrawals of their own investment principal via the fraudulent transfer actions, but that he is entitled to confiscate *all* of that money plus *all* of the Merkin funds' principal already in his custody for redistribution to other BLMIS investors. The Trustee's astonishing claim that the victims of Merkin's fraud should forfeit all of their own investment principal for the benefit of BLMIS customers is unprecedented and inequitable, which may explain why the Trustee declines to address the point in his opening brief to this Court.[19]

---

[18] *See* Reply Memorandum of Law in Further Support of Trustee's Motion, at 29-30 & n.19, *Picard v. Schneiderman*, No. 12-cv-6733 (S.D.N.Y. Feb. 21, 2013) (ECF No. 24) ("[T]he Merkin Defendants incorrectly assume that the customer claims filed by the Merkin Funds in the BLMIS liquidation will be allowed . . . .").

[19] In his opening brief to this Court, the Trustee pretends that "no party disputed that the settlement will impair the Trustee's ability to collect in full on his claims." Trustee's Br. at 27. This is flatly false. *See* Memorandum of Law in Support of Merkin Defendants' Opposition to the Trustee's Application for a Preliminary Injunction, at 18-21, *Picard v. Schneiderman*, No. 12-cv-6733 (S.D.N.Y. Jan. 25, 2013) (ECF No. 19); Joint Sur-Reply Memorandum of Law in Opposition to Trustee's Application for Enforcement of Automatic Stay and Issuance of Preliminary Injunction, at 8-9, *Picard v. Schneiderman*, No. 12-cv-6733 (S.D.N.Y. Mar. 5, 2013) (ECF No. 31).

The cases on which the Trustee relied in the district court provided him no support. In *SEC v. Packer, Wilbur & Co.*, the Court affirmed the unremarkable proposition that an investor who deliberately induces a violation of the securities laws is not entitled to reimbursement from a "quasi-public" insurance fund (SIPC) to cover losses he sustains when his fraudulent scheme goes south. 498 F.2d 978, 985 (2d Cir. 1974). The Court did not at all endorse the view that an investor, by virtue of wrongdoing that did not harm other investors, would forfeit even his own investment principal, to the extent it remained in the hands of the estate of the bankrupt broker-dealer. *See also SEC v. N. Am. Planning Corp.*, No. 72 Civ. 3158, 1975 U.S. Dist. LEXIS 14183, at *5 (S.D.N.Y. Jan. 24, 1975) (same). And in *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, the investor's account balance "represented the fruits of . . . massive fraud," 277 B.R. 520, 562 (Bankr. S.D.N.Y. 2002)—the investor had already "withdraw[n] . . . about as much as he put in," *see id.* at 566, so the remaining account balance represented other people's money. He was not entitled to have SIPC pay him fictitious profits, representing the proceeds of fraud.

Here, by contrast, the Merkin funds are victims who suffered massive net losses and are entitled to recoup the principal that they invested and lost, based on the Trustee's own approved net equity formula. The Trustee's threat that he may attempt to prevent the funds from retrieving their own investment principal from the BLMIS estate is one more reason why blocking or delaying the New York settlement with Merkin for the benefit of his victims would be inequitable.[20]

## B. The Trustee Would Not Be Entitled to an Injunction Even If Distribution of Settlement Funds Might Reduce His Ability to Recover from Merkin.

Even if the Trustee had shown that the settlement would impair his ability to collect on a future fraudulent transfer judgment (and as the district court held, he failed to make that factual showing), this would not mean that the Trustee is entitled to an injunction. The

---

[20] The Trustee also suggested in a footnote in reply below (*see* Reply, *supra* footnote 18, at 30 n.19) that he "may seek" equitable subordination of the Merkin funds' claims under 11 U.S.C. § 510(c). He does not repeat that suggestion on appeal, and for good reason. Equitable subordination is available only where the claimant's conduct injured other creditors or customers, *see* 4-510 Collier on Bankruptcy ¶ 510.05[2], and there could be no such plausible injury here.

Trustee cites no authority to the contrary. His novel and unsupported conception of Section 105 would give a bankruptcy trustee's claims against a *non-debtor* absolute legal priority over other plaintiffs' claims against the non-debtor, regardless of the basis for the other claims and all other equitable factors. But this is not the law. *See Picard v. Fairfield Greenwich Ltd.*, 490 B.R. at 71 (Marrero, J.) (rejecting the Trustee's view).[21] A bankruptcy trustee does not possess any absolute right to priority, as against the world, with respect to claims against a non-debtor. *See In re Quigley*, 676 F.3d 45, 58 & n.15 (2d Cir. 2012) (observing that an injunction is not necessarily appropriate even where a third-party lawsuit "poses the specter of direct impact on the *res* of the bankrupt estate").

This Court's summary order in *Lautenberg Foundation v. Picard* does not "require an injunction here," contrary to the Trustee's argument. Br. at 35. In *Lautenberg*, this Court affirmed the district

---

[21] Numerous decisions recognize that a bankruptcy trustee does not possess such priority as to claims against non-debtors. *See In re Granite Partners, L.P.*, 194 B.R. 318, 338 (Bankr. S.D.N.Y. 1996); *In re Enivid, Inc.*, 364 B.R. 139, 157 (Bankr. D. Mass. 2007); *In re Reliance Acceptance Grp., Inc.*, 235 B.R. 548, 560-61 (D. Del. 1999); *In re Phar-Mor Sec. Litig.*, 164 B.R. 903, 907 (W.D. Pa. 1994).

court's grant of an injunction halting claims against third parties closely related to the debtor as an appropriate exercise of discretion. *See* 2013 U.S. App. LEXIS 3523, at *3-6. But that case presented exceedingly strong circumstances to support such an injunction that are entirely absent here. And the Court did not rule in *Lautenberg* that the district court was compelled to enter an injunction, as the Trustee must establish here to obtain relief. Rather, the Court in *Lautenberg* held only that the district court's entry of an injunction was not an abuse of discretion.[22]

*Lautenberg* is sharply different from this case. *First*, the claims enjoined in *Lautenberg* were brought against Madoff's relatives who were employed by BLMIS and who, unlike in this case, held proceeds from the Madoff fraud: virtually every asset in the relatives' possession was taken from BLMIS customers. *See id.* at *5. The relatives did not suffer investment losses with BLMIS and had no claims against the BLMIS estate. *See id.* at *2; Brief for Trustee-Appellee Irving H. Picard,

---

[22] The Court expressly declined to reach the question whether the action against the third parties came within the automatic stay, holding that the ruling affirming the injunction was sufficient to dispose of the appeal.

at 11-13, *Lautenberg Found. v. Picard*, No. 11-5421-bk (2d Cir. July 11, 2012) (ECF No. 74). The Trustee could thus recover *all* of the Madoff relatives' assets and would *not* make a subsequent net equity payment to them, in which case the BLMIS estate would have more money to distribute to Madoff victims. Under those circumstances, the district court's finding that a recovery on third-party claims against the Madoff relatives would likely impair the BLMIS estate was not clear error. As a matter of logic, each dollar of recovery against the Madoff relatives would reduce the Trustee's recovery of the proceeds of fraud that they held.

The same logic does not apply at all here. In this case, the Merkin funds are the primary defendants on the Trustee's fraudulent transfer claims, and *none* of the funds' (or Merkin's) assets consist of money taken from BLMIS customers. The funds sustained net losses and therefore have substantial net equity claims against the BLMIS estate. The district court found that the Trustee failed to show that a fraudulent transfer judgment, if any, would be greater than the value of the Merkin funds' net equity claims, or that the funds (or Merkin) would be unable to cover any remaining portion of such hypothetical

45

judgment using other assets. In relying heavily on *Lautenberg*, the Trustee simply fails to come to terms with the factual findings of the district court in this case.

*Second*, in *Lautenberg*, unlike here, the claims asserted in the enjoined third-party actions were general to all customers and creditors of BLMIS, and were based on the status of the Madoff relatives as high-ranking employees of BLMIS. The third-party plaintiffs were "not seeking to redress a particularized injury or alleging harm caused directly to them by" the third-party defendants. *Picard v. Stahl*, 443 B.R. 295, 312 (Bankr. S.D.N.Y. 2011). In this case, by contrast, the Attorney General and receiver have an independent basis for suing Merkin, not shared by the Trustee, based on Merkin's breaches of duty to his own direct investors, see *supra* at 6-10. The independent nature of the claims in the New York action—distinct from any claims of the Trustee or any claim common to all customers or creditors of BLMIS—is another powerful reason that the New York actions do not intrude on the Trustee's power to marshal and administer the bankruptcy estate. *See In re Quigley*, 676 F.3d at 57 (noting that this Court has "treated

whether a suit seeks to impose derivative liability as a helpful way to assess whether it has the potential to affect the bankruptcy *res*").

Consequently, *Lautenberg* provides no basis to reverse the district court's denial of an injunction here. Indeed, *Lautenberg* stands as a narrow exception to deeply ingrained principles of equitable practice that reject the use of an injunction as a device to ensure future collection of a potential money judgment. As the Supreme Court held in *Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.*, a court generally lacks authority to enter an injunction to prevent a defendant from transferring assets in which no lien or other equitable interest is claimed. *See* 527 U.S. 308, 310, 333 (1999); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 388-89 (S.D.N.Y. 2003) (Koeltl, J.) (applying rule). While the law of bankruptcy may allow a court to enter such an injunction in narrow instances, this should be done only when, as in *Lautenberg*, exceptional circumstances are presented. Nothing like that is present here, thus confirming that the district court did not abuse its discretion in declining to enter an injunction.

47

## C.  An Injunction Would Be Inequitable for Further Compelling Reasons.

The district court's denial of the injunction is fully supported by its finding that the Trustee failed to show that the settlement of the New York actions would have any immediate adverse economic consequence on the BLMIS estate. But the injunction sought by the Trustee would also be deeply inequitable for additional reasons.

To date, the investors in the Merkin funds have received no compensation for the enormous damages that Merkin's misconduct caused them, which include losses from Merkin's pocketing of hundreds of millions in unearned management fees, much of this on money that was not invested with BLMIS. See *supra* at 7-9. The Trustee's application for an injunction seeks to prevent the Merkin investors from receiving any such compensation for at least several more years.

By contrast, the Trustee has already recovered over $9.3 billion to compensate BLMIS customers, and many BLMIS customers have already received 100 percent recovery on their claims, while many others have already recouped nearly half of their net equity losses, with more to come (*see* A. 1878:11-14). Due to his pending fraudulent transfer claims, the Trustee has provided no money to the Merkin funds

48

for their large net equity losses in their investments with BLMIS, and he has threatened that he will not do so for many years and maybe ever. See *supra* at 39-40 & n.19. The Trustee's attempt to bar *any* compensation of Merkin's victims until he has received 100 percent payment of a possible future fraudulent transfer judgment is completely unwarranted.

The Trustee seemingly suggests (Br. at 36) that if the Merkin funds recover from Merkin, they will obtain "fictitious profits" generated by the Madoff Ponzi scheme, *i.e.*, other investors' money. This is not true. The Merkin funds suffered net equity losses in the hundreds of millions of dollars. The funds parted with even more money when they paid management fees to Merkin (*see* A. 2211, 2275, 2347), including on money that was not invested with BLMIS. That money did not come from BLMIS customers, as the Trustee repeatedly contends (*e.g.*, Br. at 42-43). Rather, it came from the Merkin fund investors, substantially increasing their losses. The Trustee, not the Attorney General or receivers, ignores the "fungibility of cash" (Br. at 45) when he claims that the Merkin funds received other customers' money, not their own principal, when they made withdrawals.

49

The Trustee also seems to suggest that it would be unjust if Merkin's victims recover in any proceeding other than the one he is administering. But there is no injustice in allowing recovery on independent claims against a non-debtor. And Merkin's victims have significant management fee-related losses not shared by direct BLMIS customers, as well as an independent source of compensation, Merkin, for their injuries. Moreover, as the district court found, the Trustee failed to show that the settlement would affect BLMIS customers at all (SPA 20, 22), meaning that they will receive the same amount regardless of whether the settlement of the New York actions against Merkin is paid. The Attorney General's law enforcement action against Merkin has the beneficial effect of increasing recovery for the investors in the Merkin funds without decreasing recovery for anyone.

## POINT III

## THE SECURITIES INVESTOR PROTECTION ACT DOES NOT PREEMPT THE STATE LAW ACTIONS OR SETTLEMENT

The Trustee argues that even if the New York actions are not barred by the automatic stay under 11 U.S.C. § 362, and even if the district court reasonably declined to enter an injunction freezing the actions under 11 U.S.C. § 105, the actions are nonetheless preempted under the Securities Investor Protection Act of 1970 (SIPA). There is no merit to this contention.

The Attorney General's action against Merkin enforces New York's longstanding anti-fraud statutes, the Martin Act, *see* Gen. Bus. Law § 352 *et seq*., and Executive Law § 63(12),[23] and may be found preempted only if "that was the clear and manifest purpose of

---

[23] The Trustee's suggestion (Br. at 55-56) that the Attorney General is acting as an agent of private investors is meritless. The Martin Act and Executive Law § 63(12) authorize the State to obtain restitution for victims of fraud because it serves the public interest to undo the harm caused by fraud. The State does not act as the agent of private parties here, any more than it does when the public prosecutor obtains restitution for victims of crime. *See People v. Coventry First LLC*, 13 N.Y.3d 108 (2009) ("The Attorney General of New York State has statutory authority to serve the public interest by seeking both injunctive and victim-specific relief . . . .").

Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (quotation marks omitted). The Trustee does not identify any clear indication—or any indication at all—that Congress intended that SIPA would preempt state actions not otherwise subject to restraint under traditional bankruptcy remedies.

The Trustee references (Br. at 46) a general congressional purpose in SIPA "to channel all legal proceedings through a single trustee," which allegedly is incompatible with third-party lawsuits. But if Congress had intended to create a "super-stay" under SIPA that extended beyond the traditional bankruptcy remedies available under 11 U.S.C. §§ 105 and 362, Congress easily could have enacted such a provision. But it did not. Though Congress specifically addressed the automatic stay in SIPA, it did not expand the stay to include third-party actions such as this one. *See* 15 U.S.C. §§ 78eee(b)(2)(C) (exception to automatic stay), 78fff(b) (SIPA proceeding conducted under Bankruptcy Code). The Trustee's free-floating policy analysis (Br. at 45-50) is no basis to read into SIPA a remedial device that Congress declined to enact.

52

The Trustee next argues (Br. at 51) that the New York actions are preempted because the Merkin funds and Merkin are in possession of "customer property," *i.e.*, property of BLMIS customers, as defined in 15 U.S.C. § 78*lll*(4). But the Trustee does not explain why this would result in preemption, and in any event his premise is incorrect.

Much as this Court has ruled that property sought from a third party by a bankruptcy trustee in a fraudulent transfer suit is not property of the estate until it is recovered, *see Colonial Realty*, 980 F.2d at 131, SIPA provides that property in the hands of a third party is *not* "customer property" under the statute until it is recovered. SIPA provides that "the trustee may recover any property transferred by the debtor which, except for such transfer, *would have been* customer property," 15 U.S.C. § 78fff-2(c)(3) (emphasis added). This phrasing makes clear that the transfer to the third party disqualifies the property from being "customer property." Another clause in the same subsection confirms this point: the subsection says that *after* the

53

property is recovered in a fraudulent transfer action, but not before, "[s]uch recovered property shall be treated as customer property." *Id.*[24]

The Trustee claims (Br. at 51) that property in the hands of a third party is "customer property" under SIPA if it is "property unlawfully converted," but he takes the phrase out of context. The statute provides that "[c]ustomer property" means "cash and securities" held by the debtor for the account of a customer, "*and the proceeds of any such property* transferred by the debtor, including property unlawfully converted." 15 U.S.C. § 78*lll*(4) (emphasis added). This language does not reach property in the hands of a third party; it provides that if the debtor unlawfully converts a customer's cash and securities, the proceeds of that conversion *in the hands of the debtor* shall also be considered customer property. The Trustee's citation (Br. at 51) to subparagraph (E) of the definition of "customer property" is no

---

[24] Further confirmation is found in the language providing that "[w]henever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor . . ." 15 U.S.C. § 78fff-2(c)(3). This clause, too, places transferred property in the hands of a third party outside of the scope of "customer property."

better; that provision references "property of the *debtor*," 15 U.S.C. § 78*lll*(4)(E) (emphasis added), not third-party property.

The Securities Investor Protection Corporation quotes different language from the statute, but its argument also fails. SIPC notes (Br. at 25-26) that the statute provides that, for the purposes of a trustee's recovery action, transferred property "shall be deemed to *have been* the property of the debtor." 15 U.S.C. § 78fff-2(c)(3) (emphasis added). But this provision does not say that transferred funds are "property of the debtor" while in the third-party's hands; it clearly means that they shall be deemed to "*have been*" the property of the debtor "*at the time of transfer*." *Picard v. Estate of Chais*, 445 B.R. 206, 238 (Bankr. S.D.N.Y. 2011) (quotation marks omitted, second emphasis added).

This provision's narrow purpose is to afford the trustee standing to pursue recovery of transferred moneys representing customers' investments. The provision is needed because general principles of state property law provide that money invested with an investment advisor or broker remains property of the investor, rather than becoming property of the advisor or broker. The quoted statutory language thus "creates a fiction that grants the trustee standing to bring avoidance

actions under the Code." *Estate of Chais*, 445 B.R. at 237. Indeed, in this very case, the bankruptcy court made clear that SIPA does *not* convert transferred property into "property of the estate" for the purposes of the Bankruptcy Code. *Picard v. Merkin*, 440 B.R. 243, 271-73 (Bankr. S.D.N.Y. 2010) (holding that SIPA does not enable the Trustee to invoke the "turnover" provisions of the Bankruptcy Code, 11 U.S.C. § 542). Neither the Trustee nor SIPC acknowledges this ruling or attempts to show any error in it.

## POINT IV

### THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN RULING THAT THE TRUSTEE'S BELATED APPLICATION IS INDEPENDENTLY BARRED BY LACHES

In addition to holding that the Trustee's application failed on the merits, the district court ruled that it was independently barred by laches. The judgment below may be affirmed on this ground alone.

The elements of a laches defense under federal law are (1) unreasonable delay by the plaintiff in bringing suit, and (2) prejudice resulting from that delay. *Perez v. Danbury Hosp.*, 347 F.3d 419, 426

56

(2d Cir. 2003). The district court found that both elements were met here.

First, the court found that the Trustee failed to justify his nearly three-year delay in bringing the application. The Trustee learned of the New York actions shortly after their filing and twice threatened to seek to stay them (A. 996-997 [¶¶ 14-15]). Yet the Trustee filed no application for such judicial intervention until years later, *after* the public announcement of the New York settlement (A. 997 [¶¶ 16-17]).

Second, the court found that the prejudice that would result from granting the Trustee's long-delayed application "cannot be overstated" (SPA 12). As the court noted, the record showed that investors in the Merkin funds had relied on the New York actions in forgoing their own suits; the New York court had spent years presiding over the actions; and substantial taxpayer funds had been dedicated to prosecuting them.

The Trustee has failed to show any clear error in the district court's factual findings or any abuse of discretion in its ruling that its application is barred by laches.

57

### A. The Record Supports the District Court's Finding that the Trustee's Minimal Involvement in Settlement Talks Did Not Justify His Years of Delay.

The Trustee misstates the record, and ignores the district court's factual findings, in saying that "it is uncontested that negotiations to reach a global settlement commenced in 2009 and continued through the spring of 2012." Trustee Br. at 68. *See also id.* at 65, 69 (inaccurately describing its participation in settlement talks as "ongoing").

The district court squarely rejected this characterization of the settlement talks in the New York actions. The court found that the Trustee's legal team was involved only "sporadically and tangentially" in those discussions (SPA 11). This minimal involvement, the court held, did not excuse the Trustee's years-long and highly prejudicial delay (SPA 11). *See Harley-Davidson, Inc. v. Estate of O'Connell*, 13 F. Supp. 2d 271, 280 (N.D.N.Y 1998) (to excuse delay, settlement negotiations "must ordinarily be continuous and bilaterally progressing, with a fair chance of success" (quotation marks omitted)).

The record supports the district court's findings. Specifically, after the Trustee threatened to sue the Attorney General in November 2009, the parties discussed a possible "global resolution" involving the

58

Trustee, the Attorney General, the receivers, and Merkin (A. 2508 [¶ 9]). But "after the initial round of discussions, there was a long hiatus." (A. 2648 [¶ 4]; *see also* A. 1839:15-21, 2658-2659 [¶¶ 1-4]). Indeed, the Trustee was unable to identify any settlement discussions with Merkin's counsel during all of 2010 (A. 2653 [¶ 4]; *see also* A. 1835:15–1836:12). The Attorney General and the Trustee discussed the possibility of "global settlement" in November and December 2010 (A. 2510 [¶ 16]), but again no settlement was reached. Approximately one year later, in December 2011, the Attorney General invited the Trustee to participate in a settlement agreement that he had reached with Merkin but, once again, the parties could not resolve their differences, and soon after the Trustee said he had no interest in further discussions (A. 995 [¶ 9]). The Attorney General and the receivers accordingly settled with Merkin without the Trustee's participation (A. 2149-2189).

Nor can the Trustee's delay be justified on the ground that he had a reasonable expectation that the state law actions would not proceed absent the Trustee's participation. As the district court recognized (A. 1838:13-21), the Attorney General was prepared to litigate or settle with Merkin, with or without the Trustee. Moreover, any possible

59

settlement, whether it included the Trustee or not, would have included restitution from Merkin for investors in the Merkin funds. The *only* way for the Trustee to prevent this result was to sue to enjoin the state law actions. He declined to do so, even as all the parties incurred litigation costs and worked toward a resolution that would bring compensation to Merkin's victims. He has accordingly "lost his right to complain" (SPA 2).

### B.  The Trustee's Two Empty Threats to File for a Stay Did Not Entitle Him to Wait Years to Do So.

The Trustee argues that the district court's laches ruling was a per se abuse of discretion because the defendants had notice that he might sue to stay the New York action. He seems to argue that laches is categorically unavailable as a matter of law, no matter how long a plaintiff waits to assert his rights or how prejudicial that delay and the uncertainty it creates may be, so long as the defendant has notice that a plaintiff might sue. *See* Trustee's Br. at 66-68. This is incorrect.

Contrary to the Trustee's argument, "surprise" on the part of the defendant is not an element of laches under federal law. The two elements of the defense are unreasonable delay by the plaintiff and

resulting prejudice. *Perez*, 347 F.3d at 426. In addressing these broad elements, the "equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case." *Tri-Star Pictures*, 17 F.3d at 44. Thus, even if courts have sometimes found that a defendant was not prejudiced because he had notice of the impending claim, this does not mean that notice categorically defeats laches in all cases.[25] *See Aris Isotoner, Inc. v. Berkshire Fashions, Inc.*, 924 F.2d 465, 466-67 (2d Cir. 1991) (rejecting district court's ruling that notice to defendant barred the defense of laches).

As the district court observed, the more compelling fact than the presence of notice here is that the Trustee twice threatened to ask the bankruptcy court to stay the state actions, and twice failed to follow through. The right question is not whether the Trustee's lawsuit

---

[25] The Trustee seriously misstates the holding of *Veltri v. Bldg. Serv. 32b-J Pension Fund*, 393 F.3d 318 (2d Cir. 2004), which did not reverse the district court, as the Trustee says (Br. at 67), or rule on the defense of laches. In *Veltri*, the Court held that the statute of limitations was equitably tolled. *See id.* at 325-26. It commented on the doctrine of laches, in dicta, for the limited purpose of giving assurance that its decision did not mean that the statute of limitations could be equitably tolled "in perpetuity." *Id.* at 325 (quotation marks omitted).

"surprised" the parties.[26] The issue is whether, given the Trustee's years of inaction punctuated by empty threats, the district court justifiably found that it would be inequitable to entertain the Trustee's application to declare the New York actions void *ab initio*, after they had already been settled. The Trustee's two abandoned threats did not entitle him to keep the Attorney General, court-appointed receiver, state court, investors, and Merkin in limbo indefinitely, and they did not mean that those parties acted forever at their own risk in proceeding with the New York actions.

### C.    The Trustee's Argument That No Prejudice Would Result from Halting the New York Actions, Rather Than Declaring Them Void, Is Meritless.

The Trustee argues that the district court erred in assessing prejudice based solely on its request for an order declaring the New York actions void *ab initio*, rather than also asking whether a more limited ruling halting the New York settlement from going forward would cause prejudice. *See* Trustee's Br. at 63-64.

_____

[26] Even if "surprise" were required, the Trustee likely did surprise a great many investors in the Merkin funds who relied on the New York actions without even knowing of the Trustee's threats.

But the Trustee's effort to walk back from the relief he sought below is unavailing. He is now faulting the district court, after the fact, for having failed to address matters that he did not ask the court to decide. After all, the Trustee did not abandon his claim that the New York actions were absolutely barred and void *ab initio*, or otherwise make clear any position that the court should consider only prejudice to the New York actions that would result from halting the settlement, without declaring the state actions null and void. The Trustee's arguments that the district court failed to consider prejudice arising from a Section 105 injunction only are thus unpreserved, particularly since the district court easily could have addressed the point had those arguments been raised.

In any event, the Trustee is wrong to suggest that no prejudice would result from a stay of the settlement alone. The Trustee's fraudulent transfer action will likely take years longer to resolve, meaning that a stay would seriously delay relief to investors for Merkin's wrongdoing. This delay would be deeply prejudicial because achieving timely relief is a major reason for settling a case. There is no basis to think that the parties would have accepted the same settlement

terms if they had thought investor relief would be delayed for years, as the Trustee now seeks. Thus, the Trustee's after-the-fact request would cause great prejudice, even if it were deemed to seek only a stay of the executed settlement.

Nor is the Trustee correct in suggesting that he filed his application for an injunction as soon as a "ripened threat" to the estate's interests arose. Trustee's Br. at 64. The Trustee was aware in 2009 that the New York actions sought restitution of fees and losses from Merkin, and was further aware in 2011 that summary judgment motions had been filed and argued. He did not need to wait until those actions achieved success before seeking a stay, as his own prior threats recognized. Embracing the Trustee's novel view of "ripeness" would give bankruptcy trustees license to sit back and allow parties to spend substantial time and resources litigating claims, only to pull the rug out at the finish line. This would be inequitable and wasteful, and it should not be the law.

### D.  The Automatic Stay Is Not Immune from Laches Principles.

The Trustee also argues (Br. at 69) that a court cannot consider the equitable defense of laches in deciding claims under the automatic stay. This contention is baseless. Though this Court has not had occasion to decide the specific question whether laches applies to the automatic stay, the circuit courts to do so have held that laches does apply. *See, e.g.*, *Thornton v. First State Bank of Joplin*, 4 F.3d 650, 653 (8th Cir. 1993); *Matthews v. Rosene*, 739 F.2d 249, 251 (7th Cir. 1984); *see also Sinatra v. Gucci* (*In re Gucci*), 309 B.R. 679, 684-85 (S.D.N.Y. 2004) (Kaplan, J.) (remanding to the bankruptcy court for further fact finding on laches). The Trustee cites no decision holding otherwise.

The Trustee relies (Br. at 69-70) on the proposition that a party seeking relief from the automatic stay bears the burden of petitioning the bankruptcy court for such relief. But that principle is irrelevant: it concerns requests for relief from the automatic stay where it undisputedly applies. This case presents the very different issue whether the automatic stay applies at all. None of the cases cited by the Trustee holds that the party arguing against the stay is required to be the first mover when the scope of the stay is disputed.

65

Indeed, the very vesting of discretionary power in the court to afford relief from the stay, including by "annulling" the stay to ratify past actions retroactively, further supports the applicability of traditional laches principles. 11 U.S.C. § 362(d); *Eastern Refractories Co. v. Forty Eight Insulations, Inc.*, 157 F.3d 169, 172 (2d Cir. 1998) ("an order 'annulling' a stay . . . reaches back in time to validate proceedings or actions that would otherwise be deemed void *ab initio*."). Such power confirms that the stay, while termed "automatic," is not absolute.

The Trustee seeks to draw support from a decision of this Court that states in passing that a debtor cannot waive the automatic stay. Trustee Br. at 69-70 (citing *Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207 (2d Cir. 1986) (per curiam)). But that decision too is inapposite. The question there was whether the debtor's agreement that the stay did not apply meant that it did not. *Commerzanstalt*, 790 F.2d at 207. The question here is whether a *court* may consider the traditional equitable defense of laches in deciding whether to issue an order imposing the stay. The Trustee cites no precedent at all for his contention that the district court was *compelled* simply to disregard the Trustee's inexcusable years-long delay in seeking relief and the

66

enormous prejudice that voiding the New York actions after they had been settled would cause to the parties to those actions, Merkin's victims, and the state court.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  New York, NY
        July 19, 2013

Respectfully submitted,

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*

By:  /s/ Brian A. Sutherland
      BRIAN A. SUTHERLAND
      Assistant Solicitor General

120 Broadway, 25th Floor
New York, NY 10271
(212) 416-8096

BARBARA D. UNDERWOOD
  *Solicitor General*
RICHARD DEARING
  *Deputy Solicitor General*
BRIAN A. SUTHERLAND
  *Assistant Solicitor General*
DAVID ELLENHORN
  *Senior Trial Counsel*
  *Investor Protection Bureau*
    *of Counsel*

67

<u>/s/ James C. McCarroll</u>
James C. McCarroll
Jordan W. Siev
Michael J. Venditto
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Tel: (212) 521-5400
Fax: (212) 521-5450
*Attorneys for Bart M. Schwartz as*
*Receiver for Ariel Fund Ltd. and*
*Gabriel Capital, L.P.*


<u>/s/ Judith A. Archer</u>
Judith A. Archer
David L. Barrack
Jami Mills Vibbert
FULBRIGHT & JAWORSKI LLP
666 Fifth Avenue
New York, NY 10103
Tel: (212) 318-3000
Fax: (212) 318-3400
*Attorneys for Ralph C. Dawson as*
*Receiver for Ascot Partners, L.P.*


Reproduced on Recycled Paper

68

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Gil Abadi, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,458 words and complies with the type-volume limitations of Rule 32(a)(7)(B).


_____/s/ Gil Abadi_____
Gil Abadi