# 13-1785-bk

## United States Court of Appeals

*for the*

## Second Circuit

In Re: Bernard L. Madoff Investment Securities LLC

IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of
BERNARD L. MADOFF,

*Plaintiff-Appellant,*

– v. –

ERIC T. SCHNEIDERMAN, BART M. SCHWARTZ, RALPH C. DAWSON,
J. EZRA MERKIN, GABRIEL CAPITAL CORPORATION,

*Defendants-Appellees,*

SECURITIES INVESTOR PROTECTION CORPORATION,
Statutory Intervenor pursuant to Securities Investor Protection Act,
15 U.S.C. section 78eee(d),

*Intervenor.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REDACTED BRIEF FOR DEFENDANTS-APPELLEES
## J. EZRA MERKIN AND GABRIEL CAPITAL CORPORATION

DECHERT LLP
*Attorneys for Defendants-Appellees*
*J. Ezra Merkin and Gabriel*
*Capital Corporation*
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO RULE 26.1 OF THE
## <u>FEDERAL RULES OF APPELLATE PROCEDURE</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Defendant-Appellee Gabriel Capital Corporation hereby certifies that it does

not have a corporate parent and there is no publicly held corporation that

owns 10 percent or more of its stock.

# **Table Of Contents**

Table Of Authorities ...................................................................................ii

Issue Presented.......................................................................................... 1

Statement Of The Case ............................................................................. 2

Statement Of Facts .................................................................................... 9

A.   The Funds ........................................................................................ 9

B.   The Investments With Madoff ......................................................10

C.   The Merkin Defendants' Extensive  Due Diligence On And
     Monitoring Of Madoff..................................................................12

D.   The Alleged "Red Flags" Do Not Show Willful Blindness.........16

E.   The District Court's Decision.......................................................25

Standard Of Review.................................................................................28

Argument

     THE DISTRICT COURT DID NOT ABUSE ITS
     DISCRETION BY DENYING THE MOTION FOR A
     PRELIMINARY INJUNCTION BECAUSE THE  TRUSTEE
     FAILED TO PROVE LIKELIHOOD OF  SUCCESS ON THE
     MERITS OR IRREPARABLE HARM ......................................30

     A.   The Trustee Failed To Establish A Likelihood Of
          Success In The Avoidance Action Because The Merkin
          Defendants Were Not "Willfully Blind" To The Madoff
          Fraud...................................................................................35

     B.   The Trustee Failed To Establish  Irreparable Harm To
          The BLMIS Estate.............................................................39

     C.   The Balance Of Harms And The Public Interest Tip
          Against Granting An Injunction Under Section 105 .........49

Conclusion ...............................................................................................53

## Table Of Authorities

CASES

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ..................................................................36

*Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*,
   902 F.2d 185 (2d Cir. 1990) ..............................................................52

*Bano v. Union Carbide Corp.*,
   273 F.3d 120 (2d Cir. 2001) ..............................................................52

*Brown v. Quiniou*,
   467 F. App'x 13 (2d Cir. 2012) ..........................................................29

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master
   Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ...................................................29, 31, 41

*Fisher v. Hamilton (In re Teknek, LLC)*,
   343 B.R. 850 (Bankr. N.D. Ill. 2006) .................................................40

*Fox v. Picard*,
   848 F. Supp. 2d 469 (S.D.N.Y. 2012) ................................................42

*Global-Tech Appliances, Inc., et al. v. SEB S.A.*,
   131 S. Ct. 2060 (2011)..................................................................18, 36

*Gowan v. HSBC Mortg. Corp. (In re Dreier LLP)*,
   Bankr. No. 08-15051, 2012 WL 4867376 (S.D.N.Y. Oct. 12, 2012) ...............44

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999)............................................................................40

*Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp.,
   Inc.*,
   No. 06 Civ. 5358, 2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006)...............31, 32

*Hudson Tire Mart, Inc. v. Aetna Cas. & Sur. Co.*,
   518 F.2d 671 (2d Cir. 1975) ...................................................40, 41, 50

*In re Beacon Assocs. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010) ................................................................19

*In re Calpine Corp.*,
365 B.R. 401 (Bankr. S.D.N.Y. 2007) ...................................................31, 32, 41

*In re Dreier LLP*,
453 B.R. 499 (Bankr. S.D.N.Y. 2011) ...............................................................48

*In re FPSDA I, LLC*,
No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794 (Bankr.
E.D.N.Y. Dec. 26, 2012) ......................................................................30, 31, 32

*In re Merkin*,
817 F. Supp. 2d 346 (S.D.N.Y. 2011) .........................................................17, 19

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
703 F. Supp. 2d 362 (S.D.N.Y. 2010) ...............................................................19

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
596 F.2d 70 (2d Cir. 1979) ...............................................................30, 39, 40, 50

*Krys v. Official Comm. Of Unsecured Creditors of Refco Inc. (In re
REFCO INC.)*,
505 F.3d 109 (2d Cir. 2007) ..............................................................................44

*Lautenberg Found. v. Picard (In re Bernard Madoff Inv. Sec. LLC)*,
Nos. 11-5421, 11-5428, 2013 WL 616269 (2d Cir. Feb. 20, 2013).........4, 29, 33

*Meridian Horizon Fund, LP v. KPMG (In re Tremont Secs. Law, State
Law & Ins. Litig.)*,
487 F. App'x 636 (2d Cir. 2012) .......................................................................38

*Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*,
747 F. Supp. 2d 406 (S.D.N.Y. 2010) ...............................................................19

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
277 B.R. 520 (Bankr. S.D.N.Y. 2002) .........................................................47, 48

*New York State Court Officers Ass'n v. Hite*,
475 F. App'x 803 (2d Cir. N.Y. 2012) ..............................................................28

*Newman v. Family Mgmt. Corp.*,
No. 11-622, 2013 WL 3712404 (2d Cir. July 16, 2013) ........................17, 19, 38

*In re Bernard L. Madoff Inv. Secs. LLC.*,
Nos. 11-5044, 11-5051, 11-5175, 11-5207, 2013 WL 3064848 (2d
Cir. June 20, 2013).................................................................................42

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011) .......................................................18, 35, 36, 37

*Picard v. Katz*,
No. 11 Civ. 3605 (JSR), Trial Order (ECF No. 177) Mar. 13, 2012 ................35

*Picard v. Katz*,
No. 11 Civ. 3605 (JSR), 2012 WL 691551 (S.D.N.Y. Mar. 5,
2012)................................................................................................35

*Picard v. Maxam*,
460 B.R. 106 (Bankr. S.D.N.Y. 2011) ............................................................42

*Picard v. Merkin*,
440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..............................................................6

*Picard v. Stahl*,
443 B.R. 295 (Bankr. S.D.N.Y. 2011) ............................................................42

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
507 U.S. 380 (1993)......................................................................................42

*Random House, Inc. v. Rosetta Books LLC*,
283 F.3d 490 (2d Cir. 2002) (Rakoff, J.)..........................................................30

*RBC Nice Bearings, Inc. v. Peer Bearing Co.*,
410 F. App'x 362 (2d Cir. 2010)......................................................................29

*REDAC Project 6426, Inc. v. Allstate Ins. Co.*,
402 F.2d 789 (2d Cir. 1968) .............................................................................9

*Ressler v. Liz Claiborne, Inc.*,
75 F. Supp. 2d 43 (E.D.N.Y. 1998), *aff'd sub nom.*, *Fishbaum v.
Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999).........................................36, 37

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) ................................................................39

*Saltz v. First Frontier, LP*,
    782 F. Supp. 2d 61 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d
    Cir. 2012)..........................................................................................38

*SEC v. Cohmad Sec. Corp.*,
    No. 09 Civ. 5680, 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ...................13, 19

*SEC v. F.O. Baroff Co.*,
    497 F.2d 280 (2d Cir. 1974) .............................................................47

*SEC v. N. Am. Planning Corp.*,
    No. 72 Civ. 3158, 1975 WL 346 (S.D.N.Y. Jan. 24, 1975) ..............................47

*SEC v. Packer, Wilbur & Co.*,
    498 F.2d 978 (2d Cir. 1974) .............................................................47

*SEC v. Vesco*,
    358 F. Supp. 1186 (S.D.N.Y. 1973) .................................................9

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
    454 B.R. 285 (Bankr. S.D.N.Y. 2011) .............................................53

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)..........................37

*Smith v. Bayer Corp.*,
    131 S. Ct. 2368 (2011)......................................................................51

*Tcpip Holding Co. v. Haar Communs.*,
    244 F.3d 88 (2d Cir. 2001) ...............................................................17

*UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*,
    660 F.3d 643 (2d Cir. 2011) .............................................................28

*United States v. Colasuonno*,
    697 F.3d 164 (2d Cir. 2012) .............................................................29

*Vargas Realty Enters., Inc. v. CFA W. 111 St., L.L.C.*,
   440 B.R. 224 (S.D.N.Y. 2010) ...........................................................................48

**STATUTES**

11 U.S.C.A. § 548 ...........................................................................................35

Fed. R. Bankr. P. 7001 ...................................................................................31

Fed. R. Bankr. P. 7065 ...................................................................................31

**OTHER AUTHORITIES**

Binyamin Appelbaum, *Madoff Case 'Failures' Put SEC In Spotlight*,
   WASH. POST, Dec. 19, 2008 ...........................................................................13

## Issue Presented

Whether the District Court abused its discretion in denying the motion for a preliminary injunction and dismissing the complaint of Irving Picard (the "Trustee"), the Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC (with Bernard L. Madoff, "Madoff"), in an action that belatedly sought to enjoin the consummation of a state-court approved settlement (the "Settlement") entered into by J. Ezra Merkin and Gabriel Capital Corporation (collectively, the "Merkin Defendants") with the New York Attorney General (the "NYAG") and the Receivers (the "Receivers") for certain hedge funds previously managed by the Merkin Defendants, Ascot Partners, L.P. ("Ascot"), Gabriel Capital, L.P. ("Gabriel"), and Ariel Fund Limited ("Ariel," and collectively the "Funds"), where (i) the Trustee waited more than three years after the commencement of the NYAG action to seek to enjoin the underlying state-court litigation; (ii) neither the settled claims nor the assets used to pay the Settlement belong to the Madoff estate; and (iii) the Trustee utterly failed to satisfy any element of a claim for injunctive relief, including irreparable harm, likelihood of success on the merits or the balance of the equities.

## <u>Statement Of The Case</u>

The Trustee acknowledged before the District Court that his application for a preliminary injunction is "unusual, if not extraordinary." (A-955, at 13:5-6.)  The Trustee sought to enjoin the settlement of state court claims against the Merkin Defendants that belong to the NYAG and investors in the Funds -- not to the Trustee or the Madoff estate.  The Trustee's theory is that the Settlement, which was vetted and approved by a state court judge, may make it more difficult for the Trustee to collect from the Merkin Defendants in the theoretical event he someday prevails on his claims against the Funds and they are unable to pay any judgment.  The mere fact that the Trustee asserts claims against the same defendants with whom the NYAG and the Receivers have settled does not give the Trustee standing to preclude the Settlement, which involves independent and distinct rights, claims and parties.

In a well-reasoned twenty-six page opinion, the District Court (Rakoff, J.) thoroughly analyzed and explained the legal and factual shortcomings of each of the Trustee's contentions.  Far from abusing its discretion, the District Court correctly denied the motion for a preliminary injunction and dismissed the injunction action in its entirety.

As Judge Rakoff concluded, the Trustee's theory suffers numerous fatal legal and factual defects.  Contrary to the rhetoric in their opening briefs, the Trustee and SIPC know that the Merkin Defendants' assets are not property of the Madoff estate -- indeed the Bankruptcy Court so ruled in 2010 -- and that the funds being used to pay the Settlement cannot be traced to the Madoff estate.  The Merkin Defendants *never* received a single transfer from Madoff, and the undisputed evidence before the District Court showed that the Merkin Defendants earned tens of millions of dollars of fees from sources unrelated to the Funds and additional tens of millions of dollars in management and incentive fees from Gabriel and Ariel based on investments entirely unrelated to Madoff.

The Trustee likewise fell far short of establishing a likelihood of success on his fraudulent transfer claims against the Funds, which would require him to prove that the Merkin Defendants and the Funds were willfully blind to Madoff's fraud.  In a desperate attempt to mask the lack of evidentiary support for his claims, the Trustee resorts to distorting the facts adduced through discovery and making baseless, sanctionable accusations that ███████████████████████████████████████████ ████████████████████████████████████████████But

no such statement was ever made, and there is no support for this attempted

character assassination in the record.

The actual evidence before the District Court on the preliminary

injunction motion showed that the Merkin Defendants conducted extensive

due diligence on Madoff and that the Trustee is highly unlikely to prevail on

any of his fraudulent conveyance claims.  More fundamentally -- and

directly contrary to the Trustee's argument that the Settlement will "preclude

the Trustee from collecting in full" should he prevail on his fraudulent

conveyance claims (Tr. Br. at 2) -- the undisputed factual record before the

District Court demonstrated to a virtual certainty that the Funds would have

the financial ability to satisfy any potential judgment the Trustee

theoretically could obtain against them.

In an effort to obscure the absence of irreparable harm or a

meritorious claim in this case, the Trustee relies extensively on this Court's

recent summary order affirming a preliminary injunction enjoining third-

party claims against Peter Madoff, *Lautenberg Found. v. Picard (In re*

*Bernard Madoff Inv. Sec. LLC)*, Nos. 11-5421, 11-5428, 2013 WL 616269

(2d Cir. Feb. 20, 2013), and argues that that decision somehow mandates

issuance of an injunction here.  But *Lautenberg* provides no help to the

Trustee. The critical factors cited by the Panel in concluding that the District Court did not abuse its discretion in issuing an injunction under Section 105(a) of the Bankruptcy Code in that case -- that all or virtually all of Peter Madoff's assets were knowing fraudulent transfers received from Madoff, that his limited assets were likely to be exhausted, and that the Madoff estate would suffer "immediate adverse economic consequences" absent an injunction -- are totally absent here. Unlike Peter Madoff -- who worked for Madoff for his entire career, has pleaded guilty to conspiring to commit securities fraud, and has agreed to forfeit *$143.1 billion* to the federal government as restitution for Madoff victims -- the Merkin Defendants earned many tens of millions of dollars in fees unrelated to Madoff, and are unquestionably victims of Madoff's fraud.

As the District Court also correctly concluded, the automatic stay provided by the Bankruptcy Code with respect to property of the Madoff estate is inapplicable to the claims resolved by the Settlement because those claims belong to the NYAG, the Receivers, and the investors in the Funds who participate in the Settlement, not to the Madoff estate. Similarly, the automatic stay does not reach the assets of the Merkin Defendants to be used to pay the Settlement because the Merkin Defendants' assets are not

property of the Madoff estate, and will not "become 'property of the Madoff
Estate' unless and until they are recovered through a successful avoidance
action." *Picard v. Merkin*, 440 B.R. 243, 273 (Bankr. S.D.N.Y. 2010).
Judge Rakoff so held in denying the preliminary injunction (SPA-20), and
Judge Lifland recognized this point three years ago in dismissing the
Trustee's claims for immediate turnover.

Moreover, even if the automatic stay were applicable (which it is not),
the District Court did not abuse its discretion in finding that the Trustee
waived, and is barred by the doctrine of laches from enforcing, the automatic
stay by virtue of his strategic decision to wait more than three years after the
commencement of the NYAG action against Merkin to bring this application,
during which time the parties extensively litigated the NYAG's state court
action against the Merkin Defendants, completed document and deposition
discovery, filed cross-motions for summary judgment, and negotiated the
Settlement, which was approved in state court. Rather than burden this
Court with duplicative briefing on these issues, the Merkin Defendants rely
on the legal arguments in the NYAG and the Receivers' Joint Brief.

The District Court properly denied the Trustee's application for the
independent reason that the Trustee came nowhere close to meeting the high

bar necessary to obtain an injunction.  The Trustee does not dispute that his only claims against the Merkin Defendants are wholly derivative of the claims against the Funds -- that to the extent the Funds received fraudulent transfers and cannot satisfy any resulting judgment, the Trustee claims that he can recover such amounts from the Merkin Defendants by virtue of Merkin's status as the former general partner of Ascot and Gabriel and GCC's receipt of management fees from the Funds -- and that he therefore can collect from the Merkin Defendants only if the Funds cannot satisfy any judgment the Trustee hopes to win against them.  There is no scenario in which the Trustee can prevail against the Merkin Defendants and not the Funds.

The Trustee acknowledges that none of the Funds ever withdrew fictitious profits from their Madoff accounts and that all of the Funds were substantial net losers in the Madoff Ponzi scheme, having deposited hundreds of millions of dollars more with Madoff than they withdrew.  To prevail on his fraudulent conveyance claims, therefore, the Trustee must establish that the Funds were "willfully blind" to Madoff's fraud.  But the Trustee came nowhere close to making such a showing.  To the contrary, the evidence before the District Court showed that Merkin conducted extensive

due diligence on Madoff and believed that Madoff was a highly successful manager and that the Funds' investments with Madoff were sound. And Merkin's subjective belief was fully backed by his actions: At the time of Madoff's confession, Merkin and his family's voluntary personal investments with Madoff (through the Funds) had a stated value of more than $110 million. In these circumstances, the Trustee failed to demonstrate a probability of success on the merits of his claims against the Funds or, through those claims, against the Merkin Defendants.

In any event, the undisputed evidence before the District Court established that the Trustee has no credit exposure to the Merkin Defendants. It is undisputed that Gabriel and Ariel, whose assets are approximately $500 million each, have more than sufficient assets to satisfy any potential judgment the Trustee could obtain on his claims against them of $17.4 million and $16.2 million, respectively. It is similarly undisputed that Ascot is a net loser of at least $226 million. In light of its net equity claim and the minimum payments to be received from the Madoff estate, even in the unlikely event the Trustee were to win on his claims, his judgment would be satisfied by Ascot and Ascot would likely receive additional net distributions from the Trustee of at least $54 million. In short, as demonstrated below,

this Court should promptly reject the Trustee's baseless appeal and affirm

the District Court's order, to enable distribution of the proceeds of the

Settlement to investors in the Funds to commence.

## Statement Of Facts[1]

A.     The Funds

Ascot and Gabriel are Delaware limited liability partnerships that

were formed to operate as private investment partnerships for U.S. investors.

(A-1322; A-1327; A-1338; A-1383; A-1388; A-1401.)  Ariel is a Cayman

Islands corporation whose investors are exclusively non-U.S. persons and

certain tax-exempt U.S. persons.  (A-1442; A-1450; A-1469.)  Gabriel and

Ariel typically invested together in the same investments but were operated

as stand-alone entities.  (A-1384; A-1388; A-1399; A-1401; A-1438; A-

---

[1]     The relevant evidence before the District Court included documents that had been produced to the Trustee in his avoidance action against the Merkin Defendants and the Funds ("Avoidance Action"); transcripts of depositions taken in the Avoidance Action; transcripts of testimony by Merkin, employees of GCC, and certain non-party witnesses in the litigation brought by the NYAG ("NYAG Action") and in arbitrations brought by certain investors in the Funds against Merkin, which had been produced to the Trustee in the Avoidance Action; and materials that had been publicly filed in the NYAG Action and other litigations against Merkin, all of which were publicly available to the Trustee.  All of this evidence could properly be considered by the District Court on the preliminary injunction motion.  *See, e.g.*, *REDAC Project 6426, Inc. v. Allstate Ins. Co.*, 402 F.2d 789 (2d Cir. 1968); *SEC v. Vesco*, 358 F. Supp. 1186 (S.D.N.Y. 1973). "[T]he Court, in ruling on a motion for a preliminary injunction, has broad discretion to consider evidence other than live testimony adduced at a hearing and . . . admission of the transcripts in question would not unjustly prejudice the defendants' case."  *Vesco*, 358 F. Supp. at 1188.

9

1442; A-1450; A-1469.)

B.    <u>The Investments With Madoff</u>

At all times, the vast majority of Ascot's assets were invested through a brokerage account managed by Madoff.  From 2000 through 2008, Gabriel and Ariel also delegated a portion of their assets, ranging from zero to approximately 30%, to an account managed by Madoff.  Thus, the vast majority of the management and incentive fees the Merkin Defendants earned from those two Funds were not the result of investments with Madoff.  Moreover, in the 2007-2008 period, the Merkin Defendants were paid approximately ███████ in fees by four entities other than the Funds (and approximately ███████ by those entities in the 2003-2008 period). ████[2]

The Trustee acknowledges that, at the time of Madoff's confession, Gabriel and Ariel had net equity (total deposits into their Madoff accounts less total withdrawals from their Madoff accounts) in excess of $160 million each.  The Trustee claims that Gabriel received one withdrawal of principal from its Madoff account, in the amount of $17.4 million, in July 2008, and

---

[2]    Merkin Defendants-Appellees' Motion for Leave to File a Confidential Appellees' Appendix ("CAA") under seal is currently pending before the Court.

that Ariel received a single withdrawal of principal, in the amount of $16.2

million, on the same date. These withdrawals occurred *after* the last

payment of management and incentive fees to the Merkin Defendants, and

therefore could not have been used to make such payments.

With respect to Ascot, the Trustee acknowledges that Ascot had net

equity in its Madoff account of at least $226 million as of December 11,

2008.[3]  The Trustee asserts that Ascot withdrew a total of $461 million from

its Madoff account within six years prior to the commencement of the

Madoff SIPA proceeding, of which $280 million was withdrawn within two

years of the filing date and $181 million was withdrawn more than two years

but less than six years prior to the filing date.[4]

---

[3]     Ascot contends that its net equity claim is approximately $560 million. The
primary difference in Ascot's calculation of its net equity claim and the Trustee's
calculation relates to the treatment of the transfer from Ascot Fund Ltd. ("Ascot
Fund") to Ascot on January 1, 2003. On that date, Ascot and Ascot Fund were
restructured from being parallel funds with separate Madoff accounts, to a master-
feeder structure whereby the offshore Ascot Fund became a feeder fund to Ascot,
closed its Madoff account, and transferred all funds in that account to Ascot's
account with Madoff. The calculation of net equity in these circumstances is *sub
judice* pursuant to the consolidated briefing before the District Court. If Ascot is
correct, the Trustee's claims are even more frivolous.

[4]     In their desperation, both the Trustee and SIPC inflate the amount of their claims
by approximately $66 million, asserting in their appellate briefs that the Trustee
seeks to recover $560 million from the Funds, including more than $524 million
from Ascot. In fact, the Second Amended Complaint alleges that Ascot received
a total of $461 million in allegedly fraudulent transfers. (A-160.)

The Trustee has reported that Madoff customers with net equity claims totaling approximately $17.3 billion submitted timely claims for distributions in the SIPA proceeding.  The Trustee has already collected approximately $9.3 billion for distribution to customers with net equity claims, and an additional $2.2 billion has been forfeited to the federal government and is expected to be distributed to customers with net equity claims on the same basis as the funds recovered by the Trustee.  Thus, based solely on the amounts already recovered to date, and assuming no additional recoveries by the Trustee, customers should ultimately receive distributions totaling at least 66 cents on the dollar for their net equity claims.[5]

C.    The Merkin Defendants' Extensive
      Due Diligence On And Monitoring Of Madoff

The Merkin Defendants reasonably believed that investing in a managed account with Madoff was a sound investment, and they performed more than adequate due diligence on that investment.  Before making any investment with Madoff, Merkin was well aware of Madoff's reputation as a

---

[5]    To date, the Trustee has distributed approximately 38 cents on the dollar to Madoff customers with allowed net equity claims.  He has not yet made any distribution to the Funds, however, taking the position that under Section 502(d) of the Bankruptcy Code he is not required to allow the undisputed amounts of the Funds' net equity claims until his fraudulent transfer claims have been resolved and any judgment in his favor is paid.

leading market maker, understood the regulatory structure governing Madoff's operations, including the fact that the SEC and other regulators regularly reviewed Madoff's business, and had several meetings and conversations with Madoff himself and with other investors and customers of Madoff concerning Madoff's strategy, including its upside potential and downside risks.  (A-1524-25; A-1528-34.)

Prior to December 11, 2008, Madoff was a legend on Wall Street, breaking the NYSE's monopoly on big board trading, testifying before Congress and the SEC on market issues and, in 1999, entering into a joint venture with Goldman Sachs, Morgan Stanley, Salomon Smith Barney, and Merrill Lynch to establish the first electronic trading platform.  (A-1537-56.) Madoff served as the chairman of NASDAQ for many years and regularly did business with sophisticated market participants including Charles Schwab and Fidelity.  (A-1545-46.)

According to published reports, the SEC repeatedly inspected and investigated Madoff, including in 1992, 2006, and 2007, but did not uncover the fraud.  *See* Binyamin Appelbaum, *Madoff Case 'Failures' Put SEC In Spotlight*, WASH. POST, Dec. 19, 2008, at A1; *see also SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680, 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010)

("[T]he complaint supports the reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators."). In fact, Merkin retained in his files a 1992 article from the Wall Street Journal in which the head of the SEC's New York office announced that an investigation of certain note offerings, which the SEC had feared were a scam, revealed that the proceeds were invested with Madoff and the money -- $440 million -- "was all there." (A-1555-56.)

Furthermore, the Funds had Trading Authorization Directives with Madoff that defined the boundaries within which he was allowed to trade. By 2008, the Funds had been investing with Madoff for more than 15 years, and Merkin had been investing with Madoff for even longer. During that time, Merkin had regular meetings and telephone calls with Madoff approximately 10-15 times per year to discuss Madoff's trading strategy and execution. Perhaps most significantly, the Funds promptly received payments for hundreds of millions of dollars in redemptions whenever requested over a 15-year period.

In addition, Merkin arranged, at their request, for many investors in the Funds to meet with Madoff and do their own direct due diligence of Madoff. For example, Merkin twice took representatives from Swiss bank

Union Bancaire Privee ("UBP"), the largest single investor in Ascot, to meet with Madoff as part of their own due diligence. One of these meetings was on November 25, 2008 and included Madoff, Merkin, GCC's Chief Financial Officer Michael Autera and a team of four people from UBP. Following that meeting, UBP continued to invest hundreds of millions of dollars in Ascot. (A-1558-65.) On another occasion, Merkin took an employee of another Swiss bank, Reichmuth & Co., as well as ███████, the investment advisor of another Ascot investor, to meet with Madoff. (A-1567-71.) And yet another meeting was with Gedale Horowitz, himself an Ascot investor and also a member of the Investment Committee for another Ascot investor, Yeshiva University. (A-1573.)

The Merkin Defendants also had complete transparency to Madoff's purported trading and received written confirmations of each trade, which GCC employees entered into GCC's portfolio management system. The system, in turn, generated profit-and-loss reports that were reviewed by Merkin on a daily basis. Every month, the Funds received monthly statements from Madoff, which were reviewed and reconciled by GCC employees.

Furthermore, the Merkin Defendants engaged BDO to perform audits of the Funds every year. That audit included a review of Madoff's trading activity and Madoff's auditor's statement of controls as deemed necessary by BDO. BDO never expressed concerns about any of the materials reviewed from Madoff or about Madoff. To the contrary, BDO referred investors to Ascot for the purpose of investing with Madoff. (A-1575.)

This extensive due diligence performed by the Merkin Defendants throughout their 15 years of investments with Madoff defies any conclusion that Merkin "intentionally chose to blind" himself to Madoff's fraud. Merkin had every incentive to monitor and oversee the account at Madoff, since Merkin and his family believed they had more than $110 million invested with Madoff through their investments in the Funds.

D.    The Alleged "Red Flags" Do Not Show Willful Blindness

Nevertheless, the Trustee asserts in the Avoidance Action that the Merkin Defendants were on notice of a series of so-called red flags that purportedly indicated fraudulent activity and a failure to exercise due diligence: (i) Madoff's returns were too high and consistent, (ii) Madoff's statements reflected trades exercised at prices that were outside the daily range, (iii) other people on Wall Street, including Victor Teicher, a former

16

colleague of Merkin, supposedly told Merkin that Madoff's returns were too good to be true, (iv) Barron's and MARHedge had published articles about Madoff, (v) Madoff used paper trade confirmations, (vi) Madoff self-cleared, and (vii) that Madoff's auditor was a small, obscure accounting firm.   (A-137-20, at ¶¶ 44(a)-(t)).[6]

The Trustee's unsubstantiated allegations are not evidence and therefore could not have carried the Trustee's evidentiary burden on a motion for a preliminary injunction.  *See Tcpip Holding Co. v. Haar Communs.*, 244 F.3d 88, 99-100 (2d Cir. 2001) (holding "unsubstantiated

---

[6]     The Trustee argued in the District Court that the Merkin Defendants supposedly misled investors about Madoff's role in the Funds and sought to conceal Madoff's role from potential investors.  The Trustee has abandoned that argument on appeal, for good reason.  As a legal matter, these allegations are totally irrelevant to the Trustee's claims, which require a showing that Merkin was willfully blind to Madoff's fraud.  As a factual matter, those allegations are meritless.  Neither Merkin nor his employees ever misled or deceived an investor about Madoff's role in the Funds.  To the contrary, the evidence showed that Merkin and his employees regularly discussed Madoff's role with investors.  (*See, e.g.*, A-1577-90.)  And the Fund's governing documents expressly disclosed that Merkin would delegate investment discretion for all or a portion of the Funds' assets to independent money managers.  *See In re Merkin*, 817 F. Supp. 2d 346, 355-56 (S.D.N.Y.  2011) ("Each Fund offering memoranda also warned that Defendant Merkin could delegate investment discretion to third-party managers without notice to, or the consent of, any investors in the Funds, and that when he delegated such authority he did not have responsibility for the investment decisions of any independent money managers."); *see also Newman v. Family Mgmt. Corp.*, No. 11-622, 2013 WL 3712404, at *2 (2d Cir. July 16, 2013) (holding no misrepresentation where offering materials for a fund that had more than sixty percent of its assets indirectly invested with Madoff, when read as a whole, sufficiently bespeak the need for caution).

conclusory phrases" did not meet the evidentiary burden in a motion for a preliminary injunction).  Moreover, as a legal matter, the argument that the Merkin Defendants were on inquiry notice or conducted inadequate due diligence is insufficient for the Trustee to establish willful blindness necessary to prevail on his claims.  *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011).

In any event, the facts before the District Court showed that these purported "red flags," alone or together, did not detract from the sufficiency of the extensive due diligence performed by the Merkin Defendants, and did not even come close to suggesting a "high probability of fraud" or an "intentional choice" by the Merkin Defendants to blind themselves to Madoff's fraud.[7]  *Id*.; *see also Global-Tech Appliances, Inc., et al. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011) (defining willful blindness requirements as "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact").  Indeed, Judge Batts considered and

---

[7]    Indeed, not a single investor who has brought a separate arbitration against Merkin for losses suffered on their investments in the Funds has succeeded in proving a gross negligence or due diligence claim, which presents a much lower threshold than the willful blindness standard the Trustee faces.

rejected these same allegations in dismissing claims by a class of investors in the Funds because the allegations that Merkin "did not conduct proper due diligence [were] … without merit." *In re Merkin*, 817 F. Supp. 2d at 356.[8]

For example, while Madoff's volatility-adjusted returns were very good, there were many other successful managers of low-volatility trading strategies that were equally if not more impressive, such as Millennium Partners and Elliott Associates. Similarly, that some other money managers may have raised questions about Madoff is natural on Wall Street; as Merkin explained, "[t]he list of people on Wall Street who were very supportive of [] Bernie . . . was very long and impressive. The list of people who were skeptical was much shorter." (A-1535, at 202:10-14.)

One of those skeptics, Victor Teicher, testified that the only skepticism of Madoff he ever expressed to Merkin was with the consistency of Madoff's returns. Teicher acknowledged that he had never met Madoff and never attempted to understand the strategy, that Merkin disagreed with Teicher's assessment, and that the consistency of the returns was an issue in

---

[8]     Courts in other cases involving investments with Madoff have almost universally reached the same conclusion. *See, e.g.*, *Newman*, 2013 WL 3712404, at *2; *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 413-14 (S.D.N.Y. 2010); *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 370-71 (S.D.N.Y. 2010); *Cohmad*, 2010 WL 363844, at *3.

Teicher's mind but did not rise to the level of a "concern." (A-1799, at 41:9-18.) Teicher also admitted under oath that his concerns instead derived in large part from the fact that Madoff's office was in the Lipstick Building (according to Teicher, since "lipstick is a way of a woman disguising what her lips really look like," the choice of that building had secondary meaning) and if you type Madoff's name in an email, Microsoft Outlook does not recognize it as a name and instead attempts to change it to the two words "made off." (A-1595, at 74:10-75:15.) And Teicher explained that he found the news that Madoff had been running a massive Ponzi scheme "hilarious" precisely because Madoff had enjoyed such a good reputation on Wall Street. (A-1593, at 36:24-38:2.) In any case, before December 11, 2008 Teicher never suggested to Merkin that Madoff was running a Ponzi scheme. (A-1526-27, at 25:22-26:13.)[9]

---

[9]





Likewise, neither of the publicly available articles cited by the Trustee

supports his claim on the merits.  To the contrary, the MARHedge article

acknowledged that "the four or five professionals [interviewed,] . . . express[ed] both an understanding of the [split-strike conversion] strategy and ha[d] little trouble accepting the reported returns it ha[d] generated." (A-1597-600.)  MARHedge also noted that many managers did as well or better.  *Id*.  And the Barron's article describes Madoff as among the most-respected managers in the world.  (A-1602-03.)

Nor was it improper or suspicious for Madoff to issue paper trading confirmations.  There was no more reason to doubt the trading confirmations issued by the Madoff firm than there would have been to doubt Goldman Sachs or Morgan Stanley.  And the size of Madoff's options trades compared to the volume of listed options traded was not an issue, since Merkin was told on several occasions that Madoff executed a large and growing portion of the options trades over-the-counter with up to 20 of the major financial institutions around the world.  The OTC market for options and derivatives is far larger than the exchange-traded market and there is no way to know what has been traded in the OTC market on any given day, month or year.

The fact that Madoff self-cleared also was not a cause for concern because he was operating an SEC-registered broker-dealer, not a hedge fund

23

or pooled investment vehicle, and Goldman Sachs, Morgan Stanley and other brokerage firms regularly self-cleared their managed accounts. Given that his market making business handled more than 10% of the volume of stock traded on the New York Stock Exchange, it would have been surprising if Madoff did not clear his own trades. (A-1606, at 411:24-412:15.)

Similarly, Madoff's use of a small auditor was not a concern, because BDO -- which was in a much better position than Merkin to evaluate an auditor's qualifications -- knew that Madoff was audited by Friehling & Horowitz, requested copies of the report on internal controls performed by Friehling & Horowitz, never raised a question about the size or abilities of that firm, and issued unqualified opinions on the Funds' financial statements year after year. And BDO recommended Ascot to clients for investing with Madoff. (A-1575.)

Unable or unwilling to recognize that despite his extensive due diligence on Madoff, Merkin was fooled and victimized just like the SEC, other regulators, and thousands of other sophisticated Madoff investors, the Trustee makes a final argument that is perhaps the most absurd. According to the Trustee, notwithstanding Merkin's and his family's personal Madoff

24

exposure of more than $110 million, Merkin actually "took care to ensure that little of his money was directly or indirectly invested with Madoff." (Tr. Br. at 12.)  The Trustee's convoluted theory is apparently that the majority of the exposure was through Ariel (which had approximately 25% exposure to Madoff), not Ascot (substantially all of which was invested with Madoff), and that the losses should not really count because the amounts include fictitious profits.  In fact, Merkin voluntarily invested tens of millions of dollars of his fees *in Ariel* with Madoff rather than in any of a multitude of other offshore investments that he could have selected.

E.    The District Court's Decision

The District Court thoroughly evaluated the evidence submitted to it and the parties' legal arguments and issued a well-reasoned opinion that rejected all of the Trustee's theories.  First, The District Court concluded that the equitable doctrine of laches defeated the Trustee's request for an injunction and his entire complaint based on the essentially undisputed factual record presented to the District Court.  Specifically, Judge Rakoff found that the Trustee's three year delay in seeking an injunction and history of making empty threats that he would bring such an action, during which time the Defendants extensively litigated the state court action through

25

discovery and argument of summary judgment motions, as well as the

prejudice to parties in the NYAG Action and the state court that devoted

time and attention to overseeing that case for three years, alone was

sufficient to defeat the injunction.  (SPA-8-14.)

The District Court also rejected the Trustee's claim that the Settlement

violated the automatic stay of the Bankruptcy Code and that the NYAG

Action was void *ab initio*.  The District correctly reasoned that the claims

resolved by the Settlement were "independent claims based on separate

facts, theories, and duties than the Trustee's fraudulent transfer claims

against Merkin" and therefore were not claims against the debtor.  (SPA-14-

17.)  Nor were the settled claims an attempt to exercise control over property

of the Madoff estate, even assuming that allegedly fraudulent transfers could

be deemed property of the estate prior to a judgment in the Avoidance

Action, because the Trustee failed to establish as a factual matter that the

assets being used to fund the Settlement are proceeds of the allegedly

fraudulent transfers at issue in the Avoidance Action.  (SPA-17-19.)

The District Court similarly found that the Trustee failed as a factual

matter to prove any of the required elements for issuance of a discretionary

injunction under Section 105(a) of the Bankruptcy Code.  Notably, the

District Court explained that "the Trustee has failed to show by more than conclusory and speculative assertions that, if the settlement goes forward, the Merkin defendants would be unable to pay any fraudulent transfer judgment obtained by the Trustee." (SPA-19.) Thus, the District Court concluded that "[s]ince it is the Trustee's burden to show that the settlement will 'necessarily implicate' property of the estate, the failure to present a factual basis for this claim is fatal to the Trustee's argument." (SPA-20.) Because "the Trustee has failed to show that the estate's fraudulent transfer claims would be unable to be satisfied if the settlement goes forward," (SPA-22), the District Court found that "the Trustee has failed to demonstrate either that the Madoff Securities estate would suffer irreparable harm under the traditional test for an injunction or that allowing the settlement to go forward would 'have an immediate adverse economic consequence' on the Madoff Securities estate under the Trustee's preferred, bankruptcy-specific test." (SPA-23.) Based on these factual findings, the District Court concluded a Section 105(a) motion was unwarranted regardless of whether the traditional test or the Trustee's relaxed test applied. (SPA-23.)

Finally, the District Court rejected the Trustee's argument that SIPA preempted the NYAG's and Receivers' state-law claims.  As the District Court found, "Congress explicitly exempted state regulatory actions from the coverage of Section 362's automatic stay"  (SPA-24.)  Thus, far from expressing an intent to preempt state-law claims, "there is no evidence that Congress intended to preempt the independent state law causes of action brought in this case through enactment of SIPA."  (SPA-25.)

None of the District Court's independent reasons for denying the Trustee's motion for an injunction was erroneous, much less an abuse of its discretion.

## Standard Of Review

In reviewing the District Court's denial of a motion for a preliminary injunction, this Court "review[s] the district court's legal holdings *de novo* and its ultimate decision for abuse of discretion."  *New York State Court Officers Ass'n v. Hite*, 475 F. App'x 803, 805 (2d Cir. N.Y. 2012) (citing *Cnty. of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008)); *see also UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (citing *Cnty. of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008)).  The applicability of the automatic stay is a legal holding subject to

*de novo* review.  *See United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012).

The District Court's determination that the Trustee failed to carry its burden for an injunction under Section 105(a) of the Bankruptcy Code is reviewed for abuse of discretion.  *See Lautenberg Found. v. Picard* (*In re Bernard L. Madoff Inv. Secs., LLC*), Nos. 11-5421, 11-5428, 2013 WL 616269 (2d Cir. Feb. 20, 2013); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (reviewing grant of preliminary injunction for abuse of discretion).

This Court has "not yet settled on the appropriate standard to review a grant of summary judgment based on the defense of laches."  *Brown v. Quiniou*, 467 F. App'x 13, 14 (2d Cir. 2012); *see also RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 410 F. App'x 362, 364 (2d Cir. 2010) ("[T]his Circuit has not yet settled on the appropriate standard to review a grant of summary judgment based on laches").  But "the Supreme Court has instructed that '[w]hether laches bars an action in a given case… is a question primarily addressed to the discretion of the trial court.'" *Brown*, 467 F. App'x at 14 (quoting *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 435 (1965)).  Hence, the Merkin Defendants respectfully submit that the

Court should review the District Court's laches determination under the

abuse of discretion standard.  Regardless of the standard employed, the

District Court correctly denied the preliminary injunction and dismissed the

action.

## **Argument**

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION FOR A PRELIMINARY INJUNCTION BECAUSE THE TRUSTEE FAILED TO PROVE LIKELIHOOD OF SUCCESS ON THE MERITS OR IRREPARABLE HARM

To satisfy his burden on the motion for preliminary injunction, the

Trustee was required to produce *evidence* sufficient to establish (1)

irreparable harm in the absence of the injunction and (2) either (a) a

likelihood of success on the merits or (b) sufficiently serious questions going

to the merits to make them a fair ground for litigation and a balance of

hardships tipping decidedly in the movant's favor.  *See Random House, Inc.*

*v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002) (Rakoff, J.);

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.

1979); *In re FPSDA I, LLC*, No. 10-75439, Adv. No. 12-08032, 2012 WL

6681794, at *6-7 (Bankr. E.D.N.Y. Dec. 26, 2012).  The Bankruptcy Rules

expressly provide that Rule 65 applies in adversary proceedings.  Fed. R.

Bankr. P. 7001, 7065; *see, e.g.*, *In re FPSDA I, LLC*, 2012 WL 6681794, at

*6. "Courts have applied the 'traditional preliminary injunction standard as

modified to fit the bankruptcy context.'" *In re Calpine Corp.*, 365 B.R. 401,

409 (Bankr. S.D.N.Y. 2007); *see, e.g., Hawaii Structural Ironworkers*

*Pension Trust Fund v. Calpine Corp., Inc.*, No. 06 Civ 5358, 2006 WL

3755175, at *4 (S.D.N.Y. Dec. 20, 2006).

   "The question of whether the party seeking a preliminary injunction

has shown a likelihood of success on the merits 'necessarily focuses on the

outcome of a later proceeding, at which time the merits of the questions

giving rise to the litigation will be decided.'" *In re FPSDA I, LLC*, 2012

WL 6681794, at *7 (quoting *Matter of Commonwealth Oil Ref. Co.*, 805

F.2d 1175 (5th Cir. 1986).  A showing of likelihood of success requires the

"movant to prove that, more likely than not, it will ultimately be able to

prove its case, based on the record available to the Court at the time the

motion for a preliminary injunction is decided." *Id.* (citing *Citigroup Global*

*Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30 (2d

Cir. 2010)).[10]  Courts also frequently consider whether the public interest

---

[10]    The "sufficiently serious question" alternative standard is not applicable here
because the NYAG Action that led to the Settlement was a government action to
enforce the state's securities regulation scheme. *See Citigroup Global Mkts., Inc.*,

would be served by the issuance of the preliminary injunction.  *See e.g.*, *In re Calpine*, 365 B.R. at 409; *Hawaii Structural*, 2006 WL 3755175, at *4 (citing 2 Collier on Bankruptcy ¶ 105.02 (15th ed. 2006)); *In re FPSDA I, LLC*, 2012 WL 6681794, at *6 ("The question of whether to grant a preliminary injunction also requires that the Court ensure that the 'public interest would not be disserved' by the issuance of the preliminary injunction.").  Because the Trustee failed to establish a likelihood of success on the merits or irreparable harm, and because the balance of the equities weighed strongly against issuance of an injunction halting a state court proceeding, the District Court plainly did not abuse its discretion in denying the Trustee's motion for a preliminary injunction.

The Trustee argues that this Court's opinion in *Lautenberg* relieves him of the traditional requirements for obtaining a preliminary injunction. But the summary disposition in *Lautenberg* does no such thing; the Court held only that under the unique facts of that case the Bankruptcy Court and District Court did not abuse their discretion by enjoining claims asserted against Peter Madoff, an admitted felon at the heart of the fraud, until after

---

598 F.3d at 35 n.4.  In any event, the Trustee has plainly failed to demonstrate that 'the balance of hardships tips *decidedly*' in its favor" to enjoin a state-court approved settlement.

the resolution of the Trustee's litigation against him as necessary to preserve the limited assets available to satisfy overwhelming claims.  The unique circumstances relied on to uphold the injunction in *Lautenberg* -- and their complete absence in this litigation -- confirm that the District Court appropriately denied an injunction here.

In *Lautenberg*, there was essentially no dispute that Peter Madoff's "every asset (or the vast majority thereof)" could be traced to monies he received from Madoff.  *See Lautenberg Found.*, 2013 WL 616269, at *2. Here, by contrast, beyond making a conclusory allegation, the Trustee has not offered any evidence to meet his burden of showing that the Merkin Defendants' "every asset (or the vast majority thereof)" derived directly or indirectly from Madoff, much less that such assets can be traced to the allegedly fraudulent transfers at issue.  In fact, the uncontested record before the Court showed that the Merkin Defendants not only received no transfers from Madoff but they had significant business interests wholly apart from the Funds' Madoff-related investments.

Similarly, the *Lautenberg* Court relied on the fact that "almost all of [Peter Madoff's assets] would otherwise be expected to return to the BLMIS estate as a consequence of the Trustee's fraudulent transfer action."  In light

of Peter Madoff's being an insider who pleaded guilty to conspiring to commit securities fraud (along with several other charges) and agreed to forfeit billions of dollars for restitution to Madoff victims, this Court's observation that all of his assets were likely to be returned to the Madoff estate was plainly correct.  By contrast, in this case, the Merkin Defendants and the Funds are vigorously defending the Avoidance Action, the Trustee is unlikely to succeed on his claims and, most critically for the instant appeal, even if the Trustee does prevail in the fraudulent conveyance litigation, there is unlikely to be any, much less a substantial, unsatisfied judgment that he could seek to collect from the Merkin Defendants.[11]  Simply put, in this case, there is no likelihood of any "adverse economic consequence," much less an "immediate adverse economic consequence," if the Settlement of the NYAG Action is permitted to proceed.

---

[11] The Trustee argues that "there is no reasonable dispute that the settlement will frustrate the Trustee's Recovery Action."  (Tr. Br. at 35.)  Not only does this argument ignore the Merkin Defendants' evidentiary showing that, to a virtual certainty, the Funds would be able to pay any judgment the Trustee hopes to obtain on his fraudulent conveyance claims, the purported support for the Trustee's contention is risible.  The Trustee cites to his counsel's Declaration that "the Trustee does not believe that the Merkin Defendants and the Ascot Fund can satisfy both the amount purportedly due under the Settlement and the over $500 million the Trustee seeks in his litigation."  (A-57, ¶ 8.)  Thus, the District Court was plainly correct, and did not abuse its discretion, by rejecting this speculation and concluding that "Since it is the Trustee's burden to show that the settlement will 'necessarily implicate' property of the estate, the failure to present a factual basis for this claim is fatal to the Trustee's argument."  (SPA-20.)

A.    The Trustee Failed To Establish A Likelihood Of
      Success In The Avoidance Action Because The Merkin
      <u>Defendants Were Not "Willfully Blind" To The Madoff Fraud</u>

Section 548(c) provides that "a transferee or obligee of such a transfer

or obligation that takes *for value and in good faith*…may retain any interest

transferred or may enforce any obligation incurred, as the case may be, to

the extent that such transferee or obligee gave value to the debtor in

exchange for such transfer or obligation."  11 U.S.C.A. § 548(c) (emphasis

added); *see also Katz*, 462 B.R. at 453.  Because the withdrawals by the

Funds were all partial withdrawals of principal from their Madoff accounts,

and did not involve any fictitious profits, value is established.  The Trustee

does not dispute this.

Thus, the only issue is whether the alleged fraudulent transfers "were

received by the [Funds] in good faith, i.e. without their having willfully

blinded themselves to Madoff's scheme." *See Picard v. Katz*, No. 11 Civ.

3605 (JSR), Trial Order (ECF No. 177) Mar. 13, 2012; *see also Picard v.*

*Katz*, No. 11 Civ. 3605 (JSR), 2012 WL 691551 (S.D.N.Y. Mar. 5, 2012);

*Katz*, 462 B.R. at 454 ("as to payments received by [Defendants] from

Madoff Securities equal to a return of their principal, [Defendants] can

defeat the Trustee's claim of actual fraud simply by proving their good

faith"). In this context, "lack of due diligence cannot be equated with a lack of good faith, at least so far as section 548(c) is concerned as applied in the context of a SIPA trusteeship." *Katz*, 462 B.R. at 455. Rather, the "willful blindness" standard requires the Trustee to prove that the Funds and the Merkin Defendants subjectively believed that there was a high probability that Madoff was engaged in fraud and then consciously avoiding learning that fact. *See Global-Tech Appliances, Inc.*, 131 S. Ct. at 2070. The Trustee utterly failed to show a likelihood of success on the merits of his Avoidance Action.

As explained in detail above, the Merkin Defendants performed extensive due diligence on, and monitoring of, the Funds' investments with Madoff both prior to the initial investments and on an ongoing basis over the course of a more than 15-year relationship. Moreover, Merkin's significant personal exposure of more than $110 million to Madoff belies any suggestion of fraudulent intent or willful blindness to the potential that Madoff was operating a massive Ponzi scheme. *See, e.g.*, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (defendants' continued investment undermines a Section 10(b) claim); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998), *aff'd sub nom.*, *Fishbaum v. Liz Claiborne,*

*Inc.*, 189 F.3d 460 (2d Cir. 1999) (defendants' continuous, substantial investment belies any inference of fraudulent intent).

Furthermore, the "safe harbor" provision of Section 546(e) of the Bankruptcy Code "precludes the Trustee from bringing any action to recover from any of Madoff's customers any of the monies paid by Madoff Securities to those customers except in the case of actual fraud" by the transferor under Section 548(a)(1)(A). *Katz*, 462 B.R. at 452. Thus, in the unlikely event the Trustee can prove willful blindness by the Funds, because only claims under Section 548(a)(1)(A) survive the safe harbor, the Trustee still may recover only fraudulent transfers made within two years of the commencement of the Madoff SIPA proceeding (rather than transfers made within six years of the commencement date that might otherwise be recoverable pursuant to state law claims asserted under Section 544(a)). The only potential exception to the two-year statute of limitations requires the Trustee to prove that the defendants had "actual knowledge" of Madoff's fraud, in which case he may be able to recover fraudulent transfers made within six years of the commencement of the Madoff SIPA proceeding. *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013).

None of the Trustee's arguments, alone or in combination, changes the conclusion reached by this Court in other Madoff-related litigation: "[T]he more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals." *Meridian Horizon Fund, LP v. KPMG (In re Tremont Secs. Law, State Law & Ins. Litig.)*, 487 F. App'x 636, 641 (2d Cir. 2012) (citing *Meridian Horizon Fund, LP,* 747 F. Supp. 2d at 413 (S.D.N.Y. 2010) and noting that many of the "red flags" of the Madoff fraud were "plainly disclosed to . . . investors in and auditors of other Madoff feeder funds, and the SEC, none of whom discovered the Madoff scheme"); *see also Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d Cir. 2012) ("For twenty years, Madoff operated this fraud without being discovered and with only a handful of investors withdrawing their funds as a result of their suspicions. An inference of scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent."); *Newman v. Family Mgmt. Corp.*, No. 11-622, 2013 WL 3712404, at *3 (2d Cir. July 16, 2013) (affirming purported red flags are "facially insufficient 'to raise a right to relief above the speculative level'…because

as the district court noted, 'Madoff operated this fraud without being discovered and with only a handful of investors withdrawing their funds as a result of their suspicions.'"); *cf. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111-12 (2d Cir. 2009) (affirming dismissal of Section 10(b) claim in part because Ponzi scheme perpetrators had deceived the entire investing community and, under the *Tellabs* standard, the complaint could not overcome the competing inference that defendants' due diligence would have been futile).[12]

B.   The Trustee Failed To Establish
     Irreparable Harm To The BLMIS Estate

In addition, the District Court correctly found -- and certainly did not abuse its discretion in concluding -- that the Trustee did not prove that the Madoff estate would suffer irreparable injury absent an injunction.  *See Jackson Dairy*, 596 F.2d at 72.  Indeed, The Trustee failed to establish irreparable harm for several independent reasons.

---

[12]   Tellingly, when he pleaded guilty for his role in the fraud, Frank DiPascali, Madoff's CFO, testified that he regularly "took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were.  On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in realtime." (A-1609, at 47:9-19.)

First, the Trustee's claims against the Merkin defendants boil down to claims for money damages -- he seeks to recover "Merkin's assets as customer property" of the BLMIS estate. *See, e.g.,* Tr. Br. at 18. But a claim to recover monetary damages cannot satisfy the irreparable injury requirement. *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (holding "a party seeking a money judgment may not obtain a freeze of the defendant's assets based simply on the prospect that the defendant may otherwise be unable to satisfy the judgment that will later be entered"); *Jackson Dairy*, 596 F.2d at 72 (2d Cir. 1979) ("For it has always been true that irreparable injury means injury for which a monetary award cannot be adequate compensation and that where money damages is adequate compensation a preliminary injunction will not issue."); *Hudson Tire Mart, Inc. v. Aetna Cas. & Sur. Co.*, 518 F.2d 671, 675 (2d Cir. 1975) (noting that "the absence of a showing of irreparable harm which cannot be adequately redressed by a monetary award, should the appellant ultimately prevail, is a further ground for denying injunctive relief"); *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 868-69 (Bankr. N.D. Ill. 2006) ("Actions to recover fraudulent transfers, even when based on a modern statute, are deemed actions at law, though the ultimate

40

classification depends on what remedies the plaintiff requests.") (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 37, 43-49 (1989)).  For this reason alone, the Trustee failed to demonstrate the requisite irreparable harm entitling him to preliminary injunctive relief.  *See Hudson Tire Mart, Inc.*, 518 F.2d at 675.

Second, even though some courts have recognized "a limited exception to the imminent irreparable harm requirement that permits the court to issue a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process," *In re Calpine*, 365 B.R. at 409-10 (internal citations and quotations omitted), that exception is inapplicable here.  Assuming *arguendo* the validity of that exception,[13] the Trustee did not, and could not, show that the hypothetical inability to collect from the Merkin Defendants in the remote possibility of an unsatisfied judgment against the Funds somehow gives rise to an "imminent, substantial and irreparable" threat to a successful reorganization. *Id.*  Rather, as the District Court noted, the Trustee made "no attempt to

---

[13]     The Bankruptcy Court's status as a specialized court does not permit elimination of the long-standing requirements for injunctive relief under federal law.  *See Citigroup Global Mkts.*, 598 F.3d at 37 n.6 ("a showing of irreparable harm is fundamental to any grant of injunctive relief" (citing *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 19 (2008))).

show that this injunction 'plays an important part in the debtor's reorganization plan,' as the Madoff Securities proceeding is a liquidation, not a reorganization." (SPA-23, n.7.) *See also, e.g.*, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993).[14]

Third, and perhaps most significantly, even in the unlikely event the Trustee were to succeed in the Avoidance Action and obtain a judgment against the Funds, the evidence before the District Court showed that there is no reasonable expectation that any such judgment would not be satisfied. And as long as any judgment is satisfied by the Funds, the Trustee cannot seek any recovery from the Merkin Defendants, since his only claims against

---

[14]    The Trustee argued below that injunctions issued in three other Madoff-related cases supported its motion for a preliminary injunction here. But the third party actions at issue in two of those cases sought to usurp causes of action belonging to the Trustee. *See Fox v. Picard*, 848 F. Supp. 2d 469, 480-81 (S.D.N.Y. 2012) (claims could have been brought by "every single [BLMIS] customer"); *Picard v. Stahl*, 443 B.R. 295, 317 (Bankr. S.D.N.Y. 2011) (third party allegations are "not only similar to, but in some instances apparently derived from, the Trustee's pending Madoff Complaints"). And in the third case, an injunction was issued because that Madoff customer was attempting to avoid the Trustee's clawback litigation by offensively commencing an action against the Trustee in the Cayman Islands. *Picard v. Maxam*, 460 B.R. 106, 123 (Bankr. S.D.N.Y. 2011) (finding entity's Cayman Action particularly "vexatious" because it forced the Trustee "to litigate the same issues in both this Court and the Cayman Action"). In contrast, the claims brought against the Merkin Defendants by the NYAG and the Receiver are distinct from the claims brought by the Trustee against Merkin and, indeed, could not have been brought by the Trustee. *See In re Bernard L. Madoff Inv. Secs. LLC.*, Nos. 11-5044, 11-5051, 11-5175, 11-5207, 2013 WL 3064848, *6 (2d Cir. June 20, 2013) ("Picard stands in the shoes of BLMIS and may not assert claims against third parties for participating in a fraud that BLMIS orchestrated.").

the Merkin Defendants are as alleged subsequent transferees of withdrawals received by the Funds and as to Merkin as former general partner of Ascot and Gabriel and purportedly responsible for their liabilities in the event they are unable to pay a judgment themselves.

The record below unequivocally demonstrates that, based on the amounts actually recovered to date and the maximum amount of allowed claims based on the Trustee's report of timely submitted net equity claims that have either been allowed or are currently in litigation, each of the Funds is entitled to a distribution from the Madoff estate that exceeds the amount of any fraudulent transfer judgment the Trustee hopes to obtain. With respect to Gabriel and Ariel, this fact is obvious. Those Funds will ultimately receive distributions from the Madoff estate of more than $100 million each, which dwarfs the Trustee's claims to recover $17.4 million and $16.2 million from them, respectively. In addition, those Funds each have approximately $500 million in non-Madoff assets remaining to be liquidated and distributed to investors by their state-court appointed Receiver.

With respect to Ascot, the calculation may be more complex but the result is the same. The Trustee acknowledges that Ascot has a net equity claim of at least $226 million and as much as $560 million. The Trustee's

maximum fraudulent transfer claim is limited to $280 million, because the only claims that survive the safe harbor of Section 546(e) are for actual fraud under Section 548(a)(1)(A) of the Bankruptcy Code and have a two-year statute of limitations.  Moreover, even if the Trustee wins on that claim, upon payment of the judgment Ascot becomes entitled to an additional claim for the amount paid, pursuant to Section 502(h) of the Bankruptcy Code. *See, e.g.*, *Krys v. Official Comm. Of Unsecured Creditors of Refco Inc. (In re REFCO INC.)*, 505 F.3d 109, 113 n.4 (2d Cir. 2007); *Gowan v. HSBC Mortg. Corp. (In re Dreier LLP)*, Bankr. No. 08-15051, 2012 WL 4867376, at *3 (S.D.N.Y. Oct. 12, 2012).  Thus, assuming *arguendo* that the Trustee prevails both on the calculation of Ascot's net equity and on his two-year fraudulent transfer claims, Ascot would owe the Trustee $280 million and have a claim for $506 million ($226 million current net equity claim plus $280 million § 502(h) claim).[15]  If the recovery does not increase from current levels, Ascot will receive a distribution equal to at least 66% of that

---

[15]    Until distributions on net equity claims reach par, the potential increase in the amount of allowed claims by virtue of Section 502(h) cannot lower the current minimum percentage payout on net equity claims because such claims come into existence only upon a payment to the estate.  In other words, for a 502(h) claim to increase the denominator of the distribution formula, the numerator would necessarily have to have increased by the same amount, which can only increase the percentage payout.

$506 million claim, or approximately $334 million -- meaning that on a net basis it will receive $54 million from the Madoff estate ($334 million distribution less $280 million payment).

In light of the operative rulings on the statute of limitations, the Trustee cannot plausibly maintain that he has even a remote chance of success, much less a likelihood of success, on his six-year fraudulent transfer claims.  To prevail on those claims, he would first need to have this Court reverse Judge Rakoff's rulings in other cases currently being briefed on the applicable statute of limitations under the safe harbor, and then succeed on his claim that the Funds and the Merkin Defendants were willfully blind to Madoff's fraud.  The Trustee will not succeed on either issue.  But even ignoring reality and assuming that he could, the current recovery levels alone still compel the conclusion that there will not be any substantial judgment against Ascot that the Trustee could recover from the Merkin Defendants, under any theory.  Ascot withdrew a total of $461 million from its Madoff accounts in the six years prior to Madoff's confession and the filing of the Madoff SIPA proceeding.  Thus, in the event the Trustee somehow prevails on the six-year claims, Ascot would owe a total of $461 million, but would then have a claim for at least $687 million ($226 million

minimum net equity claim plus $461 million 502(h) claim) that would be worth *at least* $453 million ($687 million x 0.66), leaving no more than a theoretically possible shortfall of $8 million for the Trustee to seek to recover from the Merkin Defendants.[16]  Of course, if Ascot were unable to make the upfront payment in that circumstance, the Madoff estate would be better off because it would not have to pay out the greater amount -- and therefore cannot be irreparably harmed by Ascot's potential cash shortage.

Tellingly, the Trustee did not even respond to, much less dispute, these calculations before the District Court.  Instead, the Trustee argued below that the Funds may never receive any payment from the Madoff estate because (i) the Trustee might decide that they do not deserve to receive the "benefits of customer status" and (ii) they may first be required to pay in full dollars any judgment against them before then being repaid at least 66% of those amounts and their net loss on their claims.

The Trustee has abandoned those baseless arguments on appeal.  SIPC, on the other hand, contends that the Trustee may still decide to reject the

---

[16]     Not even the Trustee suggests that the Merkin Defendants could not pay an $8 million shortfall.  Hence, even if this Court reversed Judge Rakoff's well-reasoned denial of the preliminary injunction motion, this relatively small, wholly hypothetical shortfall hardly justifies the drastic remedy of enjoining consummation of the entire state-court approved Settlement.

Funds' customer claims on the basis that the Funds supposedly are not

"innocent investors," citing *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d

Cir. 1974).  SIPC Br. at 41.  But *Packer, Wilbur* does not give the Trustee

the power to reject a claim simply because he does not like the customer or

believes it undeserving of customer status.  Rather, in that case, this Court

held that a brokerage firm was not entitled to customer status because

SIPA's protection for customers generally did not extend to other broker-

dealers, and the brokerage could not qualify for one of the exceptions

because in the transaction at issue it was assisting its customer with violating

margin regulations and the anti-fraud provisions of the securities laws.  *See*

*id.* at 984-85.[17]

---

[17]     The other cases cited by the Trustee and SIPC below, but not in their opening
briefs, are likewise inapposite.  *SEC v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir.
1974), involved an individual who did not have an account with a broker yet
provided a short term loan of securities to attempt to enable the broker to alleviate
a cash bind was a customer under SIPA.  This Court rejected the lender's
contention that it could fit within a broad, literal definition of "customer" because
it was obvious that the loaned securities were never intended to be used for an
investment, trading or securities transaction.  *See id.* at 284.  Similarly, in *SEC v.
N. Am. Planning Corp.*, No. 72 Civ. 3158, 1975 WL 346 (S.D.N.Y. Jan. 24, 1975),
the District Court held that the investor was not entitled to a customer claim for
the fictitious profits he would have earned on an illegal trade that was cancelled
because it violated the margin rules in Regulation T or on another transaction that
he knew contained resale restrictions designed artificially to inflate the stock price.
*See id.* at *2-3.  And in *Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
277 B.R. 520 (Bankr. S.D.N.Y. 2002), the customer claim was denied for the
same reason -- he was the single largest beneficiary of fraudulent trading that led
to the demise of both Hanover & Company (the introducing broker) and Adler,

There is no dispute that the Funds are all substantial net losers as a result of the Madoff fraud.  Once the underlying avoidance action is resolved, and any judgment paid -- in the unlikely event the Trustee prevails on his fanciful claims -- the Trustee cannot deny Ascot's customer claim for its net loss.[18]  At that time, Ascot will have more than sufficient funds to pay any judgment because it will ultimately receive at least 66% of its net loss claim plus at least 66% of any amount it actually pays on the Trustee's fraudulent conveyance claims in the underlying litigation.  While it is certainly routine and would be most efficient to net any amounts due to the Funds (at whatever the final payout on the allowed claims is) and any judgment in

Coleman Clearing Corp. (the clearing broker), and he had withdrawn more from his account than he invested.  *See id.* at 529, 547, 563.  In other words, the customer in *Adler, Coleman* was a "net winner" in the terminology used in the Madoff SIPA proceeding.

[18]   The Trustee suggested in the District Court, without any citation to authority, that he may seek to equitably subordinate Ascot's claim.  But the Trustee knows that equitable subordination is not available against a non-insider who has repaid a fraudulent conveyance claim because "in that event, the estate will have been made whole, and will not be entitled to the additional remedy of equitable subordination."  *In re Dreier LLP*, 453 B.R. 499, 517 (Bankr. S.D.N.Y. 2011).  And even if it were available, an equitable subordination claim would require the Trustee to prove, at a minimum, that the Merkin Defendants and the Funds were active participants in Madoff's fraud.  *See, e.g.*, *Vargas Realty Enters., Inc. v. CFA W. 111 St., L.L.C.*, 440 B.R. 224, 241 (S.D.N.Y. 2010) ("In the case of non-insider creditors, unless the claimant controls the debtor, and exercises that control to gain an unfair advantage, the proponent of equitable subordination must show wrongful conduct involving fraud, illegality or some other breach of a legally recognized duty." (internal quotation marks omitted)).  In four years of litigation, not even the Trustee has made that allegation.

favor of the Trustee, and have just one net payment made, requiring Ascot to pay any judgment before the Trustee pays a greater amount (or at a minimum nearly identical amount) to Ascot would not create an insurmountable hurdle.  Given the amounts involved, there can be little dispute that Ascot could arrange very short term financing, secured by its Madoff claims, to enable it to pay any such judgment and obtain tens of millions of dollars more than that amount in distributions on its claims.  In any event, the Trustee would benefit, not be harmed, in the event Ascot was unable to do so, since he would then withhold in distributions far more than the value of his judgment (even if he somehow succeeded on his six-year claims, his maximum potential damages are $8 million).

Faced with these facts, the District Court correctly concluded that "the Trustee has failed to show that the estate's fraudulent transfer claims would be unable to be satisfied if the settlement goes forward."  (SPA-22.)  *A fortiori*, the District Court did not abuse its discretion in denying the dilatory motion for an injunction on this basis also.

C.    The Balance Of Harms And The Public Interest Tip
      Against Granting An Injunction Under Section 105

Finally, the evidence before the District Court showed that the balance of the harms and the public interest weighed decidedly against the granting

of an injunction.  The Trustee faces no irreparable harm if the Settlement is not enjoined because his claims against the Merkin Defendants boil down to claims for money damages.[19]  Tr. Br. at 35-36.  A preliminary injunction cannot issue where the money damages are adequate compensation.  *Jackson Dairy*, 596 F.2d at 72.  Moreover, any judgment the Trustee may win in the Avoidance Action, however unlikely, is highly likely to be satisfied.  The Trustee, therefore, failed to demonstrate the requisite irreparable harm entitling him to preliminary injunctive relief.  *See, e.g., Hudson Tire Mart, Inc.*, 518 F.2d at 675 (noting that "the absence of a showing of irreparable harm which cannot be adequately redressed by a monetary award, should the appellant ultimately prevail, is a further ground for denying injunctive relief").

By contrast, the harm to the Defendants in this action as well as many non-parties will be great if the Settlement was enjoined.  In particular, the Defendants have spent years litigating the NYAG Action and negotiating the

---

[19]    There is no merit to the Trustee's contention that the Settlement is unfair to Madoff's customers because it would allow investors in the Funds a potential double recovery, once in the SIPA proceeding and once through the Settlement, not available to Madoff's customers, for at least two reasons.  First, the Trustee has already denied customer claims of investors in the Funds because they were not direct customers of Madoff.  Second, the Settlement resolves claims that belong only to the investors, the NYAG, and the Receivers, and not to the Trustee.

terms of the Settlement and obtaining state court approval.  That Settlement provides significant monetary relief to investors in the Funds who choose to participate, in exchange for which those participating investors must provide the Merkin Defendants with full releases of any and all claims those investors may have against the Merkin Defendants concerning their investments in the Funds.  If the Settlement was enjoined, millions of dollars spent by the NYAG, the Receivers and the Merkin Defendants litigating the NYAG Action and negotiating the Settlement would have been wasted. Enjoining the Settlement would also directly interfere with the considered judgment and approval of the state court judge.  *See Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2375 (2011) ("Indeed, any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed."  (internal quotation marks omitted)).  In addition, investors in the Funds who otherwise would participate in the Settlement may well have tried to bring separate claims of their own, which would require substantial additional time and expense to be spent by the Merkin Defendants, those investors and various courts and arbitrators litigating claims that absent an injunction would have been settled.

In these circumstances, there can be no doubt the balance of harms tipped

decidedly against granting the injunction.

Furthermore, the public interest in encouraging settlements in general

and completing the Settlement in particular outweighed any public interest

in protecting the Trustee's ability, pre-judgment, to freeze Merkin's assets to

be available in the virtually nonexistent chance that the Trustee somehow

succeeds years from now on his fraudulent transfer claims against the Funds,

the Funds are unable to satisfy any such judgment themselves, and Merkin's

remaining assets are insufficient.  *See, e.g.*, *Bano v. Union Carbide Corp.*,

273 F.3d 120, 129 (2d Cir. 2001) ("[I]t is axiomatic that the law encourages

settlement of disputes."); *Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*, 902

F.2d 185, 190 (2d Cir. 1990) ("Courts are wary of disturbing settlements,

because they represent compromise and conservation of judicial resources,

two concepts highly regarded in American jurisprudence.").  The public

interest in the Settlement was particularly acute here, where the vast

majority of the funds to be paid by the Merkin Defendants pursuant to the

Settlement will go to investors in the Funds, who have been denied any

recovery by the Trustee from the Madoff estate because they were not direct

customers of Madoff.  *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 454

B.R. 285 (Bankr. S.D.N.Y. 2011) (concluding investors in feeder funds that invested with BLMIS are not customers for SIPA purposes and thereby ineligible to recover individual payments from SIPC). Hence, the balance of harms and the public interest also supported the denial of the Trustee's motion.

## Conclusion

For the foregoing reasons, the Merkin Defendants respectfully request that the Court affirm the District Court's denial of the Trustee's motion for a preliminary injunction and dismissal of the Trustee's action.

Dated:    New York, New York
          July 19, 2013

Respectfully submitted,

**DECHERT LLP**

By:    /s/ Neil A. Steiner_____
       Andrew J. Levander
       Neil A. Steiner
       1095 Avenue of the Americas
       New York, New York 10036
       Telephone: (212) 698-3500
       Facsimile: (212) 698-3599

*Attorneys for Defendants J. Ezra Merkin and Gabriel Capital Corporation*

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 12,262 words, inclusive of headings, footnotes, and quotations, and exclusive of those portions of the brief identified in Rule 32(a)(7)(B)(iii) and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: New York, New York
      July 19, 2013

                DECHERT LLP

                By:  /s/ Neil A. Steiner_____
                      Andrew J. Levander
                      Neil A. Steiner
                1095 Avenue of the Americas
                New York, New York 10036
                (212) 698-3500

                *Attorneys for Defendants-Appellees*
                *J. Ezra Merkin and Gabriel Capital*
                *Corporation*